**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DG Gas, LLC, DG Cordelle, LLC, and DG Real Estate Partners, LLC,   ) ) ) | |
| Plaintiffs,   ) ) | Case No.: |
| vs.   ) ) | |
| TA Franchise Systems LLC and TA Operating LLC,   ) ) | |
| Defendants.   ) | |

## COMPLAINT

Plaintiffs DG Gas, LLC, DG Cordelle, LLC, and DG Real Estate Partners, LLC, complain of Defendants TA Franchise Systems LLC and TA Operating LLC as follows:

## NATURE OF PLAINTIFFS' CLAIMS

1.     This dispute arises from a franchisor's improper solicitation and termination of a franchise agreement and a large commercial relationship involving dozens of truck stops worth more than $26,000,000 each.

2.     Two veterans of the construction and franchise industries, Matt Dahlhauser and Stephen Galbraith, were approached on November 13, 2019, by representatives of TravelCenters of America about the possibility of becoming a franchisee operating a "TA Express Center," which is a smaller, more limited version of the TA Center truck stop franchise that TravelCenters of America operates nationwide through corporate-owned stores and stores franchised by its affiliate, Defendant TA Franchise Systems LLC.

3.     Mr. Dahlhauser and Mr. Galbraith were solicited to buy land in Cordele, Georgia from TravelCenters of America and open a series of ground-up developments of TA Express Centers.

4.     TravelCenters of America also encouraged and approved Mr. Dahlhauser's and Mr. Galbraith's plans as to a half-dozen other properties they expected to become TA Express Centers, including one existing truck stop in Maysville, Kentucky.

5.     Through a limited liability company named DG Gas, LLC ("DG Gas") and some corporate affiliates, Mr. Dahlhauser and Mr. Galbraith invested several million dollars acquiring and preparing to develop an existing truck center and several greenfield sites in different states for the construction of TA Express Center truck centers.

6.     DG Gas made solid progress in developing new franchises for TravelCenters of America. It borrowed money; bought land; bought an operating truck stop; hired and funded the work of consultants, architects, general contractors, and various trades; secured government permits and approvals; and otherwise prepared to commence business as a leading TravelCenters of America franchisee with truck stops in several different states, including Georgia, Arkansas, and Kentucky.

7.     Immediately after signing its franchise agreement in December 2021 with an affiliate of TravelCenters of America, Inc., known as TA Franchise Systems, LLC (individually and together with TravelCenters of America, Inc., "TA"), and buying land through affiliates named DG Cordele, LLC and DG Real Estate Partners, LLC from an affiliate of TA named TA Operating, LLC ("TA Operating"), DG Gas discovered that the TA Express Center franchise concept was not fully developed.

8.     Despite selling a franchise to DG Gas, TA was not prepared to provide specifications and design requirements to DG Gas for its TA Express Center concept, which was a new franchising concept that TA's CEO touted as critical to its network expansion strategy.

9. The challenge was that, unbeknownst to DG Gas, TA had never had a franchisee develop a TA Express Center from the ground-up. The franchise was populated entirely with conversions of existing truck stops and corporate-owned stores, each of which had unique characteristics.

10. Nevertheless, DG Gas kept pressing forward toward opening the first of the 25 TA Express Centers that it planned to open. DG Gas borrowed millions of dollars, hired consultants, conducted multiple studies, bought a truck stop, and even started construction activity in Cordele, Georgia based on the specifications and plans that TA developed in the first six months of 2022 for use with a corporate-owned TA Express Center it was building in Walton, Kentucky. The Walton store, which did not open until February 2024, was held out by TA as "the prototype" that DG Gas could build toward. DG Gas was delayed by TA's inability to articulate its specifications, but DG Gas and TA worked through the situation.

11. As progress was being made toward constructing a TA Express Center in Cordele, Georgia, TA approached DG Gas in December 2022 about TA's insistence that DG Gas be permitted additional time to open its store in Cordele. DG Gas appreciated the foresight and accommodation and kept working with TA, which kept approving DG Gas's plans for new sites and directing DG Gas to consider other locations for additional franchises.

12. In a complete surprise to DG Gas, TravelCenters of America announced in February 2022 that it was going to be acquired as a going concern by an affiliate of the global oil and gas company commonly known as British Petroleum or BP. As a result, TravelCenters of America (and its affiliates) would cease being an independent, publicly traded company.

13. At that time, DG Gas and TA were ready to sign more franchise agreements, but TA advised DG Gas that its new owners planned to change the Franchise Disclosure Document

and the Franchise Agreement. So, DG Gas merely hosted TA executives, including Steve Hunt and William Lynn, at site visits for new projects and waited for TA to submit updated disclosure and contract documents.

14.    The BP acquisition closed and suddenly, and without warning, DG Gas received a letter from TA purporting to terminate DG Gas's franchise agreement. DG also received a cryptic email stating that it would not move forward with respect to any of the jointly planned sites DG Gas and TA were working together to develop.

15.    DG Gas was given a pretextual reason for the termination of its franchise agreement. DG Gas was told it was untimely in its store opening despite being told months earlier by TA that the store opening deadline was no longer appropriate. TA then refused to provide an explanation for its decision to cease doing business with DG Gas with respect to the six other approved truck centers that DG Gas was establishing.

16.    TA subsequently refused to buy back the site in Cordele, Georgia that it had previously sold to DG Gas, and announced that it entered into a franchise agreement with a different franchisee within the territory previously promised to DG Gas near Cordele, Georgia.

17.    This sudden termination and refusal to do business with DG Gas left DG Gas with millions in unrecoverable development costs, an unbranded truck stop incurring substantial monthly losses, and disappointed expectations that were created by the franchise disclosure document and franchise agreements prepared by TravelCenters of America.

18.    In addition, DG Gas was stuck with a worthless piece of land in Cordele, Georgia that TA foisted onto DG Gas as part of a ten-year franchise agreement. The property TA sold to DG Gas contains a deed restriction that prevents usage of the land for 15 years as anything but a TravelCenters of America-branded truck stop. That type of usage is now impossible because of

the improper termination of DG Gas's franchise agreement. DG Gas cannot even sell the land because TA subsequently entered into a franchise agreement for a truck stop about forty miles south of Cordele on I-75.

19.     Although TA had both a right to purchase and right of first refusal for the land it sold to DG Gas in Cordele, Georgia, TA refused to exercise either of its rights. Thus, DG Gas is stuck with ownership of an expensive but worthless piece of land with an anticompetitive deed restriction with a duration that is 15 times the duration of the restrictive covenants in the FA.

20.     This action seeks, among other things, injunctive relief prohibiting enforcement of an unconscionable 15-year restrictive covenant and to recover the substantial damages caused by TA's fraudulent inducement of DG Gas, breach of its obligations in the underlying agreements, improper contract termination, and unlawful refusal to continue the jointly-planned truck center projects that TA asked DG Gas to pursue.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because the claims arise under federal statutes and the U.S. Constitution. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties. This court also has supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Ohio. In addition, the parties entered into an agreement that contains an exclusive venue provision mandating certain claims be asserted in courts located in Westlake, Ohio.

## PARTIES

23.     Plaintiff DG Gas, LLC is a limited liability company registered in Georgia with its principal place of business at 1000 Johnson Ferry Rd. B250, Marietta, GA 30068. DG Gas has two members: (1) Dahlco LLC, which is a single-member limited liability company with Matt Dahlhauser, a Georgia citizen, as the sole member, and (2) Goal Line Properties, Inc., which is a single-member limited liability company with Stephen Galbraith, a Georgia citizen, as the sole member. DG Gas is in the business of developing and operating truck centers, which are often referred to as truck stops, as well as other commercial real estate-related businesses.

24.     Plaintiff DG Cordele, LLC ("DG Cordele") is a limited liability company registered in Georgia with its principal place of business at 1000 Johnson Ferry Rd. B250, Marietta, GA 30068. DG Cordele has one member, DG Real Estate Partners, LLC, which is a limited liability company registered in Georgia with its principal place of business at 1000 Johnson Ferry Rd. B250, Marietta, GA 30068 with two members: (1) Matt Dahlhauser, a Georgia citizen, and (2) Stephen Galbraith, a Georgia citizen. DG Cordele is in the real estate business.

25.     Plaintiff DG Real Estate Partners, LLC ("DG Real Estate Partners") is a limited liability company registered in Georgia with its principal place of business at 1000 Johnson Ferry Rd. B250, Marietta, GA 30068 and two members: (1) Matt Dahlhauser, a Georgia citizen, and (2) Stephen Galbraith, a Georgia citizen. DG Real Estate Partners is in the real estate business.

26.     Defendant TA Franchise Systems LLC ("TA"), is a Delaware limited liability company, with its principal place of business at 24601 Center Ridge Road, Westlake, Ohio 44145-5634 and one member, TravelCenters of America Inc., which is a Maryland company with its principal place of business at 24601 Center Ridge Road, Westlake, Ohio 44145-5634. TravelCenters of America Inc. was an independent company whose stock traded on the NASDAQ stock exchange under the ticker symbol TA until May 15, 2023, when it was acquired by BP

Products North America, Inc. ("BP Products"), which is a Maryland corporation with its principal place of business in Texas at 501 Westlake Park Blvd, Houston, TX 77079. BP Products explores, develops, refines, and markets oil and natural gas.

27.     Defendant TA Operating LLC ("TA Operating") is a Delaware limited liability company, with its principal place of business at 24601 Center Ridge Road, Westlake, Ohio 44145-5634 and one member, TravelCenters of America Inc., which is a Maryland company with its principal place of business at 24601 Center Ridge Road, Westlake, Ohio 44145-5634.

## BACKGROUND FACTS

**I.     TA Induced DG Gas to Shift from Building Truck Centers to Becoming a TA Franchisee that Builds and Operates TA-Branded Truck Centers.**

28.     Matt Dahlhauser and Stephen Galbraith, the principals of DG Gas, have a long history of successfully building, developing, and operating commercial properties and franchisees in multiple states in and around the State of Georgia.

29.     Through one of their businesses, Mr. Dahlhauser and Mr. Galbraith constructed a truck center in West Point, Georgia, which became a TA franchisee in early 2020 during the construction phase of the project.

30.     At the time, TA was the largest publicly traded full-service travel center network in the country. At the time, TA had more than 250 travel centers in over 40 states. A TA branded truck stop such as a TA Center typically offers diesel and gasoline fuel, truck maintenance and repair, full-service and quick-service restaurants, travel stores, and truck parking.

31.     Following the success of the West Point, Georgia project, certain TA executives, including William Lynn, approached the principals of DG Gas and suggested that DG Gas become a TA franchisee. TA executives described the financial opportunity of becoming a TA franchise in favorable terms and provided DG Gas with information about how to become a TA franchisee.

32.     TA executives, including William Lynn and Steve Hunt, suggested that DG Gas consider building TA Express Centers in multiple cities including Fulton, Kentucky, Harrisonburg, Virginia, and Elmira, New York. TA Express Centers were characterized as being similar to the flagship TA Centers, but easier and less expensive to build and operate because they would require less space, offer more limited services, and provide fewer amenities, such as fewer fuel islands and shower stalls.

33.     The principals of DG Gas did not know, and TA misleadingly failed to disclose, that the TA Express Center concept had never been the subject of a franchise agreement with a ground-up developer.

34.     The principals of DG Gas worked with representatives of TA to identify potential locations for TA Express Centers in several states. They also discussed land that TA wanted to sell to DG Gas. They also discussed the parameters and requirements for DG Gas to become a TA franchisee. TA suggested that DG Gas pay for five franchises and referred DG Gas to a former TA employee DG Gas could hire to be an operational expert.

35.     DG Gas was enticed into becoming a TA franchisee through conversations with TA executives and through the review of certain documents, including several versions of a Franchise Disclosure Document ("FDD") provided by TA.

36.     An FDD is a document that is required by the Federal Trade Commission's ("FTC") "Franchise Rule." *See* 16 C.F.R. 436. The FTC regulates the marketing of franchises through various means including the Franchise Rule, which sets forth information about risks, costs, and potential benefits of entering into a franchise agreement.

37.     DG Gas relied on its conversations with TA executives and the FDDs it was provided by TA, including FDD's dated April 1, 2019;  April 26, 2021; and May 2, 2022. Copies of these FDDs are attached as Exhibits A-1, A-2, and A-3.

**II.     Relying on TA's Encouragement and Representations, DG Gas Pursued a Franchise in Cordele, Georgia and Multiple Other Sites.**

38.     TA advised DG Gas that TA owned a site at the intersection of I-75 and Georgia State Highway 300 in Cordele, GA. TA executives represented that the site was suitable for development from undeveloped land into a TA Express Center, which was one of the several truck center franchise types offered by TA at the time. TA agreed to sell, and DG Gas agreed to buy, the land for $1.25 million as part of a larger relationship involving DG Gas entering into a franchise agreement. DG Gas expressed interest in becoming a franchisee that develops ground-up TA Express Centers in January 2020.

39.     TA, however, advised DG Gas in February 2020 that, "the new CEO is looking to make some tweaks, so the design is not yet final."

40.     The parties kept talking and entered into both a contract to purchase land from TA for the site dated May 18, 2020, and a franchise agreement effective April 2, 2021.

41.     Specifically, an affiliate of TA named TA Operating LLC, and affiliates of DG Gas named DG Cordele, LLC and DG Real Estate Partners, LLC entered into agreements related to the Cordele site starting in May 2020. DG Real Estate Partners, LLC entered into a Purchase and Sale Agreement ("PSA") for the Cordele site dated May 18, 2020, with TA Operating LLC.

42.     Due to some issues with government approvals associated with the Cordele site, the PSA was amended five times and ultimately closed on December 3, 2021, with DG Cordele as the buyer. A copy of the Purchase and Sale Agreement and related amendments is attached as Exhibit B.

43.     TA provided DG Gas with a proposed franchise agreement related to the Cordele site as well. DG Gas sought changes in the proposed franchise agreement, but TA refused to modify its standard terms to reflect anything other than the unique attributes of the Cordele site and the unusual scenario where a franchisor sold land to a franchisee instead of leasing it, which is the norm for a franchisee that does not own the approved property.

44.     DG Gas first executed a franchise agreement with an effective date of April 2, 2021, but that agreement was terminated and replaced with a Franchise Agreement and Addendum dated as of December 3, 2021 ("Franchise Agreement" or "FA"). A copy of that Franchise Agreement and related Addendum is attached as Exhibit C.

45.     After the sale of the land closed and the FA was signed, a Limited Warranty Deed dated December 3, 2021 was recorded in the Crisp County recorder of deeds office in connection with the sale of the Cordele site. The Limited Warranty Deed is attached as Exhibit D.

46.     The Limited Warranty Deed contains a "Deed Restriction" that states:

Commencing on the Effective Date [December 3, 2021] and terminating on the fifteenth (15th) anniversary of the Effective Date, the Property shall be used solely for the operation of a TA®- or Petro®-branded travel center pursuant to and in accordance with a franchise agreement ("Franchise Agreement") entered into between (a) an affiliate of [TA Operating LLC], its successors and/or assigns ("Franchisor"), and (b) the then current owner of the fee interest in the Property or an affiliate thereof acceptable to Franchisor in Franchisor's sole and absolute discretion (the "Use Restriction").

47.     After acquiring the Cordele site from TA, DG Gas was officially welcomed by TA as a new TA Express Center franchisee. At that time, DG Gas reasonably anticipated developing a portfolio of TA Express Center properties worth more than $200,000,000, based upon projected financials from experts hired by DG Gas at TA's suggestion.

III.    **DG Gas Requests Specs and Other Guidelines for a TA Express Center Only to Find that TA had None.**

48.    Promptly after the "welcome" meeting, DG Gas requested information necessary to start its work on developing a TA Express Center in Cordele, Georgia. DG Gas needed civil engineering and construction specifications so that it could generate plans and drawings that would be filed with permit applications with the applicable local governmental authorities.

49.    Unfortunately, TA was unable to provide DG Gas with the necessary documents. TA's head of construction was unable to send documents to DG Gas setting forth the design, shape, spacing, materials, equipment and other specifications that were the mandatory elements of the new concept TA called a TA Express Center.

50.    After several weeks of inaction by TA, DG Gas reached out to senior executives of TA to complain about the lack of direction, rules, standards, and specifications. DG Gas was told by the head of construction for TA, Peter Ungaro, on December 16, 2021 and December 29, 2021, that TA did not have construction drawings that DG Gas could rely upon as it set out to build its TA Express Center.

51.    DG Gas was given some design documents in December 2021 and some documents developed in connection with a TA-owned development it was pursuing, but those documents were not a set of standards or specifications. DG Gas needed to prepare its plans for TA and governmental approval. Although Section 6.3 of the FA states that TA shall furnish DG Gas with "standards, specifications and operating procedures and methods utilized by TA Centers" through "Manuals, bulletins or other written materials," TA had no archetype for a TA Express Center. Unbeknownst to DG Gas before it entered into the FA and undisclosed by TA, there were no structural, mechanical, plumbing, or electrical engineering drawings. There were no civil engineering materials and no details on the mandatory exterior design elements.

52.     Unbeknownst to DG Gas, at the time that DG Gas signed the FA, TA had never had a franchisee develop a ground-up TA Express Center.

53.     Conversions of existing truck centers are very different from ground-up construction projects. A conversion requires TA to be flexible because truck centers come in all sizes and shapes with a wide variety of designs, measurements, equipment, and amenities. TA was flexible as to its procedures, policies, standards, and specifications as to conversions, which the FDD stated cost franchisees around $1,540,000 excluding real estate.

54.     A ground-up construction project, however, is very different. The FDD states it can require an investment of $26,690,000 excluding real estate costs. Also, a ground-up construction project requires far more time and, most importantly, *clear direction from the franchisor* as to what must be built in order to comply with the mandates of the "TA System," which is the cornerstone of the TA franchise agreement.

55.     TA's FDD described the TA Express Center franchise as being:

established and operated pursuant to TA Franchise's system [that is] characterized by [its or its] affiliates, collection of procedures, policies, standards, specifications, controls and other distinguishing elements, including distinctive signage, interior and exterior design, décor and color schemes, including as set forth in our plans ("the Development Plans"); recipes and menu items, uniform standards, specification and procedures for operation; quality and uniformity of products and services; training and assistance; and advertising, promotional, marketing and public relations programs . . . .

56.     The FDD went on to say that the "TA System and certain of its mandatory (and suggested) standards, specifications, and procedures (the TA System Standards") are set forth in [TA's] Confidential Operations Manual, as well as in other written materials." DG Gas had a contractual obligation to adhere to the TA System Standards.

57.     Unfortunately, there were no TA System Standards when it came to a TA Express Center. Although TA may have known a conversion when it saw one, there were no procedures, policies, standards, or specifications that governed the construction of a TA Express Center on the

-12-

Effective Date of the FA. DG Gas was not given construction, civil engineering, lighting, cement thickness, spacing requirements and many other standards in December 2021 because they did not yet exist.

58.     Instead, DG Gas was told to wait for the development of construction drawings that would be generated from a company-owned property in Walton, Kentucky that was under development at the same time.

59.     DG Gas did not know, and TA did not reveal, at the time of signing the FA that TA lacked the necessary specifications for a TA Express Center. DG Gas only knew that the FA repeated the FDD's assertions as representations. "We, our predecessors and our Affiliates have expended considerable time, skill and effort in developing the TA Centers TA Express Centers and the TA System." "TA System" was defined to mean, "A collection of procedures, policies, standards, specifications, and controls and other distinguishing elements for the establishment and operation" of a TA franchise. Section 6.3 of the FA stated that TA would provide these "standards" and "specifications" to DG Gas. Unbeknownst to DG Gas at that time, none of these representations were true and the promises could not be performed because TA was focused on converting existing truck stops, not providing standards and specifications to a ground-up developer.

60.     Unfortunately for DG Gas, adherence to the "TA System" was mandatory. Section 2.1 of the FA states, "In order to maintain the goodwill associated with the [trademarks, trade names and other commercial symbols used in the operations of a TA Express Center], all TA Centers must operate as part of our TA System in accordance with the Manuals and TA Systems Standards . . . ." Compliance with the standards and specifications established by TA was mandated by Section 7.2 and several other provisions of the FA.

-13-

61.     Thus, DG Gas was required by TA's conduct to delay the commencement of its construction in Cordele, Georgia to allow time for TA to develop a store in Walton, Kentucky that TA was holding out to be the "prototype" for a TA Express Center. DG Gas's ability to meet its opening deadline was thus delayed by a risk factor that TA controlled and never disclosed.

62.     Even then, DG Gas was operating at an unfair disadvantage. The Walton, Kentucky plans were merely exemplary plans that DG Gas was told could be viewed as a "prototype."

## IV.     Despite TA's Undeveloped TA Express Center Concept, TA Encourages DG Gas to Pursue Additional Franchise Opportunities.

63.     At the time DG Gas entered into the FA, and based upon TA's representations and omissions, DG Gas reasonably expected to become a large-scale TA franchisee. With encouragement from TA, and based on plans that the parties jointly developed, DG Gas purchased, or entered into purchase contracts for, other properties, including but not limited to: (i) Macon, GA; (ii) Bowman, SC; (iii) Silver Springs, NV; (iv) Van Buren, AK (purchase contract); and (v) Fulton, KY (purchase contract) (collectively, the "Additional Development Sites"), all with the intent to build and operate TA Express Centers at these Additional Development Sites. TA secured site approvals from TA and signed additional TA paperwork for several of these Additional Development Sites.

64.     In addition, DG Gas entered into a purchase contract for an operating truck center in Maysville, KY that it intended to rebrand to become a TA Express Center. TA representatives visited the site of this project in February 2023 and gave their approval for it to become a TA Express Center conversion.

65.     TA continued to encourage DG Gas through ongoing communications between the TA leadership team and DG Gas principals, the sharing of plans and financial projections, referral

of consultants, and continued negotiations over franchise agreements for the Additional Development Sites and the conversion site in Maysville, KY (collectively, the "Additional Sites").

66.     At that time, DG Gas did not know, and TA did not disclose, that the new TA CEO was aggressively pursuing a restructuring and turnaround plan.

67.     TA induced DG Gas to make an initial payment of $40,000 under the FA. DG Gas relied on TA's representations, and the disclosures made in the applicable FDD, to pursue this business opportunity. TA's termination of the FA deprived DG Gas of this business opportunity.

**V.      TA Approaches DG Gas About Extending the Opening of the Cordele, GA Site and Establishes a Course of Performance of Flexibility.**

68.     Despite the challenges created by TA's immature TA Express Center business, DG Gas continued to follow the necessary steps to develop the Cordele, Georgia site. DG Gas secured financing, secured permits, conducted traffic and market studies, hired a general contractor, worked to mitigate soil erosion, and erected fencing. DG Gas secured a building permit for the Cordele property on October 5, 2022.

69.     During this construction process, TA approached DG Gas to discuss the timing of opening the TA Express Center in Cordele.

70.     On December 16, 2022, TA emailed DG to state that DG Gas will not meet its opening deadline and therefore will need an extension of that deadline. DG Gas was told that TA and DG Gas "must devise a reasonable opening date and stick to it" because TA did not want to see DG Gas be "penalized" for missing any deadlines. TA's Pete Ungaro, Franchise Construction Supervisor, promise to "get with Arthur" to discuss this and promised to get back to DG Gas about the precise date that would be the new opening deadline for DG Gas. He estimated the new deadline would need to be no earlier than April 2024.

71.     TA thus recognized that, through no fault of DG Gas, DG Gas's opening date obligation in the FA was no longer possible and that the parties needed to pick a date on or after April 2024 for an opening obligation to avoid financial penalties for tardiness. Due to substantial personnel changes at TA that affected Arthur's position around the time of the sale of the company in the first quarter of 2023, the extended opening date that both companies knew and agreed was necessary was never identified with precision.

72.     The "opening deadline" in the FA was always questionable. At the time that DG Gas signed the FDD and the FA, TA had never had a franchisee open a ground-up development of a TA Express Center. Nevertheless, TA published an FDD stating that the "typical" length of time between the signing of an FA and the opening of a ground-up franchise was, in fact, 18 months. TA's 300th store, which opened in Walton, Kentucky in February 2024, took over three years to develop from a green field to an operating truck stop. And, it was the "prototype" that DG Gas was told to follow.

73.     DG Gas knows of no history by TA of enforcing any opening day deadline through termination of a franchise agreement. Indeed, TA failed to enforce any right to terminate based on any opening day deadline with at least one franchisee in Littlefield, Colorado.

## VI.    Without Warning, TA Abruptly Terminates the Franchise Agreement and Advises DG Gas that TA Will Not Do Any Further Business with DG Gas.

74.     Between December 2022 when TA and DG Gas discussed the need to adjust the Opening Deadline and the summer of 2023, TA knew that DG Gas continued to invest time and money into developing the site in Cordele, GA, and pursue additional sites that TA directed DG Gas to investigate as possible franchise locations.

75.     During this period, no one from TA mentioned the store opening deadline in the FA to DG Gas.

76.     On December 13, 2022, BP announced a bid to acquire all outstanding shares of TA. Although another company made a higher offer, TA's Board of Directors unanimously recommended TA's shareholders support the proposed sale of the company's stock to BP. TA shareholders approved the sale of the company, and the transaction closed on or about May 15, 2023. On that day, TA became a wholly-owned indirect subsidiary of the global oil and gas company commonly known as BP.

77.     Approximately four weeks later, and without warning or explanation, TA's counsel sent a letter dated June 16, 2023 captioned, "Notice of Default and Termination." A copy of the letter is attached as Exhibit E.

78.     The letter purported to terminate the FA based on an alleged failure to comply with the FA's store opening deadline. Without any prior notice or an opportunity to cure, TA declared the FA, which has a ten-year term, to be terminated based on failure to meet a deadline that TA had previously confirmed was no longer controlling.

79.     The letter from TA's counsel was not preceded by any warning. The letter provided no opportunity to cure the supposed default. The letter did not propose any path forward for the parties' relationship or offer to remove the deed restrictions on the Cordele site that encumbered the land. It did not mention the six other sites that the parties were working collaboratively toward building out into TA Express Centers.

80.     When DG Gas's principals reached out to TA, they were told that TA did not merely terminate the Franchise Agreement. Without any explanation, a TA executive sent a curt email that TA was also refusing to move forward with any of DG Gas's planned projects. *See* email dated July 11, 2023 attached as Exhibit F.

-17-

81.     When asked to explain why TA was ending its business relationship with DG Gas, TA refused to explain its decision. To this day, DG Gas does not know why the newly-acquired TA refused to move forward with the Additional Sites, including DG Gas's conversion project in Maysville, which was capable of being converted to a TA Express Center within a matter of weeks.

82.     At the time it received the termination letter, DG Gas was deeply engaged in developing travel centers that it reasonably expected to be worth more than $200,000,000, based upon projected financials from experts DG hired at TA's suggestion. DG Gas undertook its efforts in reliance on the actions of TA's executives, the FDDs it signed, and the FA. Indeed, between the FDD that TA provided to DG Gas in 2020 and the purported termination of the Franchise Agreement in 2023, TA added detail to its FDDs regarding how construction is a factor that may affect a franchisee's ability to meet a contractual opening obligation. TA also added a disclosure that an extension fee for violating an opening deadline may need to be paid.

83.     TA, however, never added disclosures that land sold in conjunction with a franchise agreement may become worthless because of anti-competitive deed restrictions required by TA as a condition precedent to becoming a franchisee.  TA similarly never added disclosures that its own inability to timely provide standards for civil engineering and construction of a ground-up development are risk factors that will affect the ability of a franchisee to meet its store opening obligations.

## VII.    TA's Misrepresentations

84.    The 2022 FDD contains multiple statements indicating that the opening deadline

obligation is an obligation that could be extended with or without payment of an extension fee.

For example, it states:

> Time to Open
>
> The typical length of time between the signing of the Franchise Agreement or the first
> payment for the franchise, and the opening of your business, is approximately 18 months
> after signing the Franchise Agreement for franchisees who are building their facility, and 6
> months for franchisees who are converting an existing operation to a TA Express Center.
> Training availability, the number of other franchise openings, weather and construction all
> may affect this time line. Additionally, over the past year we have seen COVID and supply
> chain related issues delay construction by an additional 6 to 12 months in some
> circumstances. We may, in our sole discretion, agree to extend your opening date by
> providing written confirmation of the extension to you and we may require you to pay an
> extension fee in connection therewith.

2022 FDD at Item 6.

and

> You agree to open the TA Express Center for business within 6 months following the
> Agreement Date. If constructing a new TA Express Center on a site you or your Affiliates
> are purchasing, then you have 18 months to open the TA Express Center for business
> following the Agreement Date. We may, in our sole discretion, agree to extend your
> opening deadline by providing written confirmation of the extension to you and we may
> require you to pay an extension fee in connection therewith.

2022 FDD at Section 5.2.

85.    The FA states in Section 5.1(a) that DG Gas was obligated to adhere to TA's

specifications and standards in its construction of the TA Express Center it planned in Cordele,

GA. The FA states that DG is "obligated at your expense to develop and equip the TA® Center in

accordance with all of our required plans, space plans, and specifications to suit the use, shape and

dimensions of the TA® Center ("Development Plans") and to ensure that such Development Plans

and specifications comply with applicable ordinances, codes and permit requirements, and

TA® System Standards."

-19-

86.     The FA states in Section 5.2(b) that DG Gas was required to wait for TA to establish "Development Plans." Specifically, the FA states: "We may make changes to the Development Plans that we specify from time to time during the development of the TA® Center. You and your respective vendors and service providers must not begin development, remodeling or otherwise construct the TA® Center until we have approved the Development Plans."

87.     Thus, TA made a number of representations and omissions ("Representations") in the FDD on which DG Gas relied, including:

- TA has "required plans, space plans, and specifications to suit the use, shape and dimensions of" a TA Express Center ("Development Plans") (2021 FDD at Ex. E, sections 5.1(a) and 11.1 and at Items 1 and 8);

- TA "has expended considerable time, skill and effort in developing the TA Express Centers and the TA System," which includes "a collection of procedures, policies, standards, specifications, controls and other distinguishing elements for the establishment and operation of TA Express Centers." (2021 FDD at Ex. E, sections 2.1 and 1 and at Item 1);

- that the "typical" length of time for a ground-up development of a TA Express Center franchise is 18 months (2021 FDD at Item 11 and at Ex. E, section 5.2);

- the omission of a disclosure that TA lacked Development Plans and procedures, policies, standards, specifications, and other key details concerning TA Express Centers.

88.     These Representations were made to mislead DG Gas into believing the following false matters (the "False Matters"):

- that TA possessed a fully-articulated vision for TA Express Centers;

- that TA had Development Plans for TA Express Centers;

- that TA would treat any delay caused by its modification of any Development Plans as a justified reason for delaying the beginning of development of its TA Express Center;

- that TA had expended considerable time, skill and effort in developing the TA Express Centers, which included creation of a collection of specifications for the construction of TA Express Centers;

-20-

- that TA considered DG Gas to be a suitable franchisee, the Additional Sites to be suitable sites, and that TA considered the Additional Sites to be desirable for a TA Express Center;

- that the "typical" length of time for a ground-up development of a TA Express Center franchise is 18 months.

89.     TA failed to make multiple disclosures ("Omissions") in the FDDs it presented to DG Gas on at least five occasions in 2020, 2021, and 2022, including:

- that TA considered a delayed opening by a franchisee as a justification for refusing to do business with that franchisee on any other matters;

- that TA lacked specifications, procedures, and systems related to the ground-up construction of a TA Express Center;

- that the risk factors for the opening date included TA's own inability to provide construction documents and other required documentation needed to submit architectural plans for a building permit;

- that the risk factors for the opening date included lender's lack of interest in making construction loans or lack of ability to fund loans that required governmental appropriations.

**VIII.  DG Gas's Losses Are Substantial and Growing.**

90.     During the course of its status as a prospective and actual franchisee, DG Gas hired financial experts recommended by TA. These financial experts computed the expected costs and profits that DG Gas could expect in connection with its various projects with TA.

91.     Based on the FA, DG Gas expected to have a franchise in Cordele, Georgia for at least a ten-year period. DG's lost profits for the Cordele site over the 10-year franchise period are at least $21,000,000.

92.     In addition, the real estate (including improvements) that DG Gas owned in Cordele, Georgia was expected to increase in value by $7,720,000 over this ten-year period.

93.     At the ten-year mark, DG Gas expected the operating business at its Cordele site to be worth an additional $8,000,000.

94.     The lost profits at the Additional Sites during this period are more than $190,000,000.

95.     DG Gas also expected the value of its real estate holdings at the Additional Sites to increase by more than $50,000,000 over the 10-year franchise period.

96.     In addition, DG Gas expected the operating businesses at the Additional Sites to increase in value by more than $76,000,000.

97.     Moreover, DG Gas was injured by the loss of the business opportunity presented by the Statesboro Site.

98.     Moreover, DG Gas's reputation has been injured as a result of TA's improper termination.

99.     DG Gas invested years of effort and millions of dollars only to be told that TA's decision that DG Gas deserves more time to open its store in Cordele, Georgia was meaningless. After many years of effort toward becoming a substantial TA franchisee, DG Gas is stuck with worthless land for which it paid TA $1,250,000.

100.    In addition, DG expended substantial resources and time pursuing projects on the Additional Sites, and other opportunities with TA, that could have instead been used to pursue projects and opportunities with other business partners.

101.    DG Gas will prove the precise amount of the damages caused by TA at trial, but those damages are currently estimated to be in excess of $300,000,000.

**IX.     The Deed Restriction Is Causing Irreparable Harm.**

102.    DG Gas is currently suffering and will continue to suffer irreparable harm because the restrictive covenant in its deed is preventing DG Gas from selling the Cordele site.

103.    As previously stated, the deed on the property at the Cordele site contains an unconscionable restriction that prevents usage of the land for 15 years as anything but a TravelCenters of America-branded truck stop. *See* Exhibit D ("Limited Warranty Deed").

104.    DG Gas is obligated to pay property taxes and a mortgage on the property, but it is prohibited from using or selling the property for a period of time that is 15 times longer than the restrictive covenants in the FA that were tailored to protect TA's business interests in the wake of a termination of the FA.

105.    TA has both an option to purchase the Cordele property and a right of first refusal under sections 16.8 and 19.5 of the FA, but it refused to invoke either or otherwise express interest in buying the property after its improper termination of the FA.

106.    DG Gas has no adequate remedy at law for the improper deed restrictions that TA refuses to waive.

## COUNT ONE
### Violation of the Petroleum Marketing Practices Act
### (Plaintiff DG Gas, LLC against Defendant TA Franchise Systems LLC)

107.    DG Gas repeats and realleges the prior paragraphs in this Complaint as if fully restated herein.

108.    The relationship between DG Gas and TA is a petroleum marketing "franchise relationship" governed by the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2806.

109.    TA, and its parent and affiliate companies in the BP system, is a "franchisor" and a refiner or distributor of motor fuel. 15 U.S.C. § 2801(3).

110.    DG Gas is a "franchisee", or a retailer or distributor of motor fuel, for purposes of PMPA. 15 U.S.C. § 2801(4).

111.    The Cordele site is a type of "marketing premises" as defined in the PMPA. 15 U.S.C. §§ 2801(8) and (9).

112.    Defendant franchisor's termination of the FA was unlawful under the PMPA for the many reasons including but not limited to those set forth, without limitation, in the following Paragraphs.

**Improper Notice**

113.    Pursuant to the PMPA, renewal or termination must be given to a franchisee "not less than 90 days prior to the date on which such termination or nonrenewal takes effect." 15 U.S.C. § 2804(a)(2). TA did not provide adequate notice because the termination letter was effective immediately and was not preceded by any warning.

114.    Moreover, TA is only permitted to terminate the FA within 120 days from the date when TA first acquired actual or constructive knowledge of DG Gas's alleged breach. 15 U.S.C. § 2802(b)(2)(A). TA knew of this alleged inability to meet the Opening Deadline in December 2022, but took no action prior to June 16, 2023.

**TA's Improper Termination Lacked a Proper Basis Per the PMPA**

115.    The PMPA prohibits any franchise termination that is based on an unreasonable or immaterial contractual obligation. 15 U.S.C. § 2802(b)(2)(A). Not only is the PMPA applicable to this relationship but it is also incorporated into the FA, and is "applicable law" that modifies the FA by its own terms. *See* Ex. B, § 21.1. The Opening Deadline is both unreasonable and immaterial because it imposes a timeline that has never been met before, was not "typical" in any way, was too short in the best of circumstances, was far too short under the actual circumstances, was not important to TA as demonstrated by TA's failure to enforce that provision with respect to any franchisee, including its franchisee in Littlefield, Colorado that failed to meet its opening deadline.

116.    In addition, terminations are prohibited under the PMPA if the cause of the alleged contractual breach is beyond the control of the franchisee, which it was in these circumstances due to TA's own dilatory actions in providing construction drawings that would allow DG Gas's architect to develop plans that could be submitted to governmental entities to secure the necessary building permits. In addition, the historically challenging lending environment in the spring of 2023 was not something that DG Gas could control.

117.    TA also admitted that the Opening Deadline is not a material term of the FA. TA's May 2022 FDD states that the opening date term was not material as it could be cured and extended through the payment of a simple fee. (*See* Ex A-4, p. 24 (TA retains discretion to "agree to extend your opening date by providing written confirmation of the extension to you and we may require you to pay an extension fee in connection therewith.")). TA never offered DG Gas the opportunity to cure or pay a fee to extend the opening deadline as represented by TA in the most recent FDD that it published.

118.    Accordingly, TA's purported termination was not "based upon" a ground permitted pursuant to the PMPA as required by 15 U.S.C. §§ 2802(b)(1)(B). TA's termination of the FA was thus unreasonable.  Even if DG Gas breached the FA, it was not a material breach justifying or permitting termination or nonrenewal in accordance with PMPA.

119.    TA violated the notice provision of PMPA by purporting to immediately terminate the Franchise Agreement. TA additionally failed to notify DG Gas or terminate the FA within 120 days after becoming aware of DG Gas's likely violation of the term or obligation of the FA, as set forth in the PMPA. *See* 15 U.S.C. § 2802(b)(2)(A).

120.    DG Gas has incurred damages from these violations of the PMPA in an amount to be proven at trial. In addition, DG Gas is entitled to punitive damages and any expert, attorneys', or other litigation fees incurred as a result of the need to enforce its rights pursuant to the PMPA.

121.    DG Gas has been irreparably harmed by the improper termination that prevents it from developing the Cordele site and thus respectfully requests this court permanently enjoin Defendant and all persons acting in concert therewith, from enforcing the deed restriction associated with the Cordele site.

## COUNT TWO
### Breach of the Franchise Agreement
### (Plaintiff DG Gas, LLC against Defendant TA Franchise Systems LLC)

122.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

123.    DG Gas and TA entered into the FA.

124.    DG Gas performed its obligations under the FA.

125.    TA repudiated the FA on June 16, 2023 when it improperly declared the FA to be terminated as a result of an alleged breach by DG Gas.

**TA Breached the FA Term Governing the Opening Deadline**

126.    TA had no right to terminate under the FA because the FA only imposes a duty to open a flagship TA Center by the Opening Deadline, not a TA Express Center. *See* Ex. B, § 5.2.

**In addition, the Opening Deadline was not a Material Contract Term**

127.    TA's May 2022 FDD states that the opening date term was not material as it could be cured and extended through the payment of a simple fee. TA never offered DG Gas the opportunity to cure or pay a fee to extend the opening deadline as represented by TA in the most recent FDD that it published. TA was thus not entitled to terminate the FA based on a contract term that was not material.

**TA's Violation of the PMPA Breached the FA**

128.    TA violated the PMPA when it improperly terminated the FA. (*See* Count I.)

129.    The PMPA is incorporated into the FA by reference. *See* Ex. B, § 21.1.

130.    Accordingly, TA's improper termination of the FA is a breach of the agreement.

**TA Waived or Ratified the Extension of the Opening Deadline**

131.    Moreover, TA waived or at least ratified an extension of the Opening Deadline through advising DG Gas in December 2022 that the Opening Deadline needed to be changed to at least April 2024.

132.    TA's own conduct also waived any Opening Deadline obligation. TA expressly recognized that the Opening Deadline was not enforceable and assigned the task of picking a replacement deadline to a TA employee that subsequently failed to pick a replacement deadline before he separated from TA.

**In Addition, A Force Majeure Event Occurred Which Extended the Opening Date**

133.    In any event, TA lacked the right to terminate the FA because the Opening Deadline was not even in June 2023. The FA extends the time to perform any obligation, including the Opening Deadline, when a delay is the result of a Force Majeure Event. *See* Exhibit B at § 21.3. A "Force Majeure Event" under the FA is an event caused by "government regulations or orders…natural disasters…or other acts or causes of a similar nature which are outside of your or our control." *Id.* § 1. Here, Force Majeure Events were triggered by both TA's own delays, discussed herein, and the delays caused by DG Gas's lender which delayed funding of DG Gas's construction loan because it needed to first receive funding through government appropriations, which are "other acts" that are similar in nature to a government regulation or order.

**Violation of the Implied Duty of Good Faith and Fair Dealing**

134.    DG Gas performed all or substantially all of its significant and material obligations under the contract or were excused from such performance because of TA's non-performance and violations of the FA set forth herein, including but not limited to TA's wrongful and improper purported termination of the FA. Additionally, all conditions required for TA's performance had occurred.

135.    The opening date for the Cordele, GA site was a matter of discretion and flexibility and a term that was not material to the FA. TA's own conduct and course of performance implied that it was flexible in enforcing this term that was expected to be, at worse, an exposure for penalties or additional fees.

136.    Without warning, TA abandoned this flexibility and purported to exercise its right to terminate the FA based on the strict enforcement of this discretionary and immaterial contract term, and in an arbitrary and capricious manner inconsistent with the parties' prior course of performance and conduct.

137.    TA's conduct shows a refusal to cooperate and an attempt to prevent DG Gas from receiving the fruits of its bargain. TA's wrongful and inconsistent conduct contradicts the parties' reasonable expectations.

138.    In sum, TA unfairly interfered with DG Gas's right to receive the benefits of the FA through TA's wrongful conduct, and by such conduct, TA further breached the FA and damaged DG Gas in an amount to be proven at trial.

**TA Breached Other Provisions of the FA**

139.     Section 6.3 of the FA states that TA shall furnish DG Gas with "standards, specifications and operating procedures and methods utilized by TA Centers" through "Manuals, bulletins or other written materials."

140.     However, TA had no archetype for a TA Express Center. Unbeknownst to DG Gas before it entered into the FA and undisclosed by TA, there were no structural, mechanical, plumbing, or electrical engineering drawings. There were no civil engineering materials and no details on the mandatory exterior design elements.

141.     Accordingly, TA breached this provision of the FA and through this breach caused delay to DG Gas's efforts to complete the project.

**Summary**

142.     As a result of these considerations, DG Gas never breached its contract with TA and thus TA's termination was improper under both the terms of the FA and the provisions of the PMPA, which are incorporated into the FA by reference.

143.     As a result of the breach of the FA by TA, DG Gas incurred damages in the form of lost profits on the planned TA Express Center in Cordele, lost gains on the real estate in Cordele, lost gains on the sale of the Cordele business at the conclusion of the ten-year term of the FA, and lost business opportunities. DG Gas also incurred damages from this alleged breach measured by its losses on the Additional Sites.

144.     DG Gas respectfully requests this court award it compensable and punitive damages in an amount to be proven at trial.

## COUNT THREE
### Fraudulent Inducement
### (All Plaintiffs against All Defendants)

145.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

146.    TA made a number of Representations in the FDDs on which DG Gas relied.

147.    These Representations were material to DG Gas's decision to enter into the FA, fund the development of the Cordele site, and pursue the Additional Sites through the acquisition of property, funding of vendors, payment of taxes, and other expenditures.

148.    These Representations were false when made.

149.    These Representations were made by TA with knowledge of the falseness of them or with utter disregard and recklessness as to the falseness of them.

150.    These Representations were made to mislead DG Gas into believing the False Matters.

151.    DG Gas's reliance on the Representations was justified because they were made in compliance with the FTC's Franchise Rule, which was adopted to ensure franchisors disclose information that will allow potential franchisees to make investment and risk decisions. These representations created a duty owed to DG Gas separate and apart from any duty owed to DG Gas as a result of any FA.

152.    As a result of DG Gas's reliance on TA's Representations, DG Gas entered into the FA, pursued development of the Cordele site, and pursued FAs and development of the Additional Sites. Moreover, DG Gas continued performing and pursuing development of the Additional Sites in reliance on the suggestion that the Opening Deadline for the Cordele, Georgia site was not a material term of the FA and was subject to extension for all of the reasons set forth herein. The amount of these damages will be proven at trial.

-30-

## COUNT FOUR
### Negligent Misrepresentation
### (All Plaintiffs against All Defendants)

153.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

154.    Among other falsehoods, TA made the Representations set forth herein on which DG Gas relied upon such that it came to believe the veracity of the False Matters.

155.    TA possessed no reasonable grounds to believe these Representations were true when made, and TA intended for DG Gas to rely on these misrepresentations.

156.    DG Gas reasonably relied on TA's Representations, and such reasonable reliance was a substantial factor in the harm and damages DG Gas suffered, to be proven at trial.

## COUNT FIVE
### Fraud
### (All Plaintiffs against All Defendants)

157.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

158.    TA failed to make multiple disclosures, i.e. the Omissions, in the FDDs it presented to DG Gas on at least five occasions in 2020, 2021, and 2022.

159.    TA had a duty to disclose the Omissions in the FDDs, which it had a legal duty to provide to prospective franchisees under the Franchise Rule.

160.    The Omissions were material to DG Gas's decision to invest millions of dollars in pursuit of developing TA Express Centers in Cordele and at the Additional Sites.

161.    TA published the FDDs and made the Omissions, knowing that doing so was deceptive, with the intent that DG Gas rely on the FDDs, including any omissions in those documents.

162.    DG Gas justifiably relied on the FDDs, including any omissions from those documents.

163.    DG Gas was harmed by its reliance on the Omissions.

164.    DG Gas respectfully requests this Court award compensatory and punitive damages in an amount to be proven at trial.

**COUNT SIX**
**Statutory Fraud (Ohio)**
**(All Plaintiffs against All Defendants)**

165.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

166.    Section 2913.01(B) of the Ohio Revised Code defines "defraud" as the act of knowingly obtaining, by deception, some benefit for oneself or another, or knowingly causing some detriment to another person by deception.

167.    By making the Representations and Omissions set forth herein, TA knowingly deceived DG Gas, which acted on the False Matters by expending substantial resources to enter into the FA, develop and plan the Cordele, GA site, and to pursue sites and specifications for the Additional Sites.

168.    DG Gas was harmed by its reliance on the Representations and Omissions.

169.    DG Gas respectfully requests this Court award compensatory and punitive damages in an amount to be proven at trial.

**COUNT SEVEN**
**Statutory Fraud (Georgia)**
**(All Plaintiffs against All Defendants)**

170.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

171.     Georgia law provides that fraud may be "actual" or "constructive."

172.     Actual fraud consists of any kind of artifice by which another is deceived. Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. *See* GA Code § 23-2-51.

173.     By making the Representations and Omissions set forth herein, TA knowingly deceived DG Gas, which acted on the False Matters by expending substantial resources to enter into the FA, develop and plan the Cordele, GA site, and to pursue sites and specifications for the Additional Sites.

174.     TA's conduct was contrary to its legal duties, in violation of the FA and federal law, and is contrary to good conscience.

175.     DG Gas was harmed and injured by its reliance on the Representations and Omissions.

176.     DG Gas respectfully requests this Court award compensatory damages in an amount to be proven at trial.

## COUNT EIGHT
### Promissory Estoppel
### (Plaintiff DG Gas, LLC against All Defendants)

177.     DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

178.     TA made several clear, unambiguous promises to DG Gas, including that DG Gas would get a discount on the franchise fee for each franchise it developed, and that DG Gas's Additional Sites were being pursued by suitable franchisees on suitable properties ("Promises").

179.     DG Gas reasonably and foreseeably relied on these Promises.

180.     DG Gas's reliance on TA's Promises has caused DG Gas to expend millions of dollars to purchase land, pay taxes, secure services from vendors, and otherwise get ready to develop the Cordele site and the Additional Sites.

181.     DG Gas's reliance on TA's Promises has caused DG Gas to incur substantial losses in an amount that will be proven at trial.

**COUNT NINE**
**Declaratory Judgment**
**(Plaintiff DG Gas, LLC against Defendant TA Franchise Systems LLC)**

182.     DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

183.     A real controversy exists between TA and DG Gas regarding the Cordele property deed restriction. TA apparently considers it binding and enforceable, and DG Gas considers it to be void as against public policy.

184.     The controversy between the parties is justiciable in the sense that this Court may enter an Order that can be domesticated in Georgia and registered with the County Recorder of Deeds enjoining enforcement of the restriction in the deed for the Cordele site.

185.     Prompt relief is essential to preserve DG Gas's ability to close the sale of the property before other franchisees or entrepreneurs open competitive truck centers near the Cordele site and the Additional Sites.

**COUNT TEN**
**Violation of the Ohio Business Opportunity Plan Act, O.R.C. § 1334.01 *et seq*. ("BOPA")**
**(All Plaintiffs against All Defendants)**

186.     DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

187.    DG Gas was advised by TA to do business with the owner of the Cordele, Georgia Site and other related vendors and parties for the purpose of purchasing the site and constructing and operating a TA truck stop.

188.    DG Gas made an initial payment of $40,000 for the purpose of pursuing a business opportunity in Cordele, Georgia in the nature of a TA truck stop.

189.    TA represented that DG Gas would earn a substantial profit in excess of this initial payment and that there would be a considerable market for the goods and services offered at said truck stop.

190.    DG Gas relied on these representations, as well as the disclosures and statements in the applicable FDD, other communications and materials provided by TA, and the Representations and Promises described herein.

191.    In conjunction with TA's wrongful termination of the FA in connection with the Cordele site, TA refused to do business with DG Gas with respect to the Additional Sites.

192.    TA's termination of the FA and refusal to pursue any of the Additional Sites deprived DG Gas of a substantial business opportunity.

193.    DG Gas's reliance on TA's Representations and Promises and TA's improper and abrupt termination of the FA relating to the Cordele, Georgia site has caused DG Gas to incur substantial losses in an amount that will be proven at trial.

### COUNT ELEVEN
**Breach of Oral Contract**
**(Plaintiff DG Gas, LLC against Defendant TA Franchise Systems LLC)**

194.    DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

195.    DG Gas and TA entered into oral contracts for some or all of the Additional Sites, whereby TA promised to authorize a franchise truck stop to be operating by DG Gas, and enter

into a franchise agreement with DG Gas, if DG Gas would purchase the Additional Site and/or develop and construct a truck stop on the site.

196. DG Gas performed its obligations under these oral contracts.

197. TA repudiated these oral contracts shortly after it repudiated the FA relating to the Cordele, Georgia site on June 16, 2023, when it improperly declared the FA to be terminated as a result of an alleged breach by DG Gas.

198. As a result of the breach of these oral contracts by TA, DG Gas incurred damages in the form of lost profits on the planned Additional Sites, lost gains on the real estate purchased for such sites as applicable, and lost gains on the sale of the applicable businesses at the conclusion of the expected ten-year term of the applicable potential franchise agreement.

199. DG Gas respectfully requests this court award it compensable damages in an amount to be proven at trial.

**COUNT TWELVE**
**Rescission or Reformation of the PSA**
**(Plaintiffs DG Cordelle LLC and DG Real Estate Partners against Defendant TA Franchise Systems LLC)**

200. DG Gas repeats and realleges the prior paragraphs of this Complaint as if fully restated herein.

201. The parties entered into the PSA to purchase the Cordele, Georgia site for the purpose of DG Gas operating a TA Express Center.

202. As alleged herein, TA made Representations and Omissions, on which DG Gas relied.

203. The PSA may thus be rescinded because of TA's material false statements in its FDDs and in other communications concerning the FA and the TA Express Center and Plaintiffs ability to develop the site.

204.    Defendants knowingly made material false statements and omissions as alleged herein.

205.    DG Gas now owns the Cordele, Georgia site but is not authorized to construct or operate a TA truck stop, nor conduct any other business on the site since it is subject to draconian and unreasonable deed restrictions. DG Gas continues to suffer harm by being unable to conduct business or sell the site.

206.    DG Gas respectfully requests that this Court enter an order rescinding the PSA and refunding to Plaintiffs the amounts spent by DG Gas purchasing the site from Defendants.

207.    Alternatively, DG Gas respectfully requests that this Court enter an order reforming, and/or equitably modifying the purchase and sale contract for the Cordele, Georgia site to remove the deed restrictions described therein.

## PRAYER FOR RELIEF

208.    DG Gas respectfully requests this Court enter an Order and Judgment granting the following relief:

a.    Permanently enjoining TA and all persons acting in concert therewith, from enforcing the deed restriction;

b.    Award DG Gas its compensatory damages in an amount to be proven at trial,

c.    Award DG Gas punitive damages in an amount to be proven at trial;

d.    Award DG Gas expenses incurred in connection with this Action, including attorneys' fees;

e.    Award DG Gas prejudgment interest,

f.    Award DG Gas costs of this action;

g. Rescind the purchase and sale contract for the Cordele site and/or reform, and/or equitably modify the purchase and sale contract and/or Deed for the Cordele site to remove the restrictions described therein; and

Enter any other and further relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, by and through undersigned counsel, hereby respectfully demands a trial by jury on all such claims that may be so tried.

DATED:  June 12, 2024         Respectfully Submitted,

/s/ *Hugh E. McKay*
Hugh E. McKay (0023017)
McDaniel M. Kelly (0097628)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Ave, Suite 500
Cleveland, Ohio 44113
216-443-9000/ Facsimile 216-443-9011
hmckay@porterwright.com
mkelly@porterwright.com

Ana P. Crawford (0090581)
PORTER WRIGHT MORRIS & ARTHUR LLP
250 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
513-369-4237/ Facsimile 513-421-0991
acrawford@porterwright.com

       AND

/s/ *Matthew T. Furton*
Matthew T. Furton (Pro Hac Vice Application forthcoming)
(mfurton@lockelord.com)
Mark Silverman (Pro Hac Vice Application forthcoming)
(mark.silverman@lockelord.com)
Michael Kind (Pro Hac Vice Application forthcoming)
(michael.kind@lockelord.com)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
312-443-0700

*Counsel for Plaintiffs*

-38-