IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

DG Gas, LLC, et al.,                          Case No.  1:24-cv-01002-PAB

                                    Plaintiffs,

        -vs-                                  JUDGE PAMELA A. BARKER

TA Franchise Systems LLC, et al.,

                                    Defendants.    MEMORANDUM OPINION AND
                                              ORDER

        Currently pending before this Court is Defendants TA Franchise Systems LLC ("TA") and

TA Operating LLC's ("TA Operating") (collectively "Defendants") Motion to Dismiss Plaintiffs DG

Gas, LLC ("DG Gas"), DG Cordele, LLC ("DG Cordele"), and DG Real Estate Partners, LLC's ("DG

Real Estate Partners") (collectively "Plaintiffs") Complaint ("Motion to Dismiss").  (Doc. No. 11.)

Plaintiffs filed an Opposition to Defendants' Motion to Dismiss ("Opposition").  (Doc. No. 13.)

Defendants thereafter filed a Reply to Plaintiffs' Opposition ("Reply").  (Doc. No. 17.)  Accordingly,

the Motion to Dismiss is now ripe for a decision.  For the reasons set forth herein, Defendants' Motion

to Dismiss is GRANTED IN PART and DENIED IN PART.

I.      **Factual Background**

        The Complaint alleges the following facts.[1]

        A.      **Initial Discussions Regarding DG Gas Becoming a TA Franchisee**

---

[1] For purposes of this Opinion, in setting forth the factual background relevant to Defendants' Motion to Dismiss, the Court accepts Plaintiffs' factual allegations as true and construes their Complaint in the light most favorable to them as the non-moving parties.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

DG Gas is a limited liability company in the business of developing and operating truck centers, which are often referred to as truck stops, as well as other commercial real estate-related businesses. (Compl. (Doc. No. 1) at ¶ 23.) Matt Dahlhauser ("Dahlhauser") and Stephen Galbraith ("Galbraith"), the principals of DG Gas, have a "long history of successfully building, developing, and operating commercial properties and franchisees in multiple states in and around the State of Georgia." (Compl. at ¶ 28.) Through one of their businesses, Dahlhauser and Galbraith "constructed a truck center in West Point, Georgia, which became a TA franchisee in early 2020 during the construction phase of the project." (Compl. at ¶ 29.) At the time, TA had more than 250 travel centers in over 40 states. (Compl. at ¶ 30.) A TA branded truck stop such as a TA Center typically offers diesel and gasoline fuel, truck maintenance and repair, full-service and quick-service restaurants, travel stores, and truck parking. (*Id.*)

Following the success of the West Point, Georgia project, certain TA executives including William Lynn, approached the principals of DG Gas and suggested that DG Gas become a TA franchisee. (Compl. at ¶ 31.) TA executives described the financial opportunity of becoming a TA franchise in favorable terms and provided DG Gas with information about how to become a TA franchisee. (*Id.*)

Specifically, on November 13, 2019,[2] Dahlhauser and Galbraith were approached by representatives of TravelCenters of America about the possibility of becoming a franchisee operating

---

[2] In paragraphs twenty-nine and thirty-one of its Complaint, DG Gas alleges that Dahlhauser and Galbraith constructed a truck center in West Point, Georgia, which became a TA franchisee in early 2020 during the construction phase of the project, and that *following* the success of the West Point project, TA executives approached the principals of DG Gas and suggested that DG Gas become a TA franchisee. (Compl. at ¶¶ 29, 31.) However, in paragraph two of its Complaint, DG Gas alleges that Dahlhauser and Galbraith were approached by representatives of TravelCenters of America on November 13, 2019 about the possibility of becoming a franchisee. (Compl. at ¶ 2.) This timeline is unclear to the Court. It appears that DG Gas alleges that its principals were approached about becoming a franchisee in November 2019, yet simultaneously alleges that its principals were approached *following* the success of the West Point project, which did not

a "TA Express Center," which is a smaller, more limited version of the TA Center truck stop franchise that TravelCenters of America operates nationwide through corporate-owned stores and stores franchised by its affiliate, Defendant TA.  (Compl. at ¶ 2.)  TA Express Centers were characterized as being "similar to the flagship TA Centers, but easier and less expensive to build and operate because they would require less space, offer more limited services, and provide fewer amenities, such as fewer fuel islands and shower stalls."  (Compl. at ¶ 32.)  DG Gas alleges that its principals "did not know, and TA misleadingly failed to disclose, that the TA Express Center concept had never been the subject of a franchise agreement with a ground-up developer."  (Compl. at ¶ 33.)

The principals of DG Gas worked with representatives of TA to identify potential locations for TA Express Centers in several states.  (Compl. at ¶ 34.)  TA executives, including William Lynn and Steve Hunt, "suggested that DG Gas consider building TA Express Centers in multiple cities including Fulton, Kentucky, Harrisonburg, Virginia, and Elmira, New York."  (Compl. at ¶ 32.)  The principals of DG Gas and representatives of TA also discussed land that TA wanted to sell to DG Gas and the parameters and requirements for DG Gas to become a TA franchisee.  (Compl. at ¶ 34.)  TA suggested that DG Gas pay for five franchises and referred DG Gas to a former TA employee that DG Gas could hire as an operational expert.  (*Id.*)

According to DG Gas, it was "enticed into becoming a TA franchisee through conversations with TA executives and through the review of certain documents, including several versions of a Franchise Disclosure Document ("FDD") provided by TA."  (Compl. at ¶ 35.)  An FDD is a document

---

become a TA franchisee until early 2020.  It is unclear whether these allegations represent two different meetings—one in November 2019 and a second meeting later in 2020—or whether there was only one meeting in November 2019 that occurred following "success" with the project but before the West Point truck center "officially became a TA franchisee in early 2020."

that is required by the Federal Trade Commission's ("FTC") "Franchise Rule."  (Compl. at ¶ 36.)

The FTC regulates the marketing of franchises through various means including the Franchise Rule,

which sets forth information about risks, costs, and potential benefits of entering into a franchise

agreement.  (Compl. at ¶ 36.)  According to DG Gas, it "relied on its conversations with TA

executives and the FDD's it was provided by TA, including FDD's dated April 1, 2019, April 26,

2021, and May 2, 2022."  (Compl. at ¶ 37.)

     **B.**     **Cordele Site and Franchise Agreement**

In January 2020, DG Gas expressed interest in becoming a franchisee that develops ground-

up TA Express Centers.  (Compl. at ¶ 38.)  TA advised DG Gas that it "owned a site in Cordele,

Georgia" (the "Cordele Site") and "represented that the site was suitable for development from

undeveloped land into a TA Express Center, which was one of the several truck center franchise types

offered by TA at the time."  (*Id.*)  According to DG Gas, "TA agreed to sell, and DG Gas agreed to

buy, the land for $1.25 million as part of a larger relationship involving DG Gas entering into a

franchise agreement."  (*Id.*)  However, in February 2020, TA advised DG Gas that the "new CEO is

looking to make some tweaks, so the design is not yet final."  (Compl. at ¶ 39.)  "The parties kept

talking and entered into both a contract to purchase land from TA for the site dated May 18, 2020,

and a franchise agreement effective April 2, 2021" ("Original FA").  (Compl. at ¶ 40.)

Specifically, starting in May 2020, TA Operating, an affiliate of TA, and DG Cordele and DG

Real Estate Partners, affiliates of DG Gas, entered into agreements related to the Cordele Site.

(Compl. at ¶ 41.)  DG Real Estate Partners and TA Operating entered into a Purchase and Sale

Agreement ("PSA") for the Cordele Site dated May 18, 2020.  (*Id.*)  Due to some issues with

4

government approvals associated with the Cordele Site, the PSA was amended five times. (Compl. at ¶ 42.) On December 3, 2021, the PSA ultimately closed with DG Cordele as the buyer. (*Id.*)

TA also provided DG Gas with a proposed franchise agreement related to the Cordele Site. (Compl. at ¶ 43.) DG Gas sought changes in the proposed franchise agreement, but "TA refused to modify its standard terms to reflect anything other than the unique attributes of the Cordele Site and the unusual scenario where a franchisor sold land to a franchisee instead of leasing it, which is the norm for a franchisee that does not own the approved property." (*Id.*) DG Gas first executed the Original FA with an effective date of April 2, 2021, but that agreement was "terminated and replaced with a Franchise Agreement and Addendum dated as of December 3, 2021" ("Franchise Agreement" or "FA"). (Compl. at ¶ 44.) After the sale of the land closed and the FA was signed, a Limited Warranty Deed dated December 3, 2021 ("Limited Warranty Deed") was recorded in connection with the sale of the Cordele site. (Compl. at ¶ 45.) The Limited Warranty Deed contained a "Use Restriction" that provided as follows:

> Commencing on the Effective Date [December 3, 2021] and terminating on the fifteenth (15th) anniversary of the Effective Date, the Property shall be used solely for the operation of a TA®- or Petro®-branded travel center pursuant to and in accordance with a franchise agreement ("Franchise Agreement") entered into between (a) an affiliate of [TA Operating LLC], its successors and/or assigns ("Franchisor"), and (b) the then current owner of the fee interest in the Property or an affiliate thereof acceptable to Franchisor in Franchisor's sole and absolute discretion (the "Use Restriction").

(Compl. at ¶ 46.)

After acquiring the Cordele site from TA, "DG Gas was officially welcomed by TA as a new TA Express Center franchisee." (Compl. at ¶ 47.) At that time, DG Gas "reasonably anticipated developing a portfolio of TA Express Center properties worth more than $200,000,000, based upon projected financials from experts hired by DG Gas at TA's suggestion." (*Id.*)

5

### C.     Lack of TA Express Center Specifications and Construction Delay

Promptly after the "welcome" meeting, DG Gas requested information necessary to start its work on developing a TA Express Center at the Cordele Site.  (Compl. at ¶ 48.)  According to DG Gas, it "needed civil engineering and construction specifications so that it could generate plans and drawings that would be filed with permit applications with the applicable local governmental authorities."  (*Id.*)  However, "TA was unable to provide DG Gas with the necessary documents."  (Compl. at ¶ 49.)  Specifically, "TA's head of construction was unable to send documents to DG Gas setting forth the design, shape, spacing, materials, equipment and other specifications that were the mandatory elements of the new concept TA called a TA Express Center."  (*Id.*)

According to DG Gas, it "needed to prepare its plans for TA and governmental approval."  (Compl. at ¶ 51.)  Thus, after several weeks of inaction by TA, DG Gas reached out to senior executives of TA to complain about the lack of direction, rules, standards, and specifications.  (Compl. at ¶ 50.)  DG Gas was "told by the head of construction for TA, Peter Ungaro, on December 16, 2021 and December 29, 2021, that TA did not have construction drawings that DG Gas could rely upon as it set out to build its TA Express Center."  (*Id.*)  DG Gas was "given some documents in December 2021 and some documents developed in connection with a TA-owned development it was pursuing, but those documents were not a set of standards or specifications."  (Compl. at ¶ 51.)

Although the FA provided that TA "will furnish [DG Gas] with standards, specifications and operating procedures and methods utilized by TA® Centers," and that "[s]uch items will, in our sole judgment, be furnished in our Manuals, bulletins or other written materials,"[3] "TA had no archetype

---

[3] In its Complaint, DG Gas alleges that Section 6.3 of the FA provides that "TA *shall* furnish DG Gas with 'standards, specifications, and operating procedures and methods utilized by TA Centers' *through* 'Manuals, bulletins or other written materials'."  (Compl. at ¶ 51 (emphasis added).)  However, Section 6.3 of the FA attached to the Complaint reads slightly

for a TA Express Center." (Compl. at ¶ 51; Doc. No. 1-5 at PageID #740.) According to DG Gas, "unbeknownst to [it] before it entered into the FA and undisclosed by TA, there were no structural, mechanical, plumbing, or electrical engineering drawings … [and] no civil engineering materials and no details on the mandatory exterior design elements." (Compl. at ¶ 51.)

Further "[u]nbeknownst to DG Gas at the time it signed the FA was that TA had never had a franchisee develop a ground-up TA Express Center." (Compl. at ¶ 52.) According to DG Gas, "[c]onversions of existing truck centers are different from ground-up construction projects."[4] (Compl. at ¶ 53.) "A conversion requires TA to be flexible because truck centers come in all sizes and shapes with a wide variety of designs, measurements, equipment, and amenities." (*Id.*) A ground-up construction project, however, "requires far more time and, most importantly, *clear direction from the franchisor* as to what must be built in order to comply with the mandates of the 'TA System,' which is the cornerstone of the TA franchise agreement." (Compl. at ¶ 54.)

TA's FDD describes the TA Express Center as being:

---

differently. The contractual provision provides that "TA *will* furnish [DG Gas] with 'standards, specifications, and operating procedures utilized by TA® Centers,'" and that "*such items will, in our sole judgment, be furnished in our* Manuals, bulletins or other written materials." (Doc. No. 1-5 at PageID #740) (emphasis added). Accordingly, the Court accepts the language as written in Section 6.3 of the FA attached to the Complaint, rather than the language written in paragraph 51 of the Complaint. *See Cates v. Crystal Clear Technologies, LLC*, 874 F.3d 530, 536 (6th Cir. 2017) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

[4] In its Complaint, DG Gas asserts that the FDD stated that conversions cost around $1,540,000 excluding real estate, while a ground-up construction project can require an investment of $26,690,000 excluding real estate costs. (Compl. at ¶¶ 53–54.) However, a review of the 2019 FDD describes these estimated costs as a range, with $1,540,000 being the lowest end of the range and $26,690,000 being the highest end. (Doc. No. 1-1 at PageID #41.) Specifically, the FDD indicates that the "total investment necessary to begin operation of a TA Center … is from $1,540,000 to $26,690,000, excluding real estate." (*Id.*) The FDD further breaks down that range by type of expenditure, explaining that the low end of the range applies to "conversion of an existing truckstop in good condition while the high end of the range applies to new construction … [which] will vary depending on the location and geographic area of the construction project, local building codes and weather conditions." (Doc. No. 1-1 at PageID #56–58.)

7

> "established and operated pursuant to TA Franchise's system [that is] characterized by [its or its] affiliates, collection of procedures, policies, standards, specifications, controls and other distinguishing elements, including distinctive signage, interior and exterior design, décor and color schemes, including as set forth in our plans ("the Development Plans"); recipes and menu items, uniform standards, specification and procedures for operation; quality and uniformity of products and services; training and assistance; and advertising, promotional, marketing and public relations programs ...."

(Compl. at ¶ 55; Doc. No. 1-1 at PageID #46; Doc. No. 1-2 at PageID #239; Doc. No. 1-3 at PageID #453.)

The FDD further provided that the "TA System and certain of its mandatory (and suggested) standards, specifications, and procedures (the "TA System Standards") are set forth in [TA's] Confidential Operations Manual, as well as in other written materials." (Compl. at ¶ 56; Doc. No. 1-1 at PageID #47; Doc. No. 1-2 at PageID #239; Doc. No. 1-3 at PageID #454.)  According to DG Gas, however, "there were no TA System Standards when it came to a TA Express Center." (Compl. at ¶ 57.)  "Although TA may have known a conversion when it saw one, there were no procedures, policies, standards, or specifications that governed the construction of a TA Express Center on the effective date of the FA." (*Id.*)

According to DG Gas, it "was not given construction, civil engineering, lighting, cement thickness, spacing requirements, and many other standards in December 2021 because they did not yet exist." (*Id.*)  Instead, "DG Gas was told to wait for the development of construction drawings that would be generated from a company-owned property in Walton, Kentucky that was under development at the same time." (Compl. at ¶ 58.)

"DG Gas did not know, and TA did not reveal, at the time of signing the FA that TA lacked the necessary specifications for a TA Express Center." (Compl. at ¶ 59.)  Rather, "DG Gas only knew

8

that the FA repeated[5] the FDD's assertions as representations: 'We, our predecessors and our Affiliates have expended considerable time, skill and effort in developing the TA® Centers, TA® Express Centers and the TA® System.'"  (*Id.*)  "TA System" was defined as "[a] collection of procedures, policies, standards, specifications, controls and other distinguishing elements for the establishment and operation" of a TA franchise."  (*Id.*; Doc. No. 1-5 at PageID #727.)  The FA provided that:

> "[TA] may advise you from time to time regarding the operation of the TA® Center based on reports you submit to us or inspections we make. In addition, we will furnish you with … standards, specifications and operating procedures and methods utilized by TA® Centers."[6]

(Compl. at ¶ 59; FA, Section 6.3, Doc. No. 1-5 at PageID #740.)  According to DG Gas, it was unbeknownst to it at the time that "none of these representations were true, and that the promises could not be performed because TA was focused on converting existing truck stops, not providing standards and specifications to a ground-up developer."  (Compl. at ¶ 59.)

Unfortunately for DG Gas, adherence to the 'TA System' was mandatory."  (Compl. at ¶ 60.)  The FA provides that "[i]n order to maintain the goodwill associated with the [trademarks, trade names and other commercial symbols used in the operations of a TA Express Center], all TA® Centers must operate as part of our TA® System in accordance with the Manuals and TA® Systems Standards."  (*Id.*; FA, Section 2.1, Doc. No. 1-5 at PageID #728.)  "Compliance with the standards

---

[5] (*Compare* FA, Doc. No. 1-5 at PageID #728, *with* FDDs, Doc. Nos. 1-1, 1-2, 1-3 at PageID #140, 339, 546–47.)

[6] In paragraph 59 of its Complaint, DG Gas alleges that "Section 6.3 of the FA stated that TA would provide these 'standards' and 'specifications' to DG Gas."  (Compl. at ¶ 59.)  However, because the FA itself is attached to the Complaint, the Court accepts the language of Section 6.3 as written in the attached FA rather than DG Gas's summary of that section in paragraph 59.  *See Cates*, 874 F.3d at 536 ("The law is clear that courts may consider a document which was attached to the complaint in determining whether dismissal is proper.") (alterations omitted).

9

and specifications established by TA was mandated by Section 7.2 and several other provisions of the FA."  (Compl. at ¶ 60.)

Thus, according to DG Gas, it was "required by TA's conduct to delay the commencement of its construction at the Cordele Site to allow time for TA to develop a store in Walton, Kentucky that TA was holding out to be the 'prototype' for a TA Express Center."  (Compl. at ¶ 61.)  "DG Gas's ability to meet its opening deadline was thus delayed by a risk factor that TA controlled and never disclosed." (*Id.*)  And "[e]ven then, DG Gas was operating as an unfair disadvantage because the Walton, Kentucky plans were merely exemplary plans that DG Gas was told could be viewed as a 'prototype.'"  (Compl. at ¶ 62.)

## D. TA's Continued Encouragement for DG Gas to Pursue Additional Franchise Opportunities

"At the time DG Gas entered into the FA, and based upon TA's representations and omissions, DG Gas reasonably expected to become a large-scale TA franchisee."  (Compl. at ¶ 63.)  "With encouragement from TA, and based on plans that the parties jointly developed, DG Gas purchased, or entered into purchase contracts, for other properties."  (*Id.*)  These other properties included but were not limited to properties in: (i) Macon, Georgia; (ii) Bowman, South Carolina; (ii) Silver Springs, Nevada; (iv) Van Buren, Arkansas; and (v) Fulton, Kentucky (collectively the "Additional Development Sites").  (*Id.*)  DG Gas did so with the "intent to build and operate TA Express Centers at the Additional Development Sites."  (*Id.*)  "TA [sic][7] secured site approvals from TA and signed additional TA paperwork for several of these Additional Development Sites."  (*Id.*)  In addition, "DG

---

[7] This appears to be a typographical error, and context suggests to the Court that this should read "DG Gas secured site approvals from TA …" rather than "TA secured site approvals from TA …"  (Compl. at ¶ 63 (emphasis added).)

Gas entered into a purchase contract for an operating truck center in Maysville, Kentucky that it intended to rebrand to become a TA Express Center." (Compl. at ¶ 64.) TA representatives visited the site of this project in February 2023 and "gave their approval for it to become a TA Express Center conversion." (*Id.*)

According to DG Gas, "TA continued to encourage DG Gas through ongoing communications between the TA leadership team and DG Gas principals, the sharing of plans and financial projections, referral of consultants, and continued negotiations over franchise agreements for the Additional Development Sites and the conversion site in Maysville, Kentucky (collectively the "Additional Sites")." (Compl. at ¶ 65.) "At that time, DG Gas did not know, and TA did not disclose, that the new TA CEO was aggressively pursuing a restructuring and turnaround plan." (Compl. at ¶ 66.) According to DG Gas, "TA induced DG Gas to make an initial payment of $40,000[8] under the FA [and] DG Gas relied on TA's representations, and the disclosures made in the applicable FDD, to pursue this business opportunity." (Compl. at ¶ 67.) Thus, "TA's termination of the FA deprived DG Gas of this business opportunity." (*Id.*)

### E.    Discussions Regarding Extending the Opening Date of the Cordele Site

DG Gas alleges that "[d]espite the challenges created by TA's immature TA Express Center business, [it] continued to follow the necessary steps to develop the [Cordele Site]." (Compl. at ¶ 68.) For example, "DG Gas secured financing, secured permits, conducted traffic and market studies,

---

[8] Section 9 of the Addendum to the FA provides that DG Gas is to pay a "Franchise Fee" of $100,000. (Doc. No 1-5 at PageID #815.) That Franchise Fee is separated into two payments—a $40,000 payment as already explained, and an additional $60,000 "due upon the Real Estate Owner's purchase of the Site …" (*Id.*) As discussed in the analysis of Count Ten, the parties dispute whether this additional $60,000 constitutes part of the "Initial Payment" as a matter of law. *See infra* Section IV.H.

hired a general contractor, worked to mitigate soil erosion, and erected fencing … [and] secured a building permit for the Cordele property on October 5, 2022."  (*Id.*)

During this construction process, TA approached DG Gas to discuss the timing of opening the TA Express Center in Cordele (hereinafter, "Opening Date" or "Opening Deadline").  (Compl. at ¶ 69.)  Specifically, on December 16, 2022, "TA emailed DG to state that DG Gas will not meet its opening deadline and therefore will need an extension of that deadline."  (Compl. at ¶ 70.)  DG Gas was "told that TA and DG Gas 'must devise a reasonable opening date and stick to it' because TA did not want to see DG Gas be 'penalized' for missing any deadlines."  (*Id.*)  According to DG Gas, "TA's Pete Ungaro, Franchise Construction Supervisor, promised to 'get with Arthur'[9] to discuss this and promised to get back to DG Gas about the precise date that would be the new opening deadline for DG Gas," estimating "the new deadline would need to be no earlier than April 2024."  (*Id.*)

DG Gas alleges that "TA thus recognized that, through no fault of DG Gas, DG Gas's opening date obligation in the FA was no longer possible and that the parties needed to pick a date on or after April 2024 for an opening obligation to avoid financial penalties for tardiness."  (Compl. at ¶ 71.)

With respect to the new Opening Date, DG Gas alleges that "[d]ue to substantial personnel changes at TA that affected Arthur's position around the time of the sale of the company in the first quarter of 2023, the extended opening date that both companies knew and agreed was necessary was never identified with precision."  (*Id.*)  According to DG Gas, "[t]he 'opening deadline' in the FA was always questionable."  (Compl. at ¶ 72.)  At the time that DG Gas signed the FDD and the FA, "TA published an FDD stating that the 'typical' length of time between the signing of an FA and the

---

[9] Paragraphs 70 and 71 of the Complaint reference an individual named "Arthur" but do not identify his full name or title. (Compl. at ¶¶ 70–71.)

opening of a ground-up franchise was, in fact, 18 months." (*Id.*)  For example, "TA's 300th store, which opened in Walton, Kentucky in February 2024, took over three years to develop from a green field to an operating truck stop." (*Id.*)  This Walton, Kentucky store "was the 'prototype' that DG Gas was told to follow." (*Id.*)

DG Gas alleges that it "knows of no history by TA of enforcing any opening day deadline through termination of a franchise agreement" and that "TA failed to enforce any right to terminate based on any opening day deadline with at least one franchise in Littlefield, Colorado." (Compl. at ¶ 73.)  DG Gas further alleges that "[b]etween December 2022 when TA and DG Gas discussed the need to adjust the Opening Deadline and the summer of 2023, TA knew that DG Gas continued to invest time and money into developing the [Cordele Site] and pursu[ing] additional sites that TA directed DG Gas to investigate as possible franchise locations." (Compl. at ¶ 74.)  During this period, "no one from TA mentioned the store opening deadline in the FA to DG Gas." (Compl. at ¶ 75.)

### F.    TA Terminates the Franchise Agreement with DG Gas

On December 13, 2022, "BP announced a bid to acquire all outstanding shares of TA." (Compl. at ¶ 76.)  "TA's Board of Directors unanimously recommended TA's shareholders support the proposed sale of the company's stock to BP," and subsequently, "TA shareholders approved the sale of company." (*Id.*)  On or about May 15, 2023, "the transaction closed … [and] TA became a wholly-owned indirect subsidiary of the global oil and gas company commonly known as BP." (*Id.*)

Approximately four weeks later, "without warning or explanation, TA's counsel sent a letter dated June 16, 2023 captioned, 'Notice of Default and Termination.'" (Compl. at ¶ 77.)  The letter "purported to terminate the FA based on an alleged failure to comply with the FA's store opening deadline." (Compl. at ¶ 78.)  According to DG Gas, "[w]ithout any prior notice or an opportunity to

cure, TA declared the FA, which has a ten-year term, to be terminated based on failure to meet a deadline that TA had previously confirmed was no longer controlling." (*Id.*) Specifically, the letter "was not preceded by any warning," "provided no opportunity to cure the supposed default," "did not propose any path forward for the parties' relationship or offer to remove the deed restrictions on the Cordele [S]ite that encumbered the land," and "did not mention the six other sites that the parties were working collaboratively toward building out into TA Express Centers." (Compl. at ¶ 79.)

Following this letter, "DG Gas's principals reached out to TA." (Compl. at ¶ 80.) Upon doing so, "they were told that TA did not merely terminate the Franchise Agreement." (*Id.*) Rather, "[w]ithout any explanation, a TA executive sent a curt email that TA was also refusing to move forward with any of DG Gas's planned projects."[10] (*Id.*) According to DG Gas, "[w]hen asked to explain why TA was ending its business relationship with DG Gas, TA refused to explain its decision." (Compl. at ¶ 81.) DG Gas alleges that "[t]o this day, [it] does not know why the newly-acquired TA refused to move forward with the Additional Sites, including DG Gas's conversation project in Maysville, which was capable of being converted to a TA Express Center within a matter of weeks." (*Id.*)

DG Gas alleges that "[a]t the time it received the termination letter, [it] was deeply engaged in developing travel centers that it reasonably expected to be worth more than $200,000,000, based upon projected financials from experts DG hired at TA's suggestion." (Compl. at ¶ 82.) DG Gas "undertook its efforts in reliance on the actions of TA's executives, the FDDs it signed, and the FA." (*Id.*) According to DG Gas, "between the FDD that TA provided to DG Gas in 2020 and the purported

_____

[10] (*See* Doc. No. 1-8 at PageID #835 ("At this time, we are not moving forward with any of your sites.").)

termination of the Franchise Agreement in 2023, TA added detail to its FDDs regarding how construction is a factor that may affect a franchisee's ability to meet a contractual opening obligation." (*Id.*)  "TA also added a disclosure that an extension fee for violating an opening deadline may need to be paid."  (*Id.*)

"TA, however, never added disclosures that land sold in conjunction with a franchise agreement may become worthless because of anti-competitive deed restrictions required by TA as a condition precedent to becoming a franchisee."  (Compl. at ¶ 83.)  "TA similarly never added disclosures that its own inability to timely provide standards for civil engineering and construction of a ground-up development are risk factors that will affect the ability of a franchisee to meet its store opening obligations."  (*Id.*)

### G.      TA's Alleged Misrepresentations and Omissions

DG Gas alleges that the "2022 FDD contains multiple statements indicating that the opening deadline obligation is an obligation that could be extended with or without payment of an extension fee."  (Compl. at ¶ 84.)  For example, the 2022 FDD provides:

"Time to Open

The typical length of time between the signing of the Franchise Agreement or the first payment for the franchise, and the opening of your business, is approximately 18 months after signing the Franchise Agreement for franchisees who are building their facility, and 6 months for franchisees who are converting an existing operation to a TA Express Center. Training availability, the number of other franchise openings, weather and construction all may affect this time line. Additionally, over the past year we have seen COVID and supply chain related issues delay construction by an additional 6 to 12 months in some circumstances. We may, in our sole discretion, agree to extend your opening date by providing written confirmation of the extension to you and we may require you to pay an extension fee in connection therewith.

…

You agree to open the TA Express Center for business within 6 months following the Agreement Date. If constructing a new TA Express Center on a site you or your Affiliates are purchasing, then you have 18 months to open the TA Express Center for business following

15

the Agreement Date. We may, in our sole discretion, agree to extend your opening deadline by providing written confirmation of the extension to you and we may require you to pay an extension fee in connection therewith.[11]

(*Id.*; Doc. No. 1-3 at PageID #475, 557.)

According to DG Gas, Section 5.1(a) of the FA provides that "DG Gas was obligated to adhere to TA's specifications and standards in its construction of the TA Express Center it planned in Cordele, GA." (Compl. at ¶ 85.) Specifically, the "FA states that DG is 'obligated at your expense to develop and equip the TA® Center in accordance with all of our required plans, space plans, and specifications to suit the use, shape and dimensions of the TA® Center ("Development Plans") and to ensure that such Development Plans and specifications comply with applicable ordinances, codes and permit requirements, and TA® System Standards.'" (*Id.*; Doc. No. 1-3 at PageID #555.)

DG Gas further alleges that Section 5.1(b)[12] of the FA provides that "DG Gas was required to wait for TA to establish 'Development Plans.'" (Compl. at ¶ 86.) Specifically, the "FA states [that TA] may make changes to the Development Plans that we specify from time to time during the development of the TA® Center. You and your respective vendors and service providers must not begin development, remodeling or otherwise construct the TA® Center until we have approved the Development Plans." (*Id.*; Doc. No. 1-3 at PageID #556.)

Thus, DG Gas alleges that "TA made a number of representations and omissions ("Representations") in the FDD on which DG Gas relied, including:

---

[11] In its Complaint, DG Gas cites to this provision as "2022 FDD at Section 5.2." (Compl. at ¶ 84.) However, a review of the exhibits attached to the Complaint reveals that this provision appears in Section 5.2 of the *Franchise Agreement*, which is attached to the 2022 FDD as "Exhibit E." (Doc. No. 1-3 at PageID #444, 451, 533, 557.)

[12] In its Complaint, DG Gas incorrectly cites to Section 5.2(b) of the FA as containing this provision. (Compl. at ¶ 86.) However, a review of the exhibits attached to the Complaint reveals that this provision appears in Section 5.1(b), rather than Section 5.2(b). (*See* Doc. No. 1-3 at PageID #556.)

16

- TA has 'required plans, space plans, and specifications to suit the use, shape and dimensions of' a TA Express Center ("Development Plans") (Doc. No. 1-1 at PageID #149; Doc. No. 1-2 at PageID #348; Doc. No. 1-3 at PageID #555);

- TA 'has expended considerable time, skill and effort in developing the TA Express Centers and the TA System,' which includes 'a collection of procedures, policies, standards, specifications, controls and other distinguishing elements for the establishment and operation of TA Express Centers' (Doc. No. 1-1 at PageID #139–40; Doc. No. 1-2 at PageID #338–39; Doc. No. 1-3 at PageID #546–47);

- that the 'typical' length of time for a ground-up development of a TA Express Center franchise is 18 months (Doc. No. 1-1 at PageID #66; Doc. No. 1-2 at PageID #260; Doc. No. 1-3 at PageID #475);

- the omission of a disclosure that TA lacked Development Plans and procedures, policies, standards, specifications, and other key details concerning TA Express Centers."

(Compl. at ¶ 87.) According to DG Gas, "[t]hese Representations were made to mislead DG Gas into believing the following false matters (the "False Matters"):

- that TA possessed a fully-articulated vision for TA Express Centers;

- that TA had Development Plans for TA Express Centers;

- that TA would treat any delay caused by its modification of any Development Plans as a justified reason for delaying the beginning of development of its TA Express Center;

- that TA had expended considerable time, skill and effort in developing the TA Express Centers, which included creation of a collection of specifications for the construction of TA Express Centers;

- that TA considered DG Gas to be a suitable franchisee, the Additional Sites to be suitable sites, and that TA considered the Additional Sites to be desirable for a TA Express Center;

- that the 'typical' length of time for a ground-up development of a TA Express Center franchise is 18 months."

(Compl. at ¶ 88.) Finally, DG Gas alleges that "TA failed to make multiple disclosures ("Omissions") in the FDDs it presented to DG Gas on at least five occasions in 2020, 2021, and 2022, including:

17

- that TA considered a delayed opening by a franchisee as a justification for refusing to do business with that franchisee on any other matters;

- that TA lacked specifications, procedures, and systems related to the ground-up construction of a TA Express Center;

- that the risk factors for the opening date included TA's own inability to provide construction documents and other required documentation needed to submit architectural plans for a building permit;

- that the risk factors for the opening date included lender's lack of interest in making construction loans or lack of ability to fund loans that required governmental appropriations."

(Compl. at ¶ 89.)

**H.    DG Gas's Alleged Losses**

During the course of its status as a prospective and actual franchisee, DG Gas "hired financial experts recommended by TA." (Compl. at ¶ 90.) "These financial experts computed the expected costs and profits that DG Gas could expect in connection with its various projects with TA." (*Id.*) DG Gas alleges that "[b]ased on the FA, [it] expected to have a franchise in Cordele, Georgia for at least a ten-year period [and] DG's lost profits for the Cordele [S]ite over the 10-year franchise period are at least $21,000,000." (Compl. at ¶ 91.) In addition, the "real estate (including improvements) that DG Gas owned in Cordele, Georgia was expected to increase in value by $7,720,000 over this ten-year period." (Compl. at ¶ 92.) "At the ten-year mark, DG Gas expected the operating business at its Cordele [S]ite to be worth an additional $8,000,000." (Compl. at ¶ 93.)

Further, DG Gas alleges that the "lost profits at the Additional Sites during this period are more than $190,000,000," and that it "expected the value of its real estate holdings at the Additional Sites to increase by more than $50,000,000 over the 10-year franchise period." (Compl. at ¶¶ 94–95.) In addition, "DG Gas expected the operating businesses at the Additional Sites to increase in

18

value by more than $76,000,000." (Compl. at ¶ 96.)  DG Gas also alleges that it was "injured by the loss of the business opportunity presented by the Statesboro Site" and that its "reputation has been injured as a result of TA's improper termination." (Compl. at ¶¶ 97–98.)

According to DG Gas, it "invested years of effort and millions of dollars only to be told that TA's decision that DG Gas deserves more time to open its store in Cordele, Georgia was meaningless." (Compl. at ¶ 99.)  DG Gas alleges that as a result, "[a]fter many years of effort toward becoming a substantial TA franchisee, [it] is stuck with worthless land for which it paid TA $1,250,000." (*Id.*)  Finally, DG Gas alleges that it "expended substantial resources and time pursuing projects on the Additional Sites, and other opportunities with TA, that could have instead been used to pursue projects and opportunities with other business partners." (Compl. at ¶ 100.)  In sum, DG Gas asserts that "the precise amount of the damages caused by TA … are currently estimated to be in excess of $300,000,000." (Compl. at ¶ 101.)

## I.     Cordele Site Use Restriction

Finally, DG Gas alleges that it is "currently suffering and will continue to suffer irreparable harm because the restrictive covenant in its deed is preventing [it] from selling the Cordele [S]ite." (Compl. at ¶ 102.)  According to DG Gas, "the deed on the property at the Cordele [S]ite contains an unconscionable restriction that prevents usage of the land for 15 years as anything but a TravelCenters of America-branded truck stop."[13]  (Compl. at ¶ 103.)  Thus, "DG Gas is obligated to pay property taxes and a mortgage on the property, but it is prohibited from using or selling the property for a period of time that is 15 times longer than the restrictive covenants in the FA that were tailored to

---

[13] The Limited Warranty Deed is attached to the Complaint as "Exhibit D."  (*See* Doc. No. 1-6 at PageID #822–30.)

protect TA's business interests in the wake of a termination of the FA." (Compl. at ¶ 104.) Further, DG Gas alleges that "TA has both an option to purchase the Cordele property and a right of first refusal under sections 16.8 and 19.5 of the FA, but it refused to invoke either or otherwise express interest in buying the property after its improper termination of the FA." (Compl. at ¶ 105.) Accordingly, DG Gas asserts that it "has no adequate remedy at law for the improper deed restrictions that TA refuses to waive." (Compl. at ¶ 106.)

## II.    Procedural History

On June 12, 2024, Plaintiffs DG Gas, DG Cordele, and DG Real Estate Partners filed their Complaint against Defendants TA and TA Operating in federal court. (Doc. No. 1.) Therein, Plaintiffs assert the following twelve counts:[14] (1) Violation of the Petroleum Marketing Practices Act ("PMPA"); (2) Breach of the Franchise Agreement; (3) Fraudulent Inducement; (4) Negligent Misrepresentation; (5) Fraud; (6) Statutory Fraud (Ohio); (7) Statutory Fraud (Georgia); (8) Promissory Estoppel; (9) Declaratory Judgment; (10) Violation of the Ohio Business Opportunity Plan Act ("BOPA"); (11) Breach of Oral Contract; and (12) Rescission or Reformation of the PSA. (*Id.*) The Complaint also included a jury demand and request for punitive damages. (*Id.* at PageID #37–38.) Plaintiffs attached numerous documents to their Complaint, including the 2019, 2021, and 2022 FDDs, the PSA, the FA, the Limited Warranty Deed, and email correspondence between Plaintiffs and Defendants. (Doc. Nos. 1-1–1-8.)

In their Complaint, Plaintiffs request that this Court enter an order and judgment "[p]ermanently enjoining TA and all persons acting in concert therewith[] from enforcing the deed

---

[14] Each count individually specifies which of the Plaintiffs are asserting the count and identifies the Defendant(s) against whom the count is asserted.

restriction.  (Compl. at ¶ 208.)  Plaintiffs also request that this Court "[r]escind the purchase and sale contract for the Cordele [S]ite and/or reform, and/or equitably modify the purchase and sale contract and/or Deed for the Cordele [S]ite to remove the restrictions described therein."  (*Id.*)  Finally, Plaintiffs seek monetary damages including compensatory damages, punitive damages, expenses and costs incurred in connection with this action, including attorneys' fees, prejudgment interest, and any other and further relief this Court deems appropriate.  (*Id.*)

On July 8, 2024, Defendants filed a Motion to Dismiss Plaintiffs' Complaint, seeking to dismiss all twelve of Plaintiffs' counts.  (Doc. No. 11.)  On August 13, 2024, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss.  (Doc. No. 13.)  On August 27, 2024, Defendants filed their Reply to Plaintiffs' Opposition.  (Doc. No. 17.)  Accordingly, Defendants' Motion is ripe for review.

## III.    Standard of Review

Defendants move to dismiss all of Plaintiffs' claims as asserted against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Pursuant to Rule 12(b)(6), the Court accepts Plaintiffs' factual allegations as true and construes the Complaint in the light most favorable to Plaintiffs.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether a complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts

to state a claim to relief that is plausible on its face.'"  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555–56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the … claim is and the grounds upon which it rests."  *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, … it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 679.

## IV.    Analysis

### A.    Count One:  Violation of the Petroleum Marketing Practices Act

The Court first turns to Count One of the Complaint alleging that TA violated the PMPA.

#### 1.    Statutory Background

In 1978, Congress enacted the PMPA to create a uniform set of rules covering the grounds for termination and non-renewal of motor fuel marketing franchises.  *See* 15 U.S.C. § 2801 *et. seq.*; *see also Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991).  The PMPA serves to "protect

22

franchises from arbitrary or discriminatory termination or non-renewal of their franchises." *Massey*, 942 F.2d at 342.  "Under the PMPA, a franchise may only be terminated for specific statutorily enumerated reasons." *Potter v. Ashland Oil, Inc.*, 905 F.2d 1538 (Table), 1990 WL 86467, at \*1 (6th Cir. June 20, 1990).

To fall under the protection of the PMPA, a plaintiff must establish that it holds a "franchise" as defined in the statute.  *See Kirmani v. Bill Wolf Petroleum Co.*, 2016 WL 7190077, at \*3 (S.D. N.Y. Nov. 22, 2016); *Naff v. Standard Oil Co.*, 527 F. Supp. 160, 162–63 (S.D. Ohio 1981).  In relevant part, the statute defines "franchise" to mean any contract between either a "refiner" or "distributor" and either a "distributor" or "retailer" authorizing or permitting a "retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use."[15]  § 2801(1)(A).

---

[15] The PMPA also provides that the term "franchise" includes:

    (i)        any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

    (ii)      any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed--
        I.     under a trademark owner or controlled by a refiner; or
        II.    under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

    (iii)     the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

§ 2801(1)(B).  However, these additional examples are not relevant here because DG Gas relies on the definition of franchise contained in § 2801(1)(A), rather than any of the examples enumerated in § 2801(1)(B).  (*See* Doc. No. 13 at PageID #934–35 (citing § 2801(1)(A) to define a franchise).)  Accordingly, the Court will analyze DG Gas's claims under the general definition of a franchise contained in § 2801(1)(A).

23

Thus, the PMPA only applies to franchise relationships between a "refiner," "distributor," or "retailer" of motor fuels. A "refiner" is defined as "any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person." § 2801(5). A "distributor" is defined as "any person, including any affiliate of such person, who [either] purchases motor fuel for sale, consignment, or distribution to another[, or] receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier." § 2801(6). A "retailer" is defined as "any person who purchases motor fuel for sale to the general public for ultimate consumption." § 2801(7).

In accordance with congressional intent, courts must grant the PMPA "a liberal construction consistent with its overriding purpose to protect franchisees." *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir. 1989); *PDV Midwest Refining, L.L.C. v. Armada Oil and Gas Co.*, 3005 F.3d 498, 506 (6th Cir. 2002). The Sixth Circuit has recognized, however, that the PMPA "constitute[s] a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose." *May-Som Gulf, Inc.*, 869 F.2d at 921; *PDV Midwest Refining, L.L.C.*, 305 F.2d at 516; *see also Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir. 1982) ("Strict construction is particularly appropriate where, as here, the statute in question is in derogation of common law rights."). Moreover, "in adopting the PMPA, Congress struck an explicit statutory balance between the interest of franchisees in freedom from arbitrary and discriminatory franchise terminations and the interest of franchisors in freedom to transfer motor fuel marketing assets in response to changing market conditions, …. [and] in an age of increasing

24

corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency …" *May-Som Gulf, Inc.*, 869 F.2d at 921; *PDV Midwest Refining, L.L.C.*, 305 F.2d at 506.

## 2.    Application to DG Gas

TA asserts that there is no PMPA relationship between the parties because DG Gas fails to sufficiently allege a "franchise" under the statute.  (Doc. No. 11 at PageID #894.)  As explained above, the PMPA defines a "franchise" to mean any contract: (1) under which a refiner or distributor (as the case may be); (2) authorizes or permits a retailer or distributor to use; (3) in connection with the sale, consignment, or distribution of motor fuel; (4) a trademark; (5) which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.[16]  § 2801(1)(A).

TA does not challenge DG Gas's assertion that it is a refiner or distributor under the statute.[17] The Court thus turns to whether DG Gas is a "retailer" or "distributor" under the PMPA.

In its Motion, TA contends that DG Gas's Complaint does not plausibly allege that DG Gas was a "retailer" or "distributor" so as to fall within the definition of "franchise."  (Doc. No. 11 at

---

[16] Because DG Gas alleges that it purchased the Cordele Site from TA rather than leasing it, the Court relies on the standard definition of "franchise" in § 2801(1)(A) rather than the "leased marketing premises" example in § 2801(1)(B)(i). *See Brewer v. Exxon Corp.*, 626 F. Supp. 76, 79 (E.D. Tenn. 1985) (recognizing that in addition to the standard definition of a franchise under § 2801(A)(1), the "PMPA *also* covers those relationships where the franchisee does not own the property but occupies the property under a 'leased marketing premises' agreement.") (emphasis added); (Compl. at ¶¶ 38–42.)

[17] TA does not argue in its Motion that it is not a "refiner" or "distributer" under the PMPA.  (Doc. No. 11 at PageID #894–46.)  DG Gas notes this in its Opposition.  (Doc. No. 13 at PageID #936 ("Defendants do not dispute that they meet the definition of a "refiner" or "distributor," which is one of the two sides of a franchise arrangement governed by the PMPA.").)  TA, in its Reply, does not respond to DG Gas's assertion on this point.  (Doc. No. 977–82.)  Accordingly, for the limited purpose of deciding TA's 12(b) Motion, the Court finds that TA has waived any argument that it is not a "refiner" or "distributor" under the PMPA.  *See Kuhlman v. City of Cleveland*, 2023 WL 2652585, at *11 (N.D. Ohio Mar. 23, 2023) (citing *Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x. 328, 331 (6th Cir. 2008)) ("It is well established that, if a plaintiff fails to respond or to otherwise oppose a defendant's motion to dismiss, a district court may deem the plaintiff to have waived opposition."); *Fox v. Kia America, Inc.*, 726 F. Supp.3d 765, 785 (N.D. Ohio 2024).

PageID #895.)  TA argues that both a "retailer" and "distributor" are defined in the statute, in relevant part, as any person who "purchases motor fuel for sale."  (*Id.*)  TA thus submits that neither DG Gas's Complaint, nor the FA or FDDs attached thereto, sufficiently address "DG Gas purchasing motor fuel, taking title to motor fuel, the price to purchase fuel, or TA otherwise supplying fuel to Plaintiffs." (*Id.* at PageID #896.)  Further, TA contends that the few places where the FA mentions fuel does not pertain to supply and that the FA does not identify whether any such fuel would be branded.  (*Id.*) Therefore, TA asserts that without any plausible allegation that DG Gas is a "retailer" or "distributor" under the PMPA, there is no "franchise" within the meaning of the PMPA.  (*Id.*)

In its Opposition, DG Gas asserts that it has sufficiently alleged the existence of a franchise under the PMPA.[18]  (Doc. No. 13 at PageID #934.)  DG Gas first contends that paragraphs 38-47 of its Complaint allege that "it is party to a franchise contract in which a refiner and distributor granted DG Gas, as a retailer and distributor, authority and permission to use TA's trademarks in connection with the sale of motor fuel to the public," which DG Gas submits "is the essence of a franchise under the PMPA."  (*Id.*)  DG Gas asserts that it "painstakingly alleged that it purchased a truck stop franchise pursuant to a franchise agreement, the purpose of which was to sell motor fuel to the public under Defendant's trademarks," citing to paragraphs 38-47, 60, and 63-67 of its Complaint.  (*Id.*)  As support, DG Gas refers to the FA attached to the Complaint, "which contains a trademark license for an affiliate of a major oil refiner and extensive provisions about selling goods, including fuel, to the public from the franchise location."  (*Id.* at PageID #935.)

---

[18] In its Opposition, DG Gas contends that it "does not matter that the FA does not mention the PMPA."  (Doc. No. 13 at PageID #940.)  The Court agrees that the mere fact that the PMPA is not "mentioned" does not prohibit the PMPA from being applicable.  Accordingly, the Court will focus its analysis on whether DG Gas has sufficiently pled facts that satisfy the required elements of a franchise under the PMPA.

26

DG Gas further asserts that it has adequately alleged that it is both a "retailer" and "distributor."  (*Id.* at PageID #936.)  Specifically, DG Gas points to the FA's provisions regarding royalty fees owed to TA for each gallon of fuel sold from its franchise, and fees for advertising and the use of copyrights and trademarks.  (*Id.* (citing FA §§ 1, 9.2, 9.4, 10).)  DG Gas contends that the FA "contractually obligated [it] to pay [these] certain monthly fees … for the privilege of selling motor fuel to the public," and that it "could only meet its obligations to sell motor fuel through purchasing motor fuel" because it "is not a petroleum production company [or] refiner of motor fuel," but instead a "reseller."  (*Id.*)  DG Gas argues that TA's cited authority is distinguishable, and that the "purchase and resale of motor fuel by DG Gas was the *raison d'étre* for the FA."  (*Id.* at PageID #937–39.)  Finally, DG Gas cites to *Coral Group Inc. v. Shell Oil Co.*, 2006 WL 8438278, at *2 (W.D. Mo. Nov. 1, 2006), for the proposition that there is a second totality of the circumstances test for determining whether a party is a retailer, i.e., is there "sufficient indicia of entrepreneurial responsibility and risk to be considered independent dealers and businessmen," and asserts that under this test as well, it is a retailer.  (*Id.* at PageID #939–40.)

In its Reply, TA asserts that DG Gas's allegations that it is a "retailer or distributor" are conclusory.  (Doc. No. 17 at PageID #977–78.)  TA notes that DG Gas admits that both the "retailer" and "distributor" definitions require the purchase of motor fuel.  (*Id.* at PageID #978.)  With respect to being a "retailer," TA contends that the paragraphs of the Complaint cited in DG Gas's Opposition "include no allegation of the purchase of motor fuel."  (*Id.* at PageID #978–79.)  TA submits that while the Complaint alleges that a "TA branded truck stop such as a TA Center typically offers diesel and gasoline fuel," it "never alleges the purchase of fuel to allow DG Gas to fall within the PMPA's definition of a 'retailer.'"  (*Id.* at PageID #979.)  Further, TA contends that the FA does not contain

27

"a single provision … that pertains to either purchase or supply of fuel, … volume, fuel price, or fuel delivery." (*Id.* at PageID #979–80.)  TA asserts that even the section "on royalties for if and when fuel is *sold to customers* … never addresses DG Gas *purchasing* motor fuel," and that the FA does not obligate DG Gas to sell motor fuel, but instead simply "obligate[s] payment of a royalty for fuel that is sold to the motoring public." (*Id.* (emphasis in original).)  TA notes that although "one can speculate that DG Gas would have entered into a supply agreement for the purchase of fuel," that "never occurred [and was not] alleged in the Complaint," and therefore the "mere possibility that there might have been at some future date an agreement for the purchase of fuel … does not plausibly allege a PMPA relationship."[19] (*Id.* at PageID #980.)  Next, TA submits that DG Gas also cannot be a "distributor" for the same reasons, and because DG Gas has not alleged that it was receiving fuel on consignment.  (*Id.* at PageID #981.)  Finally, TA asserts that DG Gas fails to allege any supply relationship, which "further confirms the lack of a PMPA relationship." (*Id.* at PageID #981–82.)

Under the PMPA, a "retailer" means "any person who *purchases motor fuel* for sale to the general public for ultimate consumption." § 2801(7) (emphasis added).  Generally, courts follow two different approaches in determining whether a party is a "retailer." *See Coral Group Inc.*, 2006 WL 8438278, at *2.  "The first approach strictly construes the language of the PMPA and solely considers whether a party 'purchases motor fuel.'" *Id.* (citing *Sigmon v. Widenhouse Service, Inc.*, 638 F. Supp. 808, 811 (D.N.C. 1986)).  "The second test views the PMPA as remedial legislation and undertakes a broader analysis of the relationship between the parties." *Id.* (citing *Johnson v. Mobil Oil Corp.*, 553 F. Supp. 195, 198–99 (S.D.N.Y. 1982)).  Under this second test, a party is a "retailer" if there are

---

[19] TA cites to numerous cases addressed by courts within this Circuit which specifically mentioned the purchase of fuel. (Doc. No. 17 at PageID #980–81.)  These cases are discussed further below.

28

"sufficient indicia of entrepreneurial responsibility and risk to be considered independent dealers and businessmen." *Id.* (internal quotation marks omitted).  While courts look to numerous factors[20] to determine whether a party is a "retailer" under this second test, the analysis often hinges on who takes title to the fuel such as to "bear the risk of economic loss due to market fluctuations" as opposed to simply being paid to "collect[] the funds generated" by the fuel sales on behalf of the party holding title to the fuel.[21]  *Id.*; *Farm Stores, Inc.*, 763 F.2d at 1342.

At the outset, the Court notes that this case presents a highly unusual factual distinction from the authorities cited by the parties.[22]  In every case cited by both TA and DG Gas, the termination or non-renewal of the "franchise" occurred *after* the "retailer" or "distributor" had already begun

---

[20] In determining whether a party bears the risk of the sale of motor fuel, Courts look to numerous factors including: (i) who pays the investment in the gasoline inventory; (ii) who carries title on the gasoline; (iii) who secures the necessary licenses; (iv) who pays taxes on the gasoline; (v) who bears the physical loss of the gasoline; (vi) who bears the risk of economic loss due to depressed prices and reduced sales volume; (vii) who determines which gasoline and how much is purchased; and (viii) who sets the price of gasoline.  *Coral Group Inc.*, 2006 WL 8438278, at *3 (citing *Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335, 1345 (11th Cir. 1985); *Johnson*, 638 F. Supp. at 199; *Sigmon*, 638 F. Supp. at 811).

[21] *See, e.g., Farm Stores, Inc.*, 763 F.2d at 1344–45; *RWJ Companies, Inc. v. Equilon Enterprises, LLC*, 2005 WL 3544295, at *3 (S.D. Ind. Dec. 28, 2005) (collecting cases); *Irvine Fuel Exchange, Inc. v. Pacific Convenience and Fuels, LCC*, 2011 WL 1599622, at *4–5 (C.D. Cal. Apr. 28, 2011); *Sasoro 13, LLC v. 7-Eleven, Inc.*, 2023 WL 2290788, at *4 (N.D. Tex. Feb. 27, 2023); *A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, 2018 WL 10517080, at *4–7 (E.D.N.Y. Mar. 6, 2018); *Iqbal v. B & R Oil Co., Inc.*, 2009 WL 3614978, at *4 (N.D. Ill. Oct. 27, 2009); *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 634–35 (D. Colo. 1991); *Automatic Comfort, Corp. v. D & R Services, Inc.*, 620 F. Supp. 1349, 1354 (D. Conn. 1985); *Coral Group, Inc.*, 2005 WL 8159135, at *1; *Sigmon v. Widenhouse Service, Inc.*, 638 F. Supp. 808, 810–13 (M.D.N.C. 1986); *Sanna v. Friendly Service Stations, Inc.*, 593 F. Supp. 493, 498–500 (D. Conn. 1983); *Miller v. W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1048 (D.S.C. 1990); *R+C+G Station, Inc. v. Urbieta Oil, Inc.*, 2012 WL 2054934, at *4–6 (S.D. Fl. June 7, 2012); *Karak v. Bursaw Oil Corp.*, 147 F. Supp.2d 9, 13–15 (D. Mass. 2001); *Johnson*, 553 F. Supp. at 197–98; *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 6, 8 (2d Cir. 1982); *Cole v. Circle R. Convenience Stores, Inc.*, 620 F. Supp. 886, 889 (M.D. La. 1985); *see also* Alois Valerian Gross, J.D., Annotation, *Who is "distributor" or "retailer" within meaning of § 101(6), (7) of Petroleum Marketing Practices Act (15 U.S.C.A. § 2801 (6), (7))*, 80 A.L.R. Fed. 871 (Originally published in 1986) (collecting cases).

[22] Because the Court finds the authority cited by the parties to be inapplicable to the present case based on the distinction between having purchased fuel in the past versus the right to purchase fuel in the future, as explained further below, the Court finds it unnecessary to address the parties' arguments regarding those cases.

purchasing gasoline and operating under the "franchise."[23] Thus, any analysis of whether a party was a "retailer" that "purchases" fuel simply employed the two tests described above in relation to the parties' *ongoing* operations and the nature in which fuel was handled—i.e., whether the alleged "retailer" had been explicitly purchasing the fuel or demonstrating "sufficient indicia of

---

[23] *See, e.g., May-Som Gulf, Inc.*, 869 F.2d at 918–19 ("*Prior to the sale*, the plaintiffs, twelve independent Ohio Gulf service stations dealers, maintained franchise agreements with Chevron to sell motor fuel under the Gulf Trademark . . . [Chevron had maintained] supply contracts with dealers operating under the Gulf Trademark (including the plaintiff dealers).") (emphasis added); *Farm Stores, Inc.*, 763 F.2d at 1336 (asserting claims regarding "failure to *renew* a contract" in which plaintiff had been operating approximately 90 facilities that sold motor fuel) (emphasis added); *Kirmani*, 2016 WL 7190077, at *1 ("Plaintiff has operated a gas station on the property … since approximately 2004."); *Naff*, 527 F. Supp. at 162 ("Plaintiff had been working as a distributor of Sohio products for Defendant since 1967."); *Coral Group Inc.*, 2006 WL 8438278, at *1 ("In mid-October 2003, … Plaintiffs became the Multiple-Site Operator ("MSO") for twenty-nine Shell-branded gasoline stations . . ."); *Catch 26, LLC v. LGP Realty Holdings, LP*, 2017 WL 4864856, at *1 (N.D. Ill. Oct. 27, 2017) ("At the times relevant to this suit, [Plaintiffs] sold unbranded fuel … and Marathon branded fuel … pursuant to supply agreements executed with each location."); *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 849 (7th Cir. 2002) ("[Plaintiff] is a family-owned motor fuel reselling business that has purchased and sold Shell-branded motor fuels for over fifty years."); *Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC*, 559 U.S. 175, 179 (2010) ("*For many years*, Shell offered [Plaintiffs] a rent subsidy … for every gallon of motor fuel [Plaintiffs] sold above a specified threshold.") (emphasis added); *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 302 (2d Cir. 1986) ("[Plaintiff] leased and operated a Mobil Service Station … for approximately 25 years."); *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1215 (7th Cir. 1982) ("Commencing in 1963, [Plaintiff] entered into a franchise agreement with Exxon … Exxon last renewed that franchise on November 1, 1976."); *R+C+G Station, Inc.*, 2012 WL 2054934, at *1 ("[Plaintiff] is a former operator of a Valero gasoline service station and convenience store."); *Irvine Fuel Exchange, Inc.*, 2011 WL 1599622, at *1 (noting that Plaintiffs "gas stations operated under the 76 and Union 76 trademarks" from November 2003 until at least June 23, 2010); *PDV Midwest Refining, L.L.C.*, 305 F.3d at 503–05 (referencing parties entering into contract in 1990 and operating under various renewed agreements until the franchise was terminated in 1998); *Clark v. BP Oil Co.*, 137 F.3d 386, 388–90 (6th Cir. 1998) (referencing that plaintiff operated his gasoline station under franchise agreements from 1990 through 1994); *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1052 (6th Cir. 1994) ("[Plaintiff] leased Amoco stations at various locations from 1968 to 1991 … [and] purchased gasoline from Amoco pursuant to a "Meter Marketing Plan" [that] provided for consignment sales of gasoline, whereby … [Plaintiff] paid Amoco only after selling the gas to retail customers."); *Equilon Enterprises, L.L.C. v. Rahim, Inc.*, 80 F. App'x 463, 465–66 (6th Cir. 2003) (referencing Plaintiff purchasing gasoline from January 1996 until October 1, 1999); *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1510 (6th Cir. 1989) ("[Plaintiff] purchased gasoline and other service station products on credit from Marathon … [b]etween December 1983 and January 1985 . . ."); *Shell Oil Co. v. Kozub*, 574 F. Supp. 114, 115 (N.D. Ohio. 1983) (referencing plaintiff purchasing gasoline to operate a Shell station from 1979 until 1983); *Equilon Enterprises LLC v. 12 & Evergreen D&D Services, Inc.*, 232 F. App'x 504, 505 (6th Cir. 2007) ("Prior to 2004, Shell marketed its gasoline in metropolitan Detroit through franchise relationships with the Dealers, to whom it directly supplied Shell-branded gasoline. In 2004 and 2005, Shell changed its Detroit marketing strategy by dissolving its franchise relationships … and entering into ten-year gasoline supply and purchase contracts with Dealers.").

30

entrepreneurial responsibility and risk" in handling the fuel such as taking title to it.[24]  *Coral Group Inc.*, 2006 WL 8438278, at *2.

This case is uniquely distinguishable, however, because the alleged Franchise Agreement at issue was terminated *before* DG Gas began any operations, sales, or purchases of fuel.  DG Gas does not allege that it had actually purchased fuel—rather, the Complaint alleges that TA terminated the FA *prior* to any TA Express Centers opening, at a time when "DG Gas was deeply engaged in developing travel centers" but was unable to finish development due to TA's "inability to timely provide standards for civil engineering and constructions of a ground-up development" that "affect[ed] the ability of [DG Gas] to meet its store opening obligations."  (Compl. at ¶¶ 82–83.)  Thus, it appears that DG Gas asserts that it falls within the purview of the PMPA—as either a "retailer" or "distributor"—because the "purchase and resale of motor fuel by DG Gas was the *raison d'étre* for the FA," and that under the FA, the "focus of the parties' relationship centered on the operation of a truck stop that *would* generate revenue … from the sale of motor fuel and other products." (Doc. No. 13 at PageID #939) (emphasis added).  The Court construes DG Gas's argument to be that the PMPA is applicable because the FA *would* involve DG Gas purchasing motor fuel and reselling it to the public to generate revenue from which it would pay royalties to TA.

Such allegations raise an important legal question—namely, whether DG Gas is entitled to invoke the protections of the PMPA based solely on the FA allegedly authorizing or requiring DG Gas to purchase motor fuel in the *future*, or whether DG Gas should be denied the protections of the PMPA simply because it had not yet started purchasing the fuel.  Neither party has cited any authority

---

[24] *See supra* note 20.

31

that addresses this issue or involves any factually similar scenarios.[25]  Nor does the legislative history of the PMPA address this question.

The Court's independent review of federal cases analyzing the PMPA reveals one case that has directly addressed this issue.  *See Thomas v. C.K. Smith Co.*, 1986 WL 12441 (D. Mass. Oct. 20, 1986).  In *Thomas*, the plaintiff alleged that he entered into a franchise relationship that entitled him to "begin purchasing motor fuel from defendant on May 1, 1983, at a rate of approximately $1200 per tankload."  *Id.* at *1.  However, plaintiff was never able to do so because the "defendant forced plaintiff to leave the premises on April 27, 1983," causing the plaintiff to file suit "claiming that defendant had violated the PMPA by terminating his franchise agreement without proper notice or cause."  *Id.*  The court thus faced the issue of "whether plaintiff was a retailer/franchisee based on defendant's alleged promise to allow plaintiff to purchase motor fuel and lease the service station after May 1, 1983."  *Id.* at *5.

The court concluded that "the existence of an agreement to sell plaintiff motor fuel in the future does not provide plaintiff the protection of the PMPA …"  *Id.* at *6.  In its evaluation, the court referenced the statutory definition of a "retailer" as "any person who *purchases* motor fuel for sale to the general public for ultimate consumption."  *Id.* (emphasis in original).  Applying that definition, the court determined that the plaintiff was "not a person who was *purchasing* motor fuel *when evicted* by defendant."  *Id.* (emphasis added).  The court concluded that under the plain language of the statute, the existence of an agreement to "buy motor fuel in the future"—i.e., the alleged agreement to "purchase motor fuel after May 1, 1983" from the defendant—did not bring the plaintiff within the

---

[25] *See supra* note 23.

32

protections of the PMPA.  *Id.*  In reaching its decision, the court recognized that the language of a statute must ordinarily be regarded as conclusive "absent a clearly expressed legislative intention to the contrary," and that "strict construction is particularly appropriate where, as here, the statute is in derogation of common law rights."  *Id.*  Accordingly, despite the plaintiff's contentions that it "would be 'absurd' to deny him the protections of the PMPA simply because he had not yet started purchasing gasoline," the court found that the plaintiff could not "invoke the protection of the PMPA by virtue of the alleged contract to purchase motor fuel after May 1, 1983."  *Id.* at *7.

Here, the Court finds *Thomas* to be instructive and concludes that DG Gas is not a "purchaser" of motor fuel to entitle it to PMPA protections.  DG Gas cannot be considered "any person who purchases motor fuel for sale to the general public for ultimate consumption" because it had not begun operating any TA Express Centers at the time it filed its lawsuit—as it had yet to finish developing any travel centers.[26]  § 2801(7); (Compl. at ¶¶ 79–83.)  Although DG Gas asserts that any operations under the FA would require it to be a purchaser of motor fuel, the purchasing of motor fuel in the future is insufficient to bring a party within the scope of the PMPA.  *See Thomas*, 1986 WL 12441, at *6–7.  In light of *Thomas* and the Sixth Circuit's guidance that "[s]trict construction is particularly appropriate where, as here, the statute in question is in derogation of common law rights,"[27] this Court concludes that DG Gas has failed to sufficiently plead that it is a "purchaser" of motor fuel.

---

[26] A review of DG Gas's Complaint suggests that of all the development site, the Maysville site was the closest to being completed, "which was capable of being converted to a TA Express Center within a matter of weeks."  (Compl. at ¶ 81.) However, the Complaint does not allege that *any* of the sites had been fully developed, let alone had begun operations involving the purchase of motor fuel for sale to the general public.  (*See generally* Compl.)

[27] *See May-Som Gulf, Inc.*, 869 F.2d at 921 (citing *Checkrite Petroleum, Inc.*, 678 F.2d at 8).

Accordingly, the Court concludes that DG Gas is not a "retailer" as defined by the PMPA.[28]   §

2801(7).

Finally, the Court turns to whether DG Gas is a "distributor" under the PMPA.  Because DG

Gas is not a purchaser of motor fuel as explained above, it cannot be a "distributor" under §

2801(6)(A).  Thus, DG Gas can only seek PMPA protections if it qualifies as a "distributor" under §

2801(6)(B).[29]  However, it is well-established that the PMPA's "legislative history makes clear that

in defining a 'distributor' who operates under a consignment, Congress had in mind an independent

---

[28] Even setting aside the issue of future purchases of fuel not triggering PMPA protections, the Court would still find that DG Gas's Complaint is insufficient to render it a "retailer" under the PMPA for a number of reasons.  First, the Complaint does not reference DG Gas purchasing fuel at all.  (*See generally* Compl.)  Although the Complaint alleges that a "TA branded truck stop such as a TA Center typically offers diesel and gasoline fuel" and the attached FA references the payment of royalty fees for each gallon of motor fuel sold, it is not enough to simply reference the "sale" of fuel to be a "retailer" under the statute.  (Compl. at ¶ 30.)  For example, numerous cases cited by the parties demonstrate situations where a party was not considered a "retailer"—despite selling fuel to consumers—because the party never *purchased* the fuel it was selling to be a "retailer" within the meaning of the PMPA.  Further, DG Gas does not allege, and does not attach to its Complaint, any "supply agreement" or similar type of agreement that explicitly entitles it to purchase fuel in the future.  In this regard, DG Gas is even further from falling within the protections of the PMPA than the plaintiff in *Thomas*, who had alleged that he had entered an oral agreement to purchase fuel from the defendant beginning on May 1, 1983.  *See Thomas*, 1986 WL 12441, at *6.  Upon conducting a thorough review of the FA, the Court only finds one reference to the ability to purchase fuel—which notably, was not cited by either of the parties in support of their arguments.  (*See* FA Section 18.1, Doc. No. 1-5 at PageID #765.)  Section 18.1 of the FA discusses the termination of services rights and provides that TA, if entitled to terminate the FA, will "have the option to terminate or suspend any one or more of the rights under this Agreement instead of terminating this Agreement."  *Id.*  The FA then lists various "rights" including "your right to buy Diesel Fuel Products and Services from us."  *Id.*  However, this sole provision appearing in the "termination" section of the FA, coupled with no allegations in the Complaint that DG Gas ever had an agreement to "purchase" fuel, is insufficient to conclude that DG Gas was a "retailer" under the PMPA.  Finally, DG Gas provides no details as to any alleged purchasing of fuel, including whether such fuel would be branded.  It is well-established that the PMPA does not apply to unbranded fuel.  *See, e.g.*, *Catch 26, LLC*, 2017 WL 4864856, at *3 (collecting cases).  Yet in fact, in its Opposition, DG Gas argues that it is "false" that TA "must sell *their* branded fuel" to DG Gas and that the PMP does not "only appl[y] to fuel supply contracts between the defendant and the plaintiff." (Doc. No. 13 at PageID #938.)  Thus, DG Gas appears to suggest that it could be purchasing fuel from someone other than TA yet includes no information indicating whether *that* fuel would be "unbranded" or not.  Simply put, DG Gas's Complaint fails to allege a PMPA claim in numerous respects.  But this Court need not address the aforementioned deficiencies any further because DG Gas's allegations of being a "purchaser" of fuel *in the future* and resulting failure to qualify as a "retailer" under the PMPA are a sufficient basis to dismiss DG Gas's PMPA claim.

[29] § 2801(6)(B) defines a "distributor" as "any person, including any affiliate of such person, who receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier."

middleman acting as a jobber, not a dealer selling to the public at retail." *Farm Stores, Inc.*, 763 F.2d at 1341; *Sasoro 13, LLC*, 2023 WL 2290788, at \*4; *Iqbal*, 2009 WL 3614978, at \*5; *Miller*, 739 F. Supp. at 1048–49; *Johnson*, 553 F. Supp. at 198.  In this case, DG Gas admits in its Opposition that the purpose of the FA was for it to "sell motor fuel to the public" rather than to act as an independent middleman.  (Doc. No. 13 at PageID #940.)  DG Gas thus cannot qualify as a "distributor" under § 2801(6)(B).

The Court therefore concludes that DG Gas is neither a "retailer" nor "distributor" under the PMPA, and that no "franchise" exists under the PMPA as a result.  *See* § 2801(1)(A) (defining a "franchise," in relevant part, as any contract involving either a "retailer" or "distributor").  Thus, DG Gas is not afforded the protections of the PMPA and cannot sustain a claim under the statute. Accordingly, Count One of the Complaint is dismissed.[30]

## B.  Count Two:  Breach of the Franchise Agreement

The Court next turns to Count Two of the Complaint alleging that TA breached the Franchise Agreement.

### 1.  Opening Date as a Material Term

First, in its Motion, TA asserts that the Opening Date was a material term of the FA.  TA points to Section 18.2 of the FA which provides in relevant part as follows:

---

[30] Because Count One is dismissed in its entirety, the Court finds it unnecessary to address TA's argument that DG Gas has conceded that the relief sought under Count One related to the deed restriction is unrelated to the PMPA relationship and has thus abandoned the argument.  (Doc. No. 17 at PageID #982.)  However, the Court notes that even if DG Gas could have maintained a PMPA claim—which it cannot as explained above—it failed in its Opposition to respond to TA's argument on this point, and thereby would have waived any opposition thereto.  *See Kuhlman*, 2023 WL 2652585, at \*11 (citing *Humphrey*, 279 F. App'x. at 331) ("It is well established that, if a plaintiff fails to respond or to otherwise oppose a defendant's motion to dismiss, a district court may deem the plaintiff to have waived opposition."); *Fox*, 726 F. Supp.3d at 785.

"We have the right to terminate this Agreement, without giving you any opportunity to cure the default (based on the nature of the default or the default is non-curable) effective upon delivery of written notice of termination to you, if: […] (b) you fail to begin operating the TA® Center within six (6) months of the Agreement Date, or in the case of construction of a new Site, within eighteen (18) months of the Agreement Date[.]"

(FA Section 18.2, Doc. No. 1-5 at PageID #766.)  TA also points to Section 21.18 of the FA which provides: "Time is of the essence in this Agreement. It will be a material breach of this Agreement to fail to perform any obligation within the time required or permitted by this Agreement."  (FA Section 21.18, Doc. No. 1-5 at PageID #778.)  Referencing these provisions, TA submits that it is "difficult to imagine how a term identified as 'material' suggests to DG Gas that it is immaterial."  (Doc. No. 11 at PageID #897.)  TA contends that the "only support DG Gas offers for its position is that the May 2022 FDD mentions potential extensions upon TA's agreement and payment of a fee."  (*Id.*) However, TA asserts that the May 2022 FDD did not exist until after DG Gas signed the FA and cannot negate the materiality of the term in the FA entered by the parties.  (*Id.*)  Finally, TA submits that even if the May 2022 FDD was relevant, DG Gas does not allege that it "paid a fee and was granted an extension."  (*Id.*)  Accordingly, TA argues that it had the "express right to 'terminate this Agreement, without giving [DG Gas] any opportunity to cure' [the] failure to meet the Opening Date deadline," and that this express right to terminate the FA rendered the Opening Deadline material.[31] (*Id.*)

---

[31] TA also addresses DG Gas's allegation that the "FA only imposes a duty to open a flagship TA Center by the Opening Deadline, not a TA Express Center."  (Compl. at ¶ 126.)  TA raises two arguments in response to this argument.  First, TA notes that Section 2.1 of the FA provides that "[a]ll references to TA® Center(s) in this Agreement shall be interpreted as also applying to TA® Express Center(s), unless explicitly noted otherwise."  (Doc. No. 11 at PageID #897; Doc. No. 1-5 at PageID #728.)  Second, TA submits that "DG Gas did not even open a flagship TA Center, either."  (Doc. No. 11 at PageID #896.)  DG Gas does not address either of these arguments in its Opposition.  (Doc. No. 13.)  In any event, the Court finds TA's arguments on this point persuasive.

36

In its Opposition, DG Gas asserts that the question of whether a contractual provision is material is a "factual inquiry, inappropriate for resolution on the pleadings alone."  (Doc. No. 13 at PageID #941–42.)  DG Gas submits that the materiality of the Opening Deadline obligation will be a "hotly contested" issue.  (*Id.* at PageID #942.)  DG Gas contends that its Complaint contains many allegations that establish the immateriality of the Opening Date, including the following:

- "TA's delay in sending DG Gas specifications and standards for a TA Express Center demonstrates that TA did not consider the Opening Date "material." *See* Compl. ¶¶ 51, 55, 60, 72.
- TA urged DG Gas to delay opening the Cordele franchise until after construction on the Walton, KY location was finished, which was not completed until February 2024. *See* Compl. ¶¶ 10, 72.
- The parties agreed in or around December 2022 that the Opening Date was no longer appropriate and acknowledged that April 2024 was the earliest date possible for opening. Compl. ¶¶ 11, 70–72, 114, 131.
- TA knew in December 2002 [sic] that the opening deadline was impossible and yet said nothing to DG Gas who was investing in developing its TA Express Center. Compl. ¶¶ 11, 70–72, 114, 131.
- The Opening Date provision was arbitrary and speculative considering it was established at a time when TA only had franchisees converting existing truck stops, not doing a group-up [sic] development. *See* Compl. ¶¶ 51–62.
- TA has not, to DG's knowledge, ever enforced the opening-deadline provision against other franchisees. Compl. ¶ 73.
- TA changed its Franchise Disclosure Document during the term of the FA to indicate that a breach of the Opening Deadline would merely trigger a fee. Compl. ¶¶ 82, 84, 117, 127, 135."

(*Id.*)  Accordingly, DG Gas asserts that the above allegations "demonstrate the Opening Date provision's immateriality" and submits that the determination of materiality should be left to trial. (*Id.*)

In its Reply, TA asserts that DG Gas relies on "conclusory allegations" and fails to "plausibly state a claim for relief."  (Doc. No. 17 at PageID #982–83.)  TA contends that the "plain language of the FA directly and irrefutably contradicts [the] premise" that DG Gas was "entitled to a continued contractual relationship with TA, even after missing the Opening Deadline."  (*Id.* at PageID #983.)

TA cites to the FA for the premise that "DG Gas explicitly agreed that the Opening Deadline was a 'material' term of the FA … [and] that TA could terminate the FA if that deadline was not met." (*Id.* (citing FA, Sections 18.2(b), 21.18, Doc. No. 1-5 at PageID #766, 778).)  In response to DG Gas's assertion that "materiality 'tends' to be or 'generally' is a question of fact," TA submits that courts reach a different result where "the explicit language of the parties' contract confirms materiality" and that "[m]ateriality can be a question of law if the contract itself clearly makes a certain event a material breach." (Doc. No. 17 at PageID #983–84.)  Accordingly, TA asserts that here, the "plain language of the FA is 'clear in making a certain event'—namely, the failure to meet the Opening Deadline—'a material breach of that contract'" and that the Court "must respect that contractual provision." (*Id.* at PageID #984.)

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat'l Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (quoting *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

"A material breach is a breach essential to the purpose of the contract." *Whitt Sturtevant, LLP v. NC Plaza LLC*, 43 N.E.3d 19, 30 (10th Dist. 2015) (citing *Software Clearing House, Inc. v. Intrak, Inc.*, 583 N.E.2d 1056, 1060 (1st Dist. 1990)); *see also C. Norris Manufacturing, LLC v. BRT Heavy Equipment, LLC*, 2017 WL 1038958, at *4 (N.D. Ohio Mar. 17, 2017).  "The determination of whether a party's breach of contract was a 'material breach' is generally a question of fact." *Whitt Sturtevant, LLP*, 43 N.E.2d at 30; *O'Brien v. Ohio State Univ.*, 2007 WL 2729077, at *3 (10th Dist.

38

Sept. 20, 2007); *C. Norris Manufacturing, LLC*, 2017 WL 1038958, at *4; *Eagle Express, Inc. v. Paycor, Inc.*, 732 F. Supp.3d 753, 764 (S.D. Ohio 2024).

"However, materiality can be a question of law if the contract itself clearly makes a certain event a material breach." *C. Norris Manufacturing, LLC*, 2017 WL 1038958, at *4 (citing *O'Brien v. Ohio State Univ.*, 2005 WL 1532341, at *5 (Ohio Ct. Cl. 2005)). Thus, "[w]here a contract is clear in making a certain event a material breach of that contract, … a court must respect that contractual provision." *O'Brien*, 2005 WL 1532341, at *5; *In re Bachinski*, 393 B.R. 522, 543 n.11 (Bankr. S.D. Ohio 2008); *see also* 23 Williston on Contracts § 63:3 (4th ed.) (last updated May 2024).

Accordingly, "[w]hen a contract specifies that time is of the essence, a delay in performance is generally viewed as a material breach." *Fuschino v. Smith*, 2001 WL 9928, at *3 (2d. Dist. Jan. 5, 2001); *Klausing v. Chef Solutions, Inc.*, 2007 WL 3342878, at *3 (3d. Dist. Nov. 13, 2007) (same); *Marion v. Hoffman*, 2010 WL 3839439, at *4 (3d Dist. Oct. 4, 2010) (same); *Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, 2007 WL 1641155, at *6 (10th Dist. June 7, 2007) (similar); *U.S. for Use and Benefit of Ken's Carpets Unlimited, Inc. v. Interstate Landscaping Co., Inc.*, 37 F.3d 1500 (Table), 1994 WL 481684, at *6 (6th Cir. Sept. 6, 1994) ("[I]f the contract expressly provides that time is of the essence, then failure to perform on time is a material breach."); *Lelli's Inn, Inc. v. Steven Lelli's Inn on the Green, L.L.C.*, 2017 WL 6521325, at *11 (E.D. Mich. Oct. 24, 2017) (same); *In re Mackey*, 2013 WL 392449, at *7 (Bankr. N.D. Ohio Jan 31, 2013) (similar).

The Court hereby finds that the Opening Date was a material term of the FA. As TA notes, the FA explicitly provides that "[t]ime is of the essence" and that it "will be a *material* breach of this Agreement to fail to perform any obligation within the time required or permitted by this

Agreement."[32]  (FA Section 21.18, Doc. No. 1-5 at PageID #778 (emphasis added).)  The FA further

provides that TA has the "right to terminate this Agreement, without giving you an opportunity to

cure the default" if DG Gas "fail[s] to begin operating the TA® Center … within eighteen (18) months

of the Agreement Date." (FA Section 18.2, Doc. No. 1-5 at PageID #766.)  Absent these two

provisions, the inquiry of whether the Opening Date was material may indeed have been a "question

of fact."  *Whitt Sturtevant, LLP*, 43 N.E.2d at 30.  However, where a "contract is clear in making a

certain event a material breach of that contract, … a court must respect that contractual provision."[33]

*O'Brien*, 2005 WL 1532341, at *5.  Accordingly, the Court concludes that the Opening Date was a

material term of the FA.[34]

### 2.    PMPA as "Applicable Law" to Modify the FA

Second, in its Motion, TA addresses DG Gas's assertion that the PMPA modified the FA.

(Doc. No. 11 at PageID #897–98.)  Specifically, TA submits that the PMPA is never mentioned in

---

[32] *See Cates*, 874 F.3d at 536 ("The law is clear that courts may consider a document which was attached to the complaint in determining whether dismissal is proper.") (alterations omitted).

[33] While the *O'Brien* court recognized that the issue of "whether a material breach of an agreement has occurred is generally a question of fact" and examined the five-factor test often used to make that determination, it only did so *because* the "agreement in this case *does not contain a list of specific material events* or otherwise define the term 'material breach.'"  2005 WL 1532341, at *5–6 (emphasis added).  This case is distinguishable because unlike *O'Brien*—which both of DG Gas's cited cases rely on—the Franchise Agreement at issue herein explicitly sets forth the failure to perform an obligation with the time required as a material breach, including the "fail[ure] to begin operating the TA® Center … within eighteen (18) months of the Agreement Date." (FA Section 18.2, Doc. No. 1-5 at PageID #766.)

[34] DG Gas cites to various allegations of its Complaint in support of its position.  (Doc. No. 13 at PageID #942.)  The Court finds that many of these allegations relate to other issues such as whether TA "waived" the Opening Date or whether TA itself had breached its obligations under the FA such as to excuse any non-performance, rather than whether the Opening Date itself was a material term of the FA.  (*Id.*)  In other words, there is a difference between determining whether the Opening Date was a "material term" under the terms of the FA that explicitly provided so, as opposed to evaluating whether TA "waived" that "material" requirement based on circumstances that later occurred after signing the FA.  The Court will thus address each of DG Gas's cited allegations in the relevant sections below.  But, to the extent that any of the allegations are presented to dispute the materiality of the terms referenced in the FA, the Court finds that the FA "is clear in making [the failure to meet the Opening Date] a material breach of that contract," and accordingly, "must respect that contractual provision."  *O'Brien*, 2005 WL 1532341, at *5.

the FA, and that only "governing law (not the PMPA), if applicable, modifies the FA."  (*Id.*)  In its Opposition, DG Gas refutes that the PMPA must be referenced in the FA and asserts that the statute constitutes "applicable law" that modifies the FA by its own terms as "remedial legislation."  (Doc. No. 13 at PageID #942–43.)  In its Reply, TA simply reiterates that there is no plausible claim for breach based on the PMPA because the PMPA does not apply to this case.  (Doc. No. 17 at PageID #984.)

As already determined above, the PMPA is inapplicable to this case.[35]  The Court therefore rejects DG Gas's arguments that the PMPA sufficiently modified the FA to support a breach of contract claim.

### 3.    TA Waiving Enforcement or Ratifying Extension of Opening Date

Third, in its Motion, TA submits that the Complaint fails to "plausibly allege that TA waived or ratified an extension of the Opening Date."  (Doc. No. 11 at PageID #898.)  TA cites to Sections 21.2 and 21.15 for the assertion that the "FA explicitly rules out the possibility of waiver, ratification, or any modification of the FA's terms absent a signed agreement in writing."  (*Id.*)  Next, TA contends that the Complaint confirms that TA acted to enforce the deadline, rather than waive it because "TA warned DG Gas that it would be 'penalized' for missing the deadline, and to avoid such a penalty, to 'devise a reasonably opening date and stick to it.'"  (*Id.*)  Thus, TA asserts that this was not a waiver, but "[a]t most [was] an invitation to discuss a potential amendment," which "Plaintiffs acknowledge does not exist."  (*Id.*)  TA further contends that the FA's anti-waiver provision is inconsistent with waiver, and that a "waiver must be clear and unequivocal if it contradicts a written contract

---

[35] *See supra* Section IV.A (dismissing Count One under the PMPA because DG Gas is not a "retailer" or "distributor" under the statute).

provision." (*Id.*) Next, TA submits that the Complaint "alleges, without support, that TA ratified an extension of the Opening Date." (*Id.*) Specifically, TA asserts that the "Complaint does not allege that some person, purporting to act on behalf of TA, entered into an agreement to change the Opening Date," but instead alleges that "DG Gas was informed it 'must devise a reasonable opening date and stick to it' or else be 'penalized.'" (*Id.* at PageID #898–99.) Finally, TA contends that the Complaint does not ever allege that the parties reached any extension agreement, but rather that the parties "failed to pick a replacement deadline"—and thus, no ratification of an extension occurred. (*Id.* at PageID #899.)

In its Opposition, DG Gas submits that the Complaint adequately alleges that TA either waived enforcement or ratified an extension of the Opening Date. (Doc. No. 13 at PageID #943.) First, DG Gas asserts that the FA's "anti-waiver provision" is a "red herring [because the] essence of the waiver and ratification doctrines is that the express provisions of a contract were modified through the parties' *conduct*," and "terms of a written contract may be modified by the subsequent acts and agreements of the parties." (*Id.* (emphasis in original).) In this regard, DG Gas contends that the parties developed a "mutual understanding" that the Opening Date obligation was not appropriate, and that TA "acted inconsistently" with a strict enforcement of the June 2023 Opening Date. (*Id.* at PageID #944.) DG Gas also disputes TA's characterization of the email string between the parties as an "invitation to discuss a potential amendment," and asserts that a jury should make that determination following discovery that will reveal the parties' intentions and expectations. (*Id.*)

In its Reply, TA responds that the Complaint relies on a communication that, "according to Plaintiffs, worked waiver or ratification of the Opening Deadline," and that the Court can determine the legal effect on a motion to dismiss. (Doc. No. 17 at PageID #984.) TA further asserts that

Plaintiffs fail to plausibly allege any such agreement because "according to their own allegations, TA confirmed its intent to enforce the Opening Deadline and the parties never agreed there would be an extension or selected a replacement deadline." (*Id.* at PageID #984–85.)  Finally, TA submits that Plaintiffs fail to address the effect of the FA's anti-waiver clause, thereby waiving any argument thereto.  (*Id.* at PageID #985.)

"A waiver is a voluntary relinquishment of a known right." *Gembarski v. PartsSource, Inc.*, 134 N.E.3d 1175, 1180 (Ohio 2019).  "A party may waive a right by express words or by conduct that is inconsistent with that right."[36]  *Id.*; *see also Hacker v. Natl. College of Business & Technology*, 927 N.E.2d 38, 42 (2d Dist. 2010).  Specifically, "[t]o establish waiver, the party seeking waiver must demonstrate: (1) that the party knew of its right to assert an argument or defense and (2) that the totality of the circumstances establish that the party acted inconsistently with that right." *Gembarski*, 134 N.E.3d at 1180.

"[E]ven if time appears to be of the essence in an agreement, the time may be waived by a party who benefits from the time requirement if that party acts inconsistently with the time requirement." *AMP V, LP v. Long Point Energy, LLC*, --- N.E.3d ---, 2025 WL 290040, at *5 (7th Dist. Jan 16., 2025); *see also Hacker*, 927 N.E.2d at 42 (similar); *Sandler v. All Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992) (recognizing that a "time is of the essence" clause may be waived by acting inconsistently); 18 Ohio Jur. 3d Contracts § 158 ("A clause specifying that time is

---

[36] *See also Accurate Electric Constr. v. Ohio State Univ.*, 149 N.E.3d 1080, 1094 (10th Dist. 2019) ("[W]aiver of a contract provision may be express or implied."); *Lewis & Michael Moving and Storage, Inc. v. Stofcheck Ambulance Serv., Inc.*, 2006 WL 2056636, at *6 (10th Dist. 2006) (same); *Fairview Radiology, P.C. v. Defiance Hospital, Inc.*, 413 F. Supp.2d 874, 882 (N.D. Ohio 2005) (citing *Ryan v. Terra Vista Estates, Inc.*, 657 N.E.2d 522, 526 (8th Dist. 1995)) ("The terms of a written contract may be modified by the subsequent acts and agreements of the parties.").

of the essence in a contract may be waived.").  "[R]esolution of the waiver issue requires a fact-intensive analysis."  *Fravel v. Columbus Rehab. & Subacute Inst.*, 53 N.E.3d 953, 956 (10th Dist. 2015) (collecting cases); *see also EAC Properties, L.L.C. v. Brightwell*, 2011 WL 1944101, at *5 (10th Dist. May 17, 2011).

Relatedly, "[r]atification is the approval by act, word, or conduct of that which was improperly done."  *Doe v. Contemporary Services Corp.*, 2019 WL 911102, at *5 (8th Dist. Feb. 21, 2019) (alterations omitted).  For ratification to occur, "the ratifying party must know what actions he is ratifying."  *Id.* (alterations omitted).  "Knowledge need not be actual [because] the knowledge component of ratification also includes what the principal should have known."  *Hanneman Family Funeral Home and Crematorium v. Orians*, 2022 WL 893806, at *13 (3d. Dist. Mar. 28, 2022). Generally, like waiver, "whether ratification occurred is a question of fact."  *Id.*; *see also Bailey v. Midwestern Ent., Inc.*, 658 N.E.2d 1120, 1123 (10th Dist. 1995) (similar).

The Court finds that Plaintiffs' Complaint sets forth sufficient allegations that TA either waived or ratified an extension of the initial Opening Date.[37]  In its Complaint, DG Gas alleges that TA "advise[d] DG Gas in December 2022 that the Opening Deadline needed to be changed to at least April 2024."  (Compl. at ¶ 131.)  According to DG Gas, TA informed DG Gas that because "DG Gas will not meet its opening deadline and therefore will need an extension of that deadline," the parties "must devise a reasonable opening date and stick to it" because "TA did not want to see DG Gas be

---

[37] The parties do not provide the exact date of the initial Opening Deadline.  Instead, as explained above, they reference Section 18.2(b) of the FA which provides that in the case of construction of a new site, DG Gas would need to "begin operating the TA® Center … within eighteen (18) months of the Agreement Date."  (Doc. No. 1-5 at PageID #766.)  DG Gas signed the agreement on December 3, 2021, and TA signed the agreement on December 6, 2021.  (*Id.* at PageID #780.)  Accordingly, the initial Opening Date per the terms of the FA—i.e., eighteen months from the date that both parties signed the FA—would be June 6, 2023.

44

'penalized' for missing any deadlines." (Compl. at ¶ 70.) Thus, TA's representative, Pete Ungaro ("Ungaro"), "promise[d] to 'get with Arthur' to discuss this and promised to get back to DG Gas about the *precise date* that would be the *new* opening deadline for DG Gas." (*Id.*) DG Gas was allegedly informed that this "estimated … new deadline would need to be no earlier than April 2024." (*Id.*)

Moreover, DG Gas alleges various conduct by TA that could be construed as inconsistent with the initial Opening Deadline. For example, DG Gas submits that TA "urged DG Gas to delay opening the Cordele franchise until after construction on the Walton, KY location was finished"— which was not opened until February 2024—because the Walton location "was the 'prototype' that DG Gas was told to follow." (Doc. No. 13 at PageID #942; Compl. at ¶ 72.) Similarly, DG Gas asserts that "TA changed its Franchise Disclosure Document during the term of the FA" to reflect pushing back the initial Opening Deadline, including adding language "regarding how construction is a factor that may affect a franchisee's ability to meet a contractual opening obligation … [and] that an extension fee for violating an opening deadline may need to be paid." (Doc. No. 13 at PageID #942; Compl. at ¶¶ 82, 84.)

TA argues that it did not waive penalties for failure to meet the Opening Deadline and that there was never an agreed upon date for a newly extended deadline. (Doc. No. 11 at PageID #898–99.) While the Complaint includes an acknowledgment that the extended Opening Date "was never identified with precision," it also includes an allegation that TA's representative, Ungaro, agreed that there "*would be a new opening deadline* for DG Gas."[38] (Compl. at ¶¶ 70–71 (emphasis added).)

---

[38] This allegation in the Complaint contradicts TA's assertion that the "Complaint does not allege that some person, purporting to act on behalf of TA, entered into an agreement to change the Opening Date." (Doc. No. 11 at PageID #898–99.) As explained above, there is a key distinction between the parties *agreeing* that the initial Opening Date *would* be

The mere fact that the parties did not agree to the *exact* date of the extension does not preclude a finding that DG Gas and TA agreed that an extension would be granted, the date of which would be specified later.  Similarly, the allegation that "TA did not want to see DG Gas be 'penalized' for missing any deadlines" does not require a finding that TA intended to enforce the initial Opening Deadline.  (Compl. at ¶ 70.)  Rather, in the surrounding context, that statement could simply be interpreted as the *reason* that TA agreed to "the new opening deadline for DG Gas." (*Id.*)  Construed in the light most favorable to DG Gas, and when viewed together, these allegations are sufficient to assert a waiver or ratification of an extension of the Opening Deadline.

Finally, TA argues that the FA's anti-waiver provision is inconsistent with waiver.[39]  (Doc. No. 11 at PageID #898.)  Specifically, TA asserts that "waiver must be clear and unequivocal if it contradicts a written contract provision," and that the "only conduct DG Gas has pointed to is *consistent* with enforcement."  (*Id.*)  The Court rejects this argument.  A "written waiver provision, just like any other provision in a contract, can be waived by action of the parties" if the waiver is "clear and unequivocal."  *Snowville Subdivision Joint Venture Phase I v. Home S. & L. of Youngstown, Ohio*, 2012 WL 1067748, at *4 (8th Dist. 2012); *see also Home S. & L. of Youngstown*

---

changed while not yet picking out a new date—which could relieve DG Gas from needing to have the site operational by the original June 6, 2023 deadline—as opposed to the parties *finalizing* the exact new date for opening.  In similar fashion, TA contends that "the ratifying party must know what actions he is ratifying," and that TA "could not know what it was allegedly ratifying" because by DG Gas's admission, the "parties failed to pick a replacement deadline." (*Id.* at PageID #899.)  Again, the allegation that an affirmative agreement between the parties was reached for a "new opening deadline for DG Gas" does not equate to the ratifying party not "know[ing] what actions he is ratifying" merely because the exact date had not yet been chosen.  (*Id.*; Compl. at ¶ 70.)

[39] In its Reply, TA asserts that "Plaintiffs fail to address the effect of the FA's anti-waiver clause," and cites to case law for the proposition that DG Gas thereby waived the argument.  (Doc. No. 17 at PageID #985.)  In its Opposition, however, DG Gas contends that TA's reliance on the anti-waiver provision is a "red herring" because waiver and ratification doctrines involve modification through the parties' conduct, and that the "subsequent acts and agreements of the parties" could still modify the terms of the FA.  (Doc. No. 13 at PageID #943.)  In light of these assertions by DG Gas, the Court finds that DG Gas did not waive its arguments regarding the anti-waiver clause.

*v. Snowville Subdivision*, 2012 WL 4755355, at *5 (recognizing that "even with such a written waiver provision, [plaintiff], through its actions, may waive a requirement under the agreement"). As explained above, DG Gas has alleged numerous actions that could be construed as a clear waiver, including that TA "advise[d] DG Gas in December 2022 that the Opening Deadline needed to be changed to at least April 2024." (Compl. at ¶ 131.) Second, although Ohio courts have upheld certain anti-waiver clauses, an "anti-waiver clause must be enforced pursuant to its explicit terms." *Fields Excavating, Inc. v. McWane, Inc.*, 2009 WL 3721013, at *7 (12th Dist. 2009). Here, the FA's anti-waiver provision appears to address waiver by *inaction* rather than by a "course of acts and conduct," and is thus inapplicable.[40] *See, e.g.*, *Wirtgen America, Inc. v. Hayden-Murphy Equipment Company*, 2023 WL 5917404, at *6 (M.D. Tenn. Sept. 11, 2023).

---

[40] The anti-waiver provision reads as follows:

> 21.2 <u>Waivers</u>. We will not be deemed to have waived our right to demand exact compliance with any of the terms of this Agreement, even if at any time: (a) *we do not exercise a right or power available to us* under this Agreement; or (b) *we do not insist on your strict compliance* with the terms of this Agreement; or (c) *if there develops* a custom or practice which is at variance with the terms of this Agreement; or (d) *if we accept payments which are otherwise due* to us under this Agreement. Similarly, our waiver of any particular breach or series of breaches under this Agreement or of any similar term in any other agreement between you and us or between us and any other franchise owner, will not affect our rights with respect to any later breach by you or anyone else.

(FA, Section 21.2, Doc. No. 1-5 at PageID #775 (emphasis added).) Provisions (a) and (b) appear to relate to situations where TA does not affirmatively act to "exercise a right" or "insist" on strict compliance. Similarly, provision (c) relates to situations where certain customs "develop." Finally, provision (d) addresses situations where TA "accept[s] payments which are otherwise due," which is inapplicable here. However, none of these provisions address an affirmative modification by TA. *See, e.g.*, *Wirtgen America, Inc. v. Hayden-Murphy Equipment Company*, 2023 WL 5917404, at *6 (M.D. Tenn. Sept. 11, 2023) (distinguishing waiver clause that prevented waiver by inaction from "other ways" waiver could have occurred including "by a course of acts and conduct," such that it was "possible that waiver occurred through [plaintiff's] actions, rather than its omissions"). In this instance, DG Gas has alleged that TA affirmatively agreed to an extension of a deadline—specifically, that TA "advise[d] DG Gas in December 2022 that the Opening Deadline needed to be changed to at least April 2024." (Compl. at ¶ 131.) Unlike a waiver that occurs due to the mere inaction of not exercising a right, DG Gas's allegation falls outside of the waiver provision because Section 21.2 does not address any situations in which TA affirmatively seeks and intends to modify the FA by its actions, as alleged by DG Gas. At this early stage, without any fact-finding having occurred, the Court finds that the anti-waiver clause only addresses *inaction* by TA and declines to expand the waiver clause to encompass an *affirmative* waiver because an "anti-waiver clause must be enforced pursuant to its explicit terms." *Fields Excavating, Inc.*, 2009 WL 3721013, at *7.

As acknowledged by TA in its Motion,[41] the Court must evaluate whether the "*totality of the circumstances* establish that the party acted inconsistently with that right." *Gembarski*, 134 N.E.3d at 1180 (emphasis added). Such an evaluation is inherently a "fact-intensive analysis." *Fravel*, 53 N.E.3d at 956. The Court declines to undertake that fact-finding here.[42] At this early stage of evaluating TA's Motion to Dismiss and accepting DG Gas's "factual allegations as true and constru[ing] the [C]omplaint in the light most favorable to the Plaintiffs," DG Gas has sufficiently alleged either a waiver or ratification of extension of the Opening Deadline sufficient to survive dismissal under Rule 12(b)(6). *Gunasekera*, 551 F.3d at 466.

### 4. Force Majeure

Fourth, in its Motion, TA submits that the Opening Date was not extended by a force majeure event. (Doc. No. 11 at PageID #899.) Specifically, TA asserts that "TA's supposed delay and delays from DG Gas's lender" do not constitute a "Force Majeure Event" because they are neither "outside of [TA's] or [DG Gas's] control" or "of a similar nature" to "government regulations or orders, war, strikes, terrorist attacks, natural disasters, [or] acts of God" under the FA's force majeure clause.[43]

---

[41] (*See* Doc. No. 11 at PageID #898.)

[42] The Complaint references email communications on December 16, 2022, in which TA and DG Gas allegedly discussed DG Gas not meeting the Opening Deadline and the need to "devise a reasonable opening date and stick to it." (Compl. at ¶ 70.) These email communications were not attached to the Complaint. TA petitions the Court to determine the legal effect of these alleged December 16, 2022 email communications on this motion to dismiss. In support of its position, TA cites to a case in which a breach of contract claim was dismissed where the court "held as a matter of law that correspondence attached to plaintiff's complaint did not create a valid contract." (Doc. No. 17 at PageID #984.) However, the Court notes that unlike the correspondence in the case cited by TA, the December 16, 2022 emails are not attached to Plaintiffs Complaint. *See Thomas v. Publishers Clearing House, Inc.*, 29 Fed. App'x. 319, 322–23 (6th Cir. 2002) (evaluating correspondence attached to defendants' motion to dismiss to determine whether a contract had been formed). Rather, the only email communication attached to the Complaint is an email chain from July 2023, in which TA represents that it is "not moving forward with any of your sites," and TA has not attached any correspondence to its Motion. (Doc. No. 1-8; Doc. No. 11.) The Court declines to make any determinations regarding the parties' December 16, 2022 emails at this early stage without the opportunity to review those communications.

[43] The FA defines a "Force Majeure Event" as follows:

48

(*Id.*)  TA further contends that DG Gas's "failure to secure financing" cannot be excused as a force majeure because the "FA clearly allocated the responsibility and risk of obtaining financing to DG Gas."  (*Id.*)  Accordingly, TA asserts that the chance that a loan "might fall through or be delayed for regulatory reasons is an ordinary risk of financing in commercial contracts" and therefore cannot constitute force majeure.  (*Id.* at PageID #900.)

In its Opposition, DG Gas asserts that the determination of whether there was a "Force Majeure Event" is a "fact-based dispute that mangles the FA's force majeure provision and misconstrues the Complaint's allegations."  (Doc. No. 13 at PageID #944.)  DG Gas thus contends that this determination is "not susceptible for resolution on the pleadings," particularly where the "force majeure provision states that actions outside of either parties' control (not both) can trigger force majeure."  (*Id.* at PageID #944–45.)

In its Reply, TA reiterates its position that "Plaintiffs fail to plausibly allege any force majeure event that fits the FA's definition."  (Doc. No. 17 at PageID #985.)  TA also submits that DG Gas's cited authority pertained to an "ambiguous contract" and is limited to those circumstances, as opposed to "an unambiguous written contract—the situation here—[that] is precisely the sort of question of law appropriate for determination at this stage."  (*Id.*)  Finally, TA asserts that DG Gas did not address the case law in TA's Motion regarding the applicability of force majeure clauses when a party assumes the risk of an event in a contract.  (*Id.*)

---

"Any delay or failure in the performance of this Agreement, if such delay or failure is caused by government regulations or orders, war, strikes, terrorist attacks, natural disasters, acts of God, or other acts or causes of a similar nature which are outside of your or our control."

(Doc. No. 1-5 at PageID #723.)

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."[44]   *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (collecting cases); *see also Nations Lending Corp. v. Patille*, Case. No. 22 Civ. 2102, Doc. No. 9, at *13–16 (N.D. Ohio May 11, 2023) (Barker, J.) (interpreting contractual language at motion to dismiss stage).   "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Savedoff*, 524 F.3d at 763.   It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)).   "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."   *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978).   "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous."   *Airlink Commc'n, Inc. v. Owl Wireless, LLC*, 2011 U.S. Dist. LEXIS 106673 at *5 (N.D. Ohio Sep. 20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."   *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003) (citation

---

[44] The Court finds that DG Gas's cited authority asserting that "it is a fact question whether there was a force majeure event" is distinguishable because whether a fact question exists hinges on whether the terms of the contract are ambiguous as opposed to unambiguous.  *See Savedoff*, 524 F.3d at 763 ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.").

omitted).  "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract."  *Id.*  In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *State Grp. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio App. 7th Dist. 2002), so as "to give reasonable effect to every provision in the agreement."  *Stone v. Nat'l City Bank*, 665 N.E.2d 746, 752 (Ohio App. 8th Dist. 1995).  "When circumstances surrounding an agreement invest the language of the contract with a special meaning, extrinsic evidence can be considered in an effort to give effect to the parties' intention."  *Martin Marietta Magnesia Specialties, LLC v. Pub. Utils. Comm'n of Ohio*, 954 N.E.2d 104, 111 (Ohio 2011).

Ohio cases analyzing "force majeure" clauses with similar language as the FA have described such examples as "dramatic unforeseen … catastrophic events."  *See, e.g.*, *Dunaj v. Glassmeyer*, 580 N.E.2d 98, 100–101 (Ohio Com. Pl. 1990).  As such, "[m]istaken assumptions about future events or bad economic conditions do not qualify as 'force majeure.'"  *Id.*; *see also Stand Energy Corp. v. Cinergy Services, Inc.*, 760 N.E.2d 453, 457 (1st Dist. 2001) (same); *In re Old Carco LLC*, 452 B.R. 100, 119–20 (Bankr. S.D.N.Y. 2011) (reviewing Ohio decisions interpreting force majeure clauses to conclude that "as a general rule, financial difficulty does not excuse the defaulting party's performance").  Accordingly, "[w]hen a party assumes the risk of certain contingencies in entering a contract … such contingencies cannot later constitute a 'force majeure.'"  *Dunaj*, 580 N.E.2d at 497; *Stand Energy Corp.*, 760 N.E.2d at 416.

The Court finds that the FA's definition of a "Force Majeure Event" is unambiguous.  (Doc. No. 1-5 at PageID #723.)  The FA provides numerous examples of a Force Majeure Event including delays or failures caused by "government regulations or orders, war, strikes, terrorist attacks, natural

51

disasters, [and] acts of God." (*Id.*) Following these examples, the FA provides that "other acts or causes of a *similar nature* which are outside of your or our control" may also constitute a Force Majeure Event. (*Id.* (emphasis added).) This latter general provision thus must take its meaning from the specific terms with which it appears.[45]

DG Gas asserts two reasons for invoking the FA's force majeure clause. First, DG Gas submits that TA's own delays in providing directions to DG Gas constitute a Force Majeure Event. (Compl. at ¶ 133.) While DG Gas might assert that TA's failure to provide specifications constituted a breach of the FA that excused DG Gas's performance, the mere fact that TA failed to comply with its own obligations under the FA[46] does not create a Force Majeure Event. Indeed, a simple delay in providing franchise directions is not analogous to any of the "dramatic unforeseen … catastrophic events" described in the definition of a Force Majeure Event.[47] (*See* Doc. No. 1-5 at PageID #723.)

---

[45] In addition to the FA explicitly providing that "other acts or causes" must be of a "*similar nature*" as the prior examples, interpreting the latter provision within the context of the examples listed is also consistent with the principle of *ejusdem generis*, which Ohio courts have relied upon in interpreting contracts. *See Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 691 F.3d 821, 833 (6th Cir. 2012); *see also Tiger Lily, LLC v. U.S. Dep't of Hous. and Urb. Dev.*, 992 F.3d 518, 522 (6th Cir. 2021).

[46] The Court makes no determination regarding TA's obligations under the FA. Rather, the Court merely takes DG Gas's allegations as true and construes its assertions in the light most favorable to it as the non-moving party for purposes of analyzing TA's Motion to Dismiss. *Gunasekera*, 551 F.3d at 466.

[47] In its Opposition, DG Gas appears to argue that the term "outside of *your* or *our* control" means that the force majeure provision was intended to apply to "actions outside of *either* parties' control" rather than actions outside of "both" parties' control. (Doc. No. 13 at PageID #945.) Accordingly, DG Gas maintains that TA's "delays in providing directions to its franchisee" constitutes a Force Majeure Event because that delay was outside of DG Gas's control but not TA's control, i.e., out of "either parties' control," rather than outside the control of both parties. (*Id.*) The Court finds this argument unpersuasive. Indeed, every example listed in the definition of a Force Majeure Event involves a situation that is clearly outside of both parties' control. (Doc. No. 1-5 at PageID #723.) Because a general term must be interpreted within the context of the preceding specific terms, DG Gas's proposed interpretation would suggest that the listed examples— namely, "government regulations or orders, war, strikes, terrorist attacks, natural disasters, [and] acts of God"—could be considered "actions outside of either parties' control" but "not both." (*Id.*; Doc. No. 13 at PageID #945.) Such an interpretation would be "ridiculously unreasonable, unsound, or incongruous." *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 838 n.6 (6th Cir. 2023).

Second, DG Gas contends that "delays caused by DG Gas's lender which delayed funding of DG Gas's construction loan because it needed to first receive funding through government appropriations" constitutes a Force Majeure Event as "other acts" similar in nature to a government regulation or order.  (Compl. at ¶ 133.)  This argument fails for numerous reasons.  To start, the Court finds that DG Gas "assume[d] the risk" of developing and equipping the TA® Center at its expense, as well as the risk of obtaining any financing with respect to the FA.[48]  *Dunaj*, 580 N.E.2d at 497; *Stand Energy Corp.*, 760 N.E.2d at 416.  Further, the definition of a Force Majeure Event references "governmental regulations or orders," yet DG Gas does not allege any governmental action—at best, it alleges a lack thereof in failing to disperse funding.  (Compl. at ¶ 133.)  Finally, the inability to obtain funding is not a Force Majeure Event because "[m]istaken assumptions about future events or bad economic conditions" such as the inability to secure financing does not qualify as a "force majeure," and "financial difficulty does not excuse the defaulting party's performance."[49]  *Dunaj*, 580 N.E.2d at 497; *Stand Energy Corp.*, 760 N.E.2d at 416; *In re Old Carco LLC*, 452 B.R. at 119–20.  The FA did not require DG Gas to obtain funding, let alone government funding specifically,

---

[48] (*See* FA, Section 5.1, Doc. No. 1-5 at PageID #737 ("You are obligated *at your expense* to develop and equip the TA® Center …") (emphasis added); FA, Section 4.4, *Id.* at PageID #736 ("If at any time prior to acquisition, or subsequently, *you or your Affiliates proposed to obtain any financing with respect to the Site* … In the event that the terms of any financing *you seek to obtain* …") (emphasis added).)

[49] *See Hiatt v. Giles*, 2005 WL 3346172, at *2 (2d Dist. Dec. 9, 2005) ("If financing was intended to be a contingency, then such a common contingency would have been drafted into the agreement. Instead, the contract plainly states … that the financing was the duty of the Defendants. While it is equally clear that the lender failed to complete the loan, the Defendants bore the responsibility to obtain financing."); *Stand Energy Corp.*, 760 N.E.2d at 457–58 (rejecting applicability of force majeure where party was "required to purchase power at high market prices and provide it … at a low contract price" due to unforeseen market volatility).

and did not include anything related to "economic conditions" in its definition of a Force Majeure Event.[50]

Accordingly, the Court rejects DG Gas's assertion that the delay in meeting the Opening Deadline was "the result of a Force Majeure Event" that resulted in "TA lack[ing] the right to terminate the FA." (Compl. at ¶ 133.)

### 5.    Breach of Implied Duty of Good Faith and Fair Dealing

Fifth, in its Motion, TA asserts that the implied duty of good faith and fair dealing "cannot be breached by acting as allowed by the specific terms of the contract." (Doc. No. 11 at PageID #900.) Specifically, TA contends that the FA granted TA the "explicit, unconditional right to terminate for failure to meet [the Opening] [D]eadline." (*Id.*)  Thus, TA submits that the "implied covenant of good faith and fair dealing does not apply where a party to the contract has the absolute and exclusive authority to make the decision at issue." (*Id.*)

In its Opposition, DG Gas asserts that TA did not have an "unfettered right to terminate" for several reasons. (Doc. No. 13 at PageID #945.)  First, DG Gas contends that TA did not meet any of the PMPA's termination requirements.[51]  (*Id.*)  Second, DG Gas asserts that the 2022 FDD provided that "TA's newest policy as to Opening Deadlines was that an extension fee was an appropriate remedy for any delay in opening." (*Id.*)  Third, DG Gas submits that the parties agreed in December 2022 that the Opening Date was no longer appropriate. (*Id.*)  Finally, DG Gas points to its allegations

---

[50] *Compare In re Old Carco LLC*, 452 B.R. at 119 (acknowledging "[e]xpress inclusion of the clause 'change to economic conditions' as an excusing event" in force majeure provision).

[51] Having concluded above that the PMPA is inapplicable to this case, the Court rejects this argument. *See supra* Section IV.A.

that TA "encouraged DG Gas to continue performing and investing time and resources into the development of the Cordele site" that could not possibly open by the Opening Date.  (*Id.*)

In its Reply, TA reiterates that a claim for breach of good faith and fair dealing cannot override the express terms of the contract.  (Doc. No. 17 at PageID #986.)  TA also asserts that DG Gas's authority is distinguishable because it cites an "implied contractual duty, not an express" contractual duty.  (*Id.*)

As Ohio courts have explained, "[t]he duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract."  *Parker Hannifin Corp. v. Standard Motor Products, Inc.*, 2019 WL 5425242, at *26 (N.D. Ohio Oct. 23, 2019) (quoting *Connectivity Systems, Inc. v. National City Bank*, 2009 WL 10709117, at * 4 (S.D. Ohio Aug. 20, 2009)) (citing *DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc*., 2008 WL 755283, at *6 (S.D. Ohio Mar. 19, 2008)).  "The implied duty of good faith and fair dealing may not be used to override the express terms of a contract and has no application where one party to the contract has the absolute and exclusive authority to make the decision at issue."  *Id.*; *see also Connectivity Systems, Inc.*, 2009 WL 10709117, at *4; *DavCo*, 2008 WL 755283, at *7.  The duty may be implied, however, where a contract is silent as to an issue, in which case good faith is used to fill the gap.  *See Savedoff v. Access Group, Inc*., 524 F.3d 754, 764 (6th Cir. 2008) ("[T]his duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap.")

First, the Court rejects DG Gas's argument that TA did not have the right to terminate the FA because of the reference to an "extension fee" in the 2022 FDD.  (Doc. No. 13 at PageID #945.)  DG Gas points to the 2022 FDD for the proposition that an "extension fee was an appropriate remedy for

55

any delay in opening."  (Doc. No. 13 at PageID #945.)  Yet a review of the 2022 FDD indicates that it was entirely within TA's discretion whether to grant any extension at all, including an extension that required DG Gas to pay a fee.[52]  Setting aside whether the 2022 FDD could override Section 18.2 of the FA, it is clear that the express terms of the 2022 FDD provide that TA had no obligation to offer DG Gas the opportunity to pay an extension fee prior to terminating the FA.  Because TA "ha[d] the absolute and exclusive authority" to not offer DG Gas the chance to pay an extension fee before terminating, the failure to do so cannot support a claim for breach of the implied duty of good faith. *Parker Hannifin* Corp, 2019 WL 5425242, at *26.

Nonetheless, the Court finds DG Gas's other allegations sufficient to survive dismissal. Specifically, DG Gas asserts that the parties agreed in December 2022 that the Opening Date was no longer appropriate, and that TA "encouraged DG Gas to continue performing and investing time and resources" despite knowing that it was impossible for DG Gas to open the Cordele Site by the Opening Date.  (Doc. No. 13 at PageID #945.)  Taking these allegations as true and presuming that TA did in-fact agree to set a new deadline "no earlier than April 2024" as alleged in the Complaint, DG Gas could maintain a claim for implied breach of the duty of good faith.  (Compl. at ¶ 70.)  TA does not point to any provision in the FA that expressly provides the ability to terminate the FA for a deadline it had waived or ratified an extension of.[53]  (Compl. at ¶ 70.)  The Court, therefore, at this preliminary stage, "must use good faith in filling the gap."  *Savedoff*, 524 F.3d at 764.

---

[52] (*See* Doc. No. 1-3 at PageID #475 ("We *may, in our sole discretion*, agree to extend your opening date by providing written confirmation of the extension to you and we may require you to pay an extension fee in connection therewith.") (emphasis added).)

[53] As previously explained, the Court concludes that DG Gas has alleged facts sufficient at this stage to support the theory that TA agreed to either a waiver or extension of the initial Opening Deadline of June 2023.  *See supra* Section IV.B.3.

Accordingly, the Court finds that DG Gas has alleged facts sufficient to support a claim of breach of the implied duty of good faith.[54]

### 6.      Breach of Section 6.3 of the FA

The Court turns to the final allegation in Count Two of the Complaint pertaining to Section 6.3 of the FA.  In its Motion, TA submits that DG Gas has failed to allege a breach of Section 6.3. (Doc. No. 11 at PageID #900–01.)  Specifically, TA contends that the allegation that "TA had no archetype for a TA Express Center" is a "non sequitur" and does not demonstrate a breach of Section 6.3 because that section does not require an "archetype for a TA Express Center."  (*Id.*)  TA further asserts that Section 6.3 is a portion of the FA titled "Training and Ongoing Assistance," and therefore involves "TA's guidance on the *operation* of the franchised location."  (*Id.*)  In its Opposition, DG Gas does not address TA's arguments on this point.  (Doc. No. 13.)  TA thus, in its Reply, submits that "Plaintiffs fail to address their allegation of a breach of Section 6.3 of the FA, and that portion of the Motion should be granted."  (Doc. No. 17 at PageID #986.)

As an initial matter, by not opposing TA's argument, DG Gas has waived any opposition thereto.  *See Humphrey v. U.S. Attorney Gen.'s Office*, 279 Fed. Appx 328, 331 (6th Cir. 2008) (finding that a plaintiff's failure to oppose arguments raised in the defendants' motion to dismiss is grounds for the district court to assume that opposition to the motion is waived).  Nonetheless, the Court will address the substance of TA's arguments.[55]

---

[54] The Court finds it unnecessary to address the parties' remaining cited authority.

[55] Courts within this district often address the merits of arguments raised in a defendant's motion to dismiss notwithstanding a plaintiff's failure to oppose the arguments.  *See, e.g., Depew v. City of Solon*, 2023 WL 2242795, at *4 (N.D. Ohio Feb. 27, 2023) (Barker, J.) (addressing substance of defendants' arguments despite plaintiff's failure to oppose them); *Carey Estate of Carey v. KeyBank, N.A.*, 2024 WL 3554946, at *3 (N.D. Ohio July 26, 2024) (same); *Cox v. Bank of America, N.A.*, 2024 WL 3091056, at *3 (N.D. Ohio Jun. 21, 2024) (same); *Crable v. City of Cleveland*, 2024 WL 665023, at *5 (N.D. Ohio Feb. 16, 2024) (same); *Treadwell v. Warden, Mansfield Corr. Inst.*, 2023 WL 3390772, at *2

57

As explained previously, contractual language is ambiguous if "the language is susceptible of two or more reasonable interpretations." *Covington*, 784 N.E.2d at 190. In this case, Section 6.3 of the FA provides that "[TA] will furnish you with … standards, specifications and operating procedures and methods utilized by TA® Centers" and that such items will be "furnished in our Manuals, bulletins, or other written materials …" (Doc. No. 1-5 at PageID #740.) The provision also provides that "[at] your request, we will furnish reasonable guidance and assistance …" (*Id.*)

Upon evaluating the Complaint as a whole, the Court concludes that DG Gas has plausibly alleged a breach of Section 6.3 of the FA. TA argues that the Complaint fails to allege a breach because it alleges that "TA had no archetype for a TA Express Center," which is not required in Section 6.3. (Doc. No. 11 at PageID #900–01.) But DG Gas alleges more than this in its Complaint. (*See* Compl. at ¶¶ 8, 10, 13, 48–51, 57–62, 83, 139–141.) Specifically, DG Gas alleges that from the outset, "TA was not prepared to provide specifications and design requirements to DG Gas for its TA Express Center concept." (Compl. at ¶ 8.) As a result, "DG Gas was delayed by TA's inability to articulate its specifications," but nonetheless "worked through the situation" with TA and "waited for TA to submit updated disclosure and contract documents." (Compl. at ¶¶ 10, 13.) DG Gas further alleges that despite Section 6.3 of the FA requiring TA to furnish DG Gas with "standards, specifications and operating procedures and methods utilized by TA Centers," TA was "unable to provide DG Gas with the necessary documents." (Compl. at ¶¶ 48–51.) For example, "DG Gas was

_____

(N.D. Ohio May 10, 2023); *A.B. Pratt & Co. v. Bridgeport Group, LLC*, 2023 WL 2865640, at *23 (N.D. Ohio Apr. 10, 2023) (same); *Barich v. City of Euclid*, 2023 WL 1995285, at *1 (N.D. Ohio Feb. 14, 2023) (same); *Fox*, 726 F. Supp.3d at 785–86 (analyzing amended complaint to determine whether plaintiff had plausibly alleged claim notwithstanding plaintiff's failure to respond to defendant's argument); *see also Jae v. ChexSystems Inc.*, 2018 WL 3368871, at *2 n.5 (N.D. Ohio July 10, 2018) ("The Court *may* interpret the absence of a response to a motion to dismiss as a waiver of opposition … Nevertheless, despite the lack of opposition by plaintiff, the Court addresses Chex's arguments in an abundance of caution.") (emphasis added) (internal quotation marks omitted).

not given construction, civil engineering, lighting, cement thickness, spacing requirements and many other standards" and "was told to wait for the development of construction drawings" which were never provided.  (Compl. at ¶¶ 57–62.)  These allegations, taken as true and viewed in totality, are sufficient to withstand a motion to dismiss.  *See Gunasekera*, 551 F.3d at 466.

TA also contends that Section 6.3 appears under a heading titled "Training and Ongoing Assistance," and thus, must be solely limited to guidance on the "operation" of the franchised location.  (Doc. No. 11 at PageID #901.)  However, remembering that the FA "must be construed as a whole" and "constru[ing] the [C]omplaint in the light most favorable to the Plaintiffs," the Court cannot conclude at this early stage that the language is not "susceptible of two or more reasonable interpretations."  *State Grp.*, 782 N.E.2d at 1246; *Gunasekera*, 551 F.3d at 466; *Covington*, 784 N.E.2d at 190.  And because the provision is "reasonably susceptible of more than one interpretation, it is ambiguous as a matter of law … [and] is a question of fact."  *In re Fifth Third Early Access Cash Advance Litigation*, 925 F.3d 265, 280 (6th Cir. 2019) (applying Ohio law).[56]  Accordingly, the Court finds that DG Gas has plausibly alleged that TA breached Section 6.3 of the FA and declines to dismiss the claim.

For the aforementioned reasons, the Court concludes that DG Gas has plausibly alleged that TA: (i) either waived enforcement or ratified an extension of the Opening Date; (ii) breached the implied duty of good faith and fair dealing as related to TA's alleged extension of the Opening Date and encouragement of DG Gas to continue performing while knowing the Opening Date could not

---

[56] *See also New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520–21 (6th Cir. 2022).

be met; and (iii) breached Section 6.3 of the FA.[57]  Accordingly, for these reasons, the Court declines to dismiss Count Two of DG Gas's Complaint.

### C. Counts Three, Four, and Five:  Fraudulent Inducement, Negligent Misrepresentation, and Fraud

The Court next turns to Counts Three, Four and Five of DG Gas's Complaint alleging fraudulent inducement, negligent representation, and fraud (hereinafter the "Fraud Counts").

The elements of fraudulent inducement under Ohio law are: (1) a representation (or concealment of a fact when there is a duty to disclose); (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with intent to mislead another into relying upon it; (5) justifiable reliance; and (6) resulting injury proximately caused by the reliance. *See Bender v. Logan*, 76 N.E.3d 336, 352 (4th Dist. 2016) (citing cases).  "Under Ohio law, the elements of traditional fraud and fraudulent inducement are the same."  *Pablo Air Charter, LLC v. Black*, 692 F. Supp.3d 749, 757 (N.D. Ohio 2023); *see also Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2002).

The elements of a negligent misrepresentation claim under Ohio law are: (1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.  *See Nazareth Deli LLC v. John W. Dawson Ins. Inc.*, 200 N.E.3d

---

[57] *See supra* Sections IV.B.3, IV.B.5.

652, 669 (10th Dist. 2022); *Martin v. Ohio State Univ. Found.*, 742 N.E.2d 1198, 1209 (10th Dist. 2000). "A negligent misrepresentation claim does not lie for omissions: there must be an affirmative false statement." *Martin*, 742 N.E.2d at 1209; *see also Nazareth Deli LLC*, 200 N.E.3d at 669.

In its Motion, TA first asserts arguments that are generally applicable to the Fraud Counts. Thereafter, TA submits further arguments as to each count individually. The Court will address each argument, below.

### 1. Fraud Counts Limited to DG Gas and TA

In its Motion, TA begins by asserting that the Fraud Counts only allege claims by DG Gas against TA. (Doc. No. 11 at PageID #901.) Although the Complaint indicates that the Fraud Counts are brought by "[a]ll Plaintiffs against [a]ll Defendants," TA contends that the allegations fail to implicate any parties other than DG Gas and TA. (*Id.*) Thus, TA submits that the Complaint "improperly lump[s] the Individual Defendants together" and therefore "fail[s] to satisfy Rule 9(b)'s heightened pleading requirement." (*Id.*) Accordingly, TA asserts that the Fraud Counts should be dismissed as to TA Operating and should not include claims by DG Cordelle and DG Real Estate Partners. (*Id.*)

In their Opposition, Plaintiffs do not address TA's arguments on this point. (Doc. No. 13.) TA thus, in its Reply, submits that "Counts Three through Five must be limited to DG Gas and TA." (Doc. No. 17 at PageID #986.)

As previously explained, a district court may deem a plaintiff to have waived opposition if the plaintiff fails to respond or to otherwise oppose a defendant's motion to dismiss. The Court therefore finds that Plaintiffs have waived any arguments against limiting the Fraud Counts to DG

Gas and TA.  Accordingly, Counts Three through Five are dismissed on this basis as to all parties except as asserted by DG Gas against TA.

### 2.    Whether an Independent Duty Exists Separately from the FA

Next, in its Motion, TA asserts that the Fraud Counts are duplicative of Count Two.  (Doc. No. 11 at PageID #901.)  TA submits that all the Representations and Omissions that DG Gas relies upon are "matters covered by terms of the integrated FA."  (*Id.* at PageID #902.)  Thus, TA contends that the Fraud Claims cannot proceed alongside the breach of contract claims because DG Gas has not shown that the Fraud Claims "derive from the breach of duties that are independent of the contract and that would exist notwithstanding the contract."  (*Id.*)  Finally, TA submits that the FTC Franchise Rule relied upon by DG Gas does not "include a private right of action" and instead "contemplates duties will be enforced through *contract*," thus causing the Fraud Claims to fail because they are "based on the matters covered by the FA."  (*Id.* at PageID #902–03.)

In its Opposition, DG Gas submits that the independent tort doctrine does not bar its claims because it is "well-settled law that the economic loss doctrine does not bar claims for fraud or negligent misrepresentation."  (Doc. No. 13 at PageID #946.)  DG Gas further asserts that contrary to TA's assertions, the Fraud Claims "exist outside of the FA … [because they] are for *inducing* DG Gas to enter into the FA for the Cordele [S]ite in the first place, and to begin work on the Additional Sites," and accordingly "are not duplicative of the contract claims."  (*Id.* at PageID #947 (emphasis in original).)  Next, DG Gas contends that it is not "bringing a claim *under* the FTC Franchise Rule," but instead relies on it "as the source of an independent legal duty to speak accurately and comprehensively about the risks [DG Gas] faced as [a] prospective franchisee[]."  (*Id.*)  DG Gas thus asserts that TA failed to provide a compliant FDD, and that "TA's statements including those made

62

by its personnel and in its FDDs, were made outside the contract and designed to induce [DG Gas] to enter into the FA." (*Id.* at PageID #948.)

In its Reply, TA submits that the "economic loss doctrine and the duplicative nature of Plaintiffs' common-law fraud claims are distinct concepts deserving of distinct treatment." (Doc. No. 17 at PageID #986.) Beginning with the "duplicative claims" argument, TA contends that the Representations and Omissions at issue are all "duplicative of the terms of the FA." (*Id.* at PageID #987.) Specifically, TA asserts that the "FDD was made part of the FA" and that DG Gas "represented they were not relying on any representations outside of the FDD." (*Id.*) TA thus submits that the "alleged misrepresentation is a contractual provision itself," and therefore, DG Gas "cannot maintain any variety of fraud claim alongside a duplicative breach of contract claim." (*Id.*)

Under Ohio law, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Bibbs v. Allstate Ins. Co.*, 2024 WL 4124171, at *8 (N.D. Ohio Sept. 9, 2024) (citing *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981) (interpreting Ohio law)). More specifically, "Ohio law does not recognize a tort claim premised upon the same actions as those upon which the plaintiff bases a breach of contract claim unless the plaintiff identifies some duty or misrepresentation by the breaching party independent of the contract." *Bibbs*, 2024 WL 4124171, at *8; *see also Little Mountain Precision, LLC v. DR Guns, LLC*, 2023 WL 1816711, at *6 (N.D. Ohio Feb. 8, 2023) (citing *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800 (9th Dist. Sept. 21, 2005)) ("A tort claim based upon the same actions as those upon which a claim of contract is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract.").

Generally, "[a] plaintiff can maintain a tort claim for fraud for in the inducement … occurring in the contractual relationship because both theories raise separate and independent legal duties that are considered outside the scope of the contract." *Bibbs*, 2024 WL 4124171, at *9 (collecting cases). "This is because the focus of the wrongful conduct in a fraud in the inducement … claim is not the conduct that causes a contractual or promissory breach, but the intent of the tortfeasor, at the formation of the contract or promise, to defraud the other party into entering into the agreement." *Id.* The Ohio Supreme Court has explained that a claim of fraudulent inducement "asserts that a misrepresentation of facts *outside the contract or other wrongful conduct* induced a party to enter the contract." *Id.* (citing *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998)); *Little Mountain Precision, LLC*, 2023 WL 1816711, at *6.  "In other words, the claim involves some *collateral misrepresentation* designed to induce the plaintiff to enter into the contract." *Bibbs*, 2024 WL 4124171, at *9 (citing *Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp.3d 764, 775 (S.D. Ohio 2016)).

Based on the above principles, "Ohio and federal courts addressing this issue often find that a fraudulent inducement claim cannot succeed if the alleged misrepresentation is a contractual provision itself." *Little Mountain Precision, LLC*, 2023 WL 1816711, at *7; *Bibbs*, 2024 WL 4124171, at *9; *see also Thornton v. Cangialosi*, 2010 WL 2162905 (S.D. Ohio May 26, 2010).  For example, in *Thornton*, the court held that the plaintiffs had not alleged any misrepresentations collateral to the contract because the same representations were in the contract itself.  2010 WL 2162905, at *3.  Specifically, the plaintiffs had alleged that the defendant both "promised to buy back their stock and represented that he was financially solvent."  Yet both of those representations were contained in the contract itself and formed the basis for the plaintiffs' breach of contract claim.  *Id.*

The court therefore determined that "[t]he representations that allegedly induced Plaintiffs to enter into the [contracts] are the same allegedly unfulfilled promises that give rise to the breach of contract claim."[58]  *Id.* at *5.  Accordingly, despite recognizing that the "Plaintiffs may have sufficiently alleged a claim of fraudulent inducement" otherwise, the fraudulent inducement claim was dismissed. Other courts have reached similar conclusions.[59]  *Id.*

Notably, however, those cases did not involve any other "duty owed separately from that created by the contract, that is, a duty owed even though no contract existed."  *Little Mountain Precision, LLC*, 2023 WL 1816711, at *6 (citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (9th Dist. 1996)).  Indeed, courts applying Ohio law have concluded that "[a] party can bring a fraud claim and breach of contract in the same action, as long as there is a duty owed by the breaching party that is separate from the breach of contract claim."  *Strategy Grp. for Media, Inc. v. Lowden*, 2013 WL 1343614, at *4 (5th Dist. Mar. 21, 2013); *Wells Fargo Bank, N.A. v. Pt. Dume Shopping Ctr., LLC*, 2018 WL 3241253, at *9 (N.D. Ohio July 3, 2018).  Accordingly, the above cited authority supporting dismissal of the Fraud Claims is inapplicable if there exists a

---

[58] Put another way, "the court dismissed the fraudulent inducement claim finding that the misrepresentations that form[ed] the basis of the fraudulent inducement claim are the very representations set forth in the parties' agreement."  *Little Mountain Precision, LLC*, 2023 WL 1816711, at *7 (summarizing *Thornton*).

[59] *See, e.g.*, *Little Mountain Precision, LLC*, 2023 WL 1816711, at *8 ("Because plaintiff's sole allegation supporting its fraudulent inducement claim is the contractual language itself, the Court finds that dismissal is warranted."); *Bibbs*, 2024 WL 4124171, at *8–9 ("Under Count IV, Plaintiff cannot sustain a claim for fraudulent misrepresentation/omission because … Plaintiff's claim is premised entirely on alleged statements or omissions within the contract … Under Count III, Plaintiff makes no allegations about misrepresentations of facts outside the contract; instead, he implies that the misrepresentations at issue are entirely related to statements and representations made in the Policy … Accordingly, Plaintiff cannot sustain a claim for fraud in the inducement."); *Dayton Children's Hospital v. Garrett Day, LLC*, 149 N.E.3d 1004, 1032–34 (2d. Dist. 2019) (relying on *Thornton* to reach similar result); *R.G. Barry Corp. v. Olivet Int'l, Inc.*, 2016 WL 51228, at *7–8 (S.D. Ohio Jan. 5, 2016); *Infocision Mgmt. Corp. v. Foundation for Moral Law Inc.*, 2009 WL 2244166, at *4–6 (N.D. Ohio July 27, 2009) (merging fraudulent inducement claim with breach of contract claim because defendant's "failure to perform pursuant to [plaintiff's] interpretation of the [contract] provision gave rise to both claims").

"duty owed separately from that created by the contract."  *Little Mountain Precision, LLC*, 2023 WL
1816711, at *6.

At least one case within this circuit has concluded that the FTC Franchise Rule's "federal duty
to make certain disclosures in an FDD may form part of the foundation of a state fraud claim."  *Lunt
v. Frost Shades Franchising, LLC*, 2023 WL 3484202, at *8 (M.D. Tenn. May 16, 2023).  In *Lunt*,
the court relied upon the FTC Franchise Rule to establish the "duty to disclose" in relation to a claim
for fraudulent inducement "not because the [fraud claim] actually 'enforces' the federal Franchise
Rule, but because the Franchise Rule, like any binding disclosure obligation, changes the landscape
of which omissions can be considered false or misleading."  2023 WL 3484202, at *8.  Other courts
outside the Sixth Circuit have reached similar conclusions.[60]

With the above principles in mind, the Court turns to the Complaint at hand.  In the present
case, DG Gas relies solely upon Representations or Omissions in the FDDs as the basis to assert its
Fraud Claims.  (*See* Compl. at ¶¶ 84–89, 145–64.)  TA correctly submits that such Representations
and Omissions "are matters covered by terms of the integrated FA."  (Doc. No. 11 at PageID #902.)
Indeed, it appears that "[t]he representations that allegedly induced [DG Gas] to enter into the [FA]
are the same allegedly unfulfilled promises that give rise to the breach of contract claim."  *Little
Mountain Precision*, 2023 WL 1816711, at *7 (citing *Thorton*, 2010 WL 2162905, at *5); *see also
Bibbs*, 2024 WL 4124171, at *8–9.  Accordingly, these cases would suggest that the Fraud Claims

---

[60] *See also TC Tech Mgt. Co. v. Ceeks on Call America, Inc.*, 2004 WL 5154906, at *5 (E.D. Va. Mar. 24, 2004)
(permitting plaintiff to use defendant's alleged violation of FTC Franchise Rule to help establish duty to disclose as to
fraud claim and recognizing that "[s]everal courts have held that FTC regulations can be used to establish a duty of care
for fraud and negligence claims"); *Rodopoulos v. Sam Piki Enterprises, Inc.*, 570 So.2d 661, 665 (Ala. 1990) ("[W]e now
hold that FTC regulations are admissible in this fraud case with regard to the defendants' duty to disclose."); *Florida Auto
Auction of Orlando, Inc. v. U.S.*, 74 F.3d 498, 502 n.2 (4th Cir. 1996) (rejecting argument that a duty imposed by federal
regulations cannot give rise to a state common law claim).

should be dismissed unless DG Gas can rely on another "duty owed separately from that created by the [FA], that is, a duty owed even though no contract existed." *Little Mountain Precision*, 2023 WL 1816711, at *6 (citing *Textron Fin. Corp.*, 684 N.E.2d at 1270)).

However, the Court finds that DG Gas has sufficiently pled a duty owed separately from the FA to support its Fraud Claims by way of the FTC Franchise Rule.  As explained in *Lunt*, the FTC Franchise Rule's "federal duty to make certain disclosures in an FDD may form part of the foundation of a state fraud claim." *Lunt*, 2023 WL 3484202, at *8.  Here, DG Gas alleges that the FTC's Franchise Rule "created a duty owed to DG Gas separate and apart from any duty owed to DG Gas as a result of any FA." (Compl. at ¶ 151.)  The Complaint alleges various Representations and Omissions at issue relating to the ability to meet the Opening Date, (*see* Compl. at ¶¶ 84–89), and according to DG Gas, "the FTC Franchise Rule requires disclosure of all factors that could potentially affect a franchisee's ability to meet any opening deadline."  (Doc. No. 13 at PageID #948 (citing 16 C.F.R. 436.5(k)(2).)  Following *Lunt*, this duty under the FTC Franchise Rule may suffice as a "duty owed separately from that created by the [FA]" to support the Fraud Claims.  *Little Mountain Precision*, 2023 WL 1816711, at *6.  Indeed, the FTC Franchise Rule disclosure duty is a "duty owed even [if] no contract existed" because TA was required to comply with the rule as to the initial 2019 and 2021 FDDs before the FA was signed.[61]  *Id.*

---

[61] TA, in its Reply, cites to two cases to assert that disclaimers of prior representations negate claims of reliance.  *See Axios, Inc. v. Thinkware, Inc.*, 2015 WL 5029227, at *7 (S.D. Ohio Aug. 26, 2015); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp.2d 954, 963–64 (N.D. Ohio 1998).  Specifically, TA submits that "Plaintiffs represented that they were not relying on any representations outside of the FDD" and that the parties thus "agreed to limit the universe of what Plaintiffs could rely on." (Doc. No. 17 at PageID # 987.)  Yet the alleged "representations" at issue here were not "outside of the FDD"—rather, they were contained *in* the FDDs themselves.  (*Id.*)  (Doc. No. 17 at PageID #987.)  Accordingly, TA's arguments are inapplicable because the limited universe of what "Plaintiffs could rely on" appears to include the FDDs.  (*Id.*)

TA cites to one case for the proposition that the FTC Franchise Rule does not create a "duty" sufficient to support a claim for fraud.  *See Yogo Factory Franchising, Inc. v. Ying*, 2014 WL 1783146, at *9 (D.N.J. May 5, 2014).  In *Yogo*, the court concluded that the defendants could not base their fraud claims on an alleged violation of applicable FTC franchise disclosure rules.  *Id.* However, the cases relied upon by *Yogo* primarily involved a private party attempting to bring a claim *under* the FTC Franchise Rule, rather than a state common law claim in which the FTC Franchise Rule established the legal duty necessary to support the state common law claim.[62]  The Court finds those cases distinguishable from the above referenced authority, in which the FTC Franchise Rule merely served to create a duty in relation to state common law claims being asserted.  *See, e.g.*, *Lunt*, 2023 WL 3484202, at *8.  Moreover, *Yogo* is not binding upon this Court.  The Court thus declines to adopt its holding here and instead finds *Lunt* to be more persuasive.[63]

As admitted by TA, "Counts Three through Five are only plausible if an independent duty exists separately from the contract …"  (Doc. No. 17 at PageID #988.)  Such an independent duty has been sufficiently alleged here under the FTC Franchise Rule.  Accordingly, the Court declines to dismiss Counts Three through Five on this basis.[64]

---

[62] *See, e.g.*, *Robinson v. Wingate Inns Intern., Inc.*, 2013 WL 6860723, at *2 (D.N.J. Dec. 20, 2013); *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 987 (D.C. Cir. 1973).  Additionally, one other case relied upon by *Yogo* involved a party asserting that "Pennsylvania public policy incorporates the specific prohibitions and disclosure requirements of [the FTC Franchise Rule]," which is again distinguishable from the present case.  *See Vino 100, LLC v. Smoke on the Water, LLC*, 864 F. Supp.2d 269, 280 (E.D. Penn. 2012).

[63] *See supra* note 60.

[64] Because DG Gas has alleged that TA breached a duty independent of the FA with respect to its alleged misrepresentations and omissions, the Court concludes that such misrepresentations would be "collateral to the written agreement" and therefore finds that the parties' arguments related to "collateral misrepresentations" are sufficiently addressed in the Court's analysis.  *See Hodell-Natco Indus., Inc. v. SAP America, Inc.*, 13 F. Supp.3d 786, 796 (N.D. Ohio 2014) (finding that alleged misrepresentations were "collateral to the written agreement" because they were "made in breach of a common law duty independent of the Licensing Agreement").

### 3. Fraud Claims Pleading Separate Damages

Next, in its Motion, TA asserts that the Complaint "never pleads any damage for the [F]raud [C]laims separate from, and in addition to, those attributable to the breach of contract claim" as required under Ohio law. (Doc. No. 11 at PageID #902.) DG Gas, in its Opposition, does not address this argument. (Doc. No. 13.) TA thus, in its Reply, submits that DG Gas abandoned the claim by failing to address TA's arguments regarding pleading damages separate from its breach of contract claim. (*Id.* at PageID #989.)

By not opposing TA's argument, DG Gas has waived any opposition thereto. *See Humphrey*, 279 Fed. Appx at 331. Nonetheless, the Court will address the substance of TA's arguments.[65]

"Where a plaintiff asserts a tort claim based on the same conduct that constitutes a breach of contract, the plaintiff must show fraud damages separate from those attributable to the breach of contract." *Lebo v. Impac Funding Corp.*, 2012 WL 630046, at *5 (N.D. Ohio Feb. 8, 2012) (applying Ohio law). As this Court recently explained, however, this burden is lower at the motion to dismiss stage because a plaintiff's fraud claim can still survive a motion to dismiss "even if the plaintiff's complaint alleges that the fraud and the breach caused 'duplicative damages.'" *Starlion Electronics Distribution, LLC v. JDS Pro Health LLC*, 2025 WL 606521, at *13 (N.D. Ohio Feb. 25, 2025). Indeed, numerous courts within this circuit have found it premature to dismiss a fraud claim based on the possibility of duplicative damages:

> "It is also unclear at this stage of the litigation if recovery under both causes of action would produce duplicative damages. Dismissal of the fraud claim is therefore premature. Of course, should [the plaintiff] ultimately prevail on her fraud claim, her recoverable damages would

---

[65] *See supra* note 55.

be limited to those separate and distinct from any damages awarded on her breach of contract claim."

*Starlion Electronics Distribution, LLC*, 2025 WL 606521, at *13 (citing *Cunningham Prop. Mgmt. Tr. v. Ascent Res. – Utica, LLC*, 351 F. Supp.3d 1056, 1067 (S.D. Ohio 2018) (quoting *Lebo*, 2012 WL 630046, at *5)).[66]

Accordingly, "at this earlier [motion to dismiss] stage of the litigation, the plaintiff need only avoid pleading that its injury for fraud is the lack [of] payment on the contract." *Starlion Electronics Distribution, LLC*, 2025 WL 606521, at *13; *see also Polytec Internacional, S.A. v. Artco Global Group, LLC*, 2023 WL 8600575, at *3 (S.D. Ohio Sept. 6, 2023) (concluding that plaintiff "need not show *proof* of separate duties or damages at the pleading stage" but needed to allege damages other than lack of payment under the contracts); *Mitsui Sumitomo Ins. Co. of Am. V. Vertiv Corp.*, 2024 WL 962742, at *5 (S.D. Ohio Mar. 5, 2024) ("[T]he Court permits Plaintiffs to plead in the alternative and allows both their contract and fraud claims to proceed at the pleading stage.").

The Court finds that DG Gas has adequately pled damages separately from the lack of payment under the contract.  Unlike the cases cited by TA,[67] DG Gas has alleged various types of damages, including but not limited to: (i) lost profits for the Cordele Site; (ii) lost increase of Cordele

---

[66] *See also G.C. Franchising Systems, Inc. v. Kelly*, 2021 WL 1209263, at *8 (S.D. Ohio Mar. 31, 2021) (similar); *Price v. Gulfport Energy Corp.*, 2020 WL 5433683, at *2 (S.D. Ohio Sept. 10, 2020) ("[I]t is unclear at this stage if both fraud and breach of contract claims would lead to duplicative damages, so dismissing the fraud claim is premature.").

[67] *See Textron Fin. Corp.*, 684 N.E.2d at 1271 (finding that plaintiff failed to "*offer evidence* of damages distinct" from the breach of contract at the *summary judgment* stage) (emphasis added); *Cord v. Victory Solutions, L.L.C.*, 2018 WL 899076, at *3 (8th Dist. Feb. 15, 2018) (finding that the plaintiff "alleged the same damages, $44,341.75, for her breach of contract and fraud claims" and alleged "no independent damages or injury that resulted from [the defendant's] alleged promises to pay"); *Ruggles v. Bulkmatic Transport Co.*, 2004 WL 5376213, at *9 (S.D. Ohio June 23, 2004) (finding plaintiff's fraud allegations of being "damaged by failing to receive the full and proper amount of compensation due to them" were no different than breach of contract allegations for not being compensated "on an adjusted gross revenue or cartage rate basis instead of the gross revenue basis as required").

Site real estate value; (iii) lost increase of Cordele Site operating business value; (iv) lost profits at the Additional Sites; (v) lost increase of Additional Sites real estate value; (vi) lost increase of Additional Sites operating business value; (vii) loss of business opportunity by the Statesboro Site; (viii) reputational damages; (ix) costs paid for worthless real estate at Cordele Site; and (x) development costs of the Cordele Site and Additional Sites.  (Compl. at ¶¶ 90–101, 152.)  At this stage, it is unclear whether the fraud and breach of contract claims would produce duplicative damages.  *See Starlion Electronics Distribution, LLC*, 2025 WL 606521, at *13.  DG Gas will bear the burden of proving that distinction at the summary judgment stage, and the Court will not hesitate to limit duplicative recovery if it becomes apparent.  But for purposes of resolving TA's Motion here, DG Gas's allegations are sufficient to prevent dismissal of the Fraud Claims on this basis.

### 4. Applicability of Economic Loss Doctrine to Negligent Misrepresentation[68]

Next, in its Motion, TA asserts that a "tort claim based upon the same actions as a contract claim can only exist independently where there is 'a duty owed separately from that created by the contract.'"  (Doc. No. 11 at PageID #901–02.)  In its Opposition, DG Gas submits that it is well-settled law that the economic loss doctrine does not bar claims for fraud or negligent misrepresentation.  (Doc. No. 13 at PageID #947–48.)  In its Reply, TA responds that recent case law

---

[68] As discussed previously, TA begins its Motion by broadly asserting that a tort claim cannot exist alongside a contract claim unless a duty is owed separately from that created by the contract.  (Doc. No. 11 at PageID #901–02.)  In its Opposition, DG Gas argues that the economic loss doctrine does not bar claims for "fraud or negligent misrepresentation."  (Doc. No. 13 at PageID #947.)  However, TA, in its Reply, limits its discussion of the economic loss doctrine to negligent misrepresentation as alleged in Count Four, and does not address the doctrine as it relates to Counts Three or Five.  (Doc. No. 17 at PageID #988–89.)  Thus, while DG Gas appears to reference the economic loss doctrine in relation to Counts Three through Five, TA separates the issues of "intertwined fraud and breach of contract claims"—as applied to Counts Three and Five—from the "economic loss doctrine" which TA described as a "conceptually similar but distinct doctrine that also bars Count Four."  (Doc. No. 13 at PageID #947–48; Doc. No. 17 at PageID #988.)  The Court shall accordingly limit its analysis of the "economic loss doctrine" arguments to Count Four of the Complaint.

demonstrates that negligent misrepresentation is not completely exempt from the economic loss rule. (Doc. No. 17 at PageID #988.)  Rather, TA asserts that the "operative question is whether the alleged speaker violated a duty that arises in tort, separate from any contract," and because no such duty exists, Count Four is barred.[69]  (*Id.*)

The Court rejects TA's argument that the economic loss doctrine bars the negligent misrepresentation claim.  First, TA's own cited authority provides that "Ohio courts have also recognized the tort of negligent misrepresentation as an exception to the economic loss rule."  *PLC Corp. v. Brandywine Recovery, Inc.*, 2015 WL 5852829, at *7 (N.D. Ohio Oct. 6, 2015).  Second, as already explained, the FTC Franchise Rule suffices as an independent duty "separate from any contract."  *See Lunt*, 2023 WL 3484202, at *8.  Third, TA's cited authorities are distinguishable from the present case.[70]  Accordingly, the Court concludes that TA's negligent misrepresentation claim is not barred by the economic loss doctrine.

### 5.     Ratification of FA through Continued Performance

---

[69] TA also raises various arguments involving the requirement of a "special relationship" for negligent misrepresentation. (Doc. No. 17 at PageID # 988–89.)  These arguments appear to be a response to DG Gas's arguments addressing the "special relationship" standard at a later part of its Opposition brief. (Doc. No. 13 at PageID #950–51.)  Accordingly, the Court will address these arguments separately.

[70] *See Carter v. Univ. Park Dev. Corp.*, 2022 WL 4589195, at * (9th Dist. Sept. 30, 2022); *PLC Corp.*, 2015 WL 5852829, at *6–7.  In *Carter*, the trial court had dismissed the plaintiff's negligent misrepresentation claim under the economic loss rule because the "only damages [plaintiff] asserted were the same as his breach of contract claim."  2022 WL 4589195, at *4.  As explained previously, DG Gas has sufficiently alleged separate damages at this stage.  Moreover, the court indicated that the plaintiff did not even mention any of the tax returns containing the alleged misrepresentations in the negligent misrepresentation part of his complaint, "let alone allege that he justifiably relied on them to his pecuniary loss."  *Id.* at *5.  Here, DG Gas repeatedly references the alleged misrepresentations in its Complaint.  (*See* Compl. at ¶¶ 84–88, 153–56.)  As for *PLC Corp.*, that case was evaluated at the summary judgment stage.  2015 WL 5852829, at *1.  Finally, *PLC Corp.* explicitly acknowledges that an "injured party may proceed in the alternative, raising breach of contract and negligent misrepresentation."  *Id.* at *8.

Next, in its Motion, TA submits that even if DG Gas plausibly alleged fraud, it waived those claims through its continued performance despite learning of the fraud.  (Doc. No. 11 at PageID #903.)  Specifically, TA contends that "[o]nce a party learns of the facts underlying a fraud claim and still performs, it has ratified the contract and waives its fraud claim."  (*Id.*)  Thus, TA asserts that the "Complaint admits waiver because, after learning of the alleged Representations and Omissions, DG Gas continued to perform."  (*Id.*)

DG Gas, in its Opposition, does not address this argument.  (Doc. No. 13.)  TA thus, in its Reply, submits that DG Gas abandoned the Fraud Claims by not addressing its continued performance after learning of the alleged misrepresentations, which TA contends amounts to ratification that waives any fraud claim.  (Doc. No. 17 at PageID #990.)

By not opposing TA's argument, DG Gas has waived any opposition thereto.  *See Humphrey*, 279 Fed. Appx at 331.  Nonetheless, the Court will address the substance of TA's arguments.[71]

"In Ohio, one who performs a contract after learning of fraud in its inducement ratifies the contract and may not subsequently disaffirm."  *Hawes v. Downing Health Technologies L.L.C.*, 2022 WL 1573737, at *8 (8th Dist. May 19, 2022) (citing *Baltimore & O.R. Co. v. Jolly Bros. & Co.*, 72 N.E. 888 (Ohio 1904)); *Ziegler v. Findlay Indus., Inc.*, 380 F. Supp.2d 909, 911 (N.D. Ohio 2005).  "Moreover, 'the performance of an executory contract after knowledge of facts making it voidable on the ground of fraud in its procurement, is a waiver of any right of action for damages for the fraud,' unless to stop performance would be impracticable."  *Hawes*, 2022 WL 1573737, at *8; *Ziegler*, 380 F. Supp.2d at 911.

---

[71] *See supra* note 55.

73

While TA's Motion provides that DG Gas continued to perform "after learning of the alleged Representations and Omissions," it does not specify the exact "facts underlying the fraud" that DG Gas allegedly learned.[72]  (Doc. No. 11 at PageID #903.)  Context suggests that TA is relying on DG Gas's discovery that TA allegedly "did not have construction drawings that DG Gas could rely upon," which contradicts certain Representations and Omissions contained in the FDD.  (Compl. at ¶ 50.)  For example, TA appears to submit that the lack of construction drawings conflicts with the Representation that TA had "required plans, space plans, and specifications to suit the use, shape and dimensions of" a TA Express Center, and that TA had "expended considerable time, skill and effort in developing the TA Express Centers and the TA System."  (Compl. at ¶ 87.)  Similarly, TA purportedly argues that DG Gas learning about the lack of construction drawings negates any Omission that "TA lacked specifications, procedures, and systems related to the ground-up construction of a TA Express Center."  (Compl. at ¶ 89.)  TA thus maintains that "DG Gas kept pressing forward toward opening the first of the 25 TA Express Centers that it planned to open" even after learning "that the TA Express Center franchise concept was not fully developed."[73]  (Compl. at ¶¶ 7, 10.)

Mere discovery of the lack of construction plans negating these specific Representations and Omissions, however, does not necessarily equate to DG Gas "learning the facts underlying the fraud." *Ziegler*, 380 F. Supp.2d at 911.  Indeed, the full context of the alleged fraud is not simply that TA

---

[72] In similar fashion, TA's Reply provides, without specificity, that "according to their own allegations, [DG Gas] continued to perform after learning of the alleged misrepresentations …."  (Doc. No. 17 at PageID #990.)

[73] TA references these provisions in a later section of its Motion while seemingly reiterating the same claim.  (Doc. No. 11 at PageID #905.)

74

failed to immediately provide DG Gas with specifications.  Rather, the essence of the Fraud Claims is the failure to disclose that "TA's own inability to provide construction documents and other required documentation" constituted a "*risk factor*" for the Opening Date that *would be held against* DG Gas, and that TA led DG Gas to believe that "TA would treat any delay caused by its modification of any Development Plans as a *justified reason* for delaying the beginning of development of its TA Express Center," rather than a "justification for refusing to do business with [DG Gas] on any other matters."  (*See* Compl. at ¶ 87–89 (emphasis added).)  As just one example, DG Gas points to Section 5.1(b)[74] of the FA providing that TA "may make changes to the Development Plans" and that DG Gas "must not begin development, remodeling, or otherwise construct the TA® Center until [TA] ha[s] approved the Development Plans."  (Doc. No. 1-5 at PageID #737.)

Upon review, the Court concludes that DG Gas did not waive the Fraud Claims because the Complaint does not show that DG Gas had fully "learn[ed] the facts underlying the fraud" while continuing performance.  *Ziegler*, 380 F. Supp.2d at 911.  Specifically, DG Gas's discovery that TA did not have construction drawings finalized yet does not equate to "learning the facts underlying the fraud" because DG Gas did not know that TA would consider that a reason for termination.  Instead, DG Gas has alleged facts that, if true, indicate that TA led DG Gas to believe that a delayed Opening Date would not be an issue.[75]  Thus, it is not TA's mere lack of pre-prepared specifications that

---

[74] In its Complaint, DG Gas mistakenly refers to this provision as Section 5.2(b) rather than Section 5.1(b).

[75] Such facts include the allegations that TA either waived or ratified an extension of the Opening Date, which are extensively discussed above.  *See* Section IV.B.3.  This also includes the allegation that "DG Gas was told to wait for the development of construction drawings that would be generated from a company-owned property in Walton, Kentucky that was under development at the same time.  (Compl. at ¶ 58.)  As for the specific language of the FA, DG Gas cites to numerous provisions in its Complaint, including Section 5.1(a) that DG Gas was obligated to develop the TA Center "in accordance with all of our required plans, space plans, and specifications," combined with Section 5.1(b) that DG Gas "must not begin development" until TA approved the plans, as well as Section 6.3(a) providing that TA would furnish DG Gas with "standards, specifications and operating procedures and methods utilized by TA® Centers."  (FA, Sections

constitutes the alleged fraud.  Rather, it is TA's allegedly hidden intent to penalize DG Gas for any such lack of specifications caused by itself, despite representing otherwise and encouraging DG Gas to continue performance.  And DG Gas did not discover this alleged hidden intent until the FA was finally terminated on June 16, 2023, at which point it stopped performing.  (Compl. at ¶ 77.)

Accordingly, for the foregoing reasons, and at this stage of the proceedings, the Court finds that arguably DG Gas did not "perform[] under the contract after learning the facts underlying the fraud" such as to ratify the FA and waive its Fraud Claims, and therefore, declines to dismiss the Fraud Counts on that basis.[76]  *Ziegler*, 380 F. Supp.2d at 911.

### 6.  Whether the Complaint Sufficiently Pleads Justifiable Reliance

Next, in their Motion, Defendants assert that DG Gas could not have justifiably relied on any of the Representations due to the FA's non-reliance and integration clauses.  (Doc. No. 11 at PageID #904.)  Defendants contend that Plaintiffs' Fraud Claims primarily rely on the allegation that "TA represented it had developed specifications and operation plans for the TA Express Center concept." (*Id.*)  Yet according to Defendants, the "FDD requires only that TA will provide 'one set of Development Plans'" and in the Complaint DG Gas admitted that TA informed DG Gas that "the design is not yet final."  (*Id.*)  Thus, Defendants submit that DG Gas could not have been justified in

---

5.1(a), 5.1(b), 6.3(a), Doc. No. 1-5 at PageID #736–37, 740.)  TA appears to focus on the Representations and Omissions related to the lack of specifications—however, such provisions must be evaluated within the full context of the FA, which under DG Gas's interpretation, represents that TA may modify the specifications and requires DG Gas to wait for approval before beginning construction.  Finally, the Court acknowledges that TA disputes the characterization of these provisions and notes that the Court has not made any final determination as to the interpretation of the above cited FA provisions. Rather, the Court finds it premature to make such a determination, and for purposes of this Opinion, simply interprets those provisions in the light most favorable to the non-moving party.  *See Gunasekera*, 551 F.3d at 466.

[76] Later in their Motion, Defendants assert the same arguments for the proposition that "DG Gas did not actually rely on any of the Representations."  (Doc. No. 11 at PageID #905.)  Accordingly, for the same reasons discussed above, the Court rejects Defendants' arguments relating to actual reliance.  *See* Section IV.C.5.

relying on purported Representations that differ from contractual duties.  (*Id.*)  Defendants next assert that the alleged misrepresentations regarding TA expending "considerable time, skill and effort in developing the TA Express Centers" similarly fail because the 2021 FDD discloses the exact number of TA Express Centers as of the end of 2020, and DG Gas does not plead facts suggesting that representation should be construed to mean anything more than those efforts.  (*Id.* at PageID #904–05.)  Finally, Defendants maintain that DG Gas failed to plausibly allege that it justifiably relied on the alleged representations that the "typical" time for building a ground-up TA Express Center was 18 months.  (*Id.*)  Defendants specifically note that: (i) the FDD states that this "typical" time was "*approximately* 18 months"; (ii) the FDD provided numerous factors that could affect that timeline including construction, which "was the responsibility of DG Gas"; and (iii) the contact information for all franchisees was provided in the FDD, and DG Gas was encouraged to "contact them to ask about their experiences."  (*Id.*)  Thus, according to Defendants, "the 'typical' time was an approximation, subject to specific circumstances, and [DG Gas] had opportunity to conduct its own investigation."  (*Id.*)

In their Opposition, Plaintiffs first assert that they are "not required to plead every single evidentiary fact that will be offered at trial" and "need not plead dates, times and places with precision, provided that the Complaint gives fair and reasonable notice to the [D]efendants of the claim and the grounds upon which it is based."  (Doc. No. 13 at PageID #948–49.)  Plaintiffs next contend that the issue of justifiable reliance is a "classic factual dispute that is inappropriate for resolution at the 12(b)(6) phase."  (*Id.* at PageID #949.)  Further, Plaintiffs submit that the existence of the integration clause in the FA does not change that conclusion, as the "effect of an integration clause is an improper consideration on a motion to dismiss."  (*Id.*)  Nonetheless, Plaintiffs reference

the language of the integration clause that DG Gas did not rely on any representations "that are contrary to the statement made" in the FDDs or FA and maintain that the Fraud Claims are "not based on allegations that are fundamentally inconsistent with the FA," but rather, "alleged statements [that] are *in addition to* the statements in the FA." (*Id.* at PageID #950 (emphasis in original).) Accordingly, Plaintiffs contend that "Defendants cannot rely on the terms of the FA to bar discovery regarding disputed fact issues." (*Id.*)

In their Reply, Defendants submit that this case does not involve a factual dispute, and that the supposed reliance fails not because of competing factual assertions …" (Doc. No. 17 at PageID #989–90.)  Rather, Defendants assert that the "pleaded facts in the Complaint and the unambiguous language of a written contract" demonstrate that justifiable reliance is not plausible, and under such circumstances, "the Court can determine at this stage that Plaintiffs could not have justifiably relied on any of the alleged misrepresentations." (*Id.* at PageID #990.)

Generally, under Ohio law, "the issue of justifiable reliance is one of fact" and "cannot be resolved via a [Rule 12(b)(6)] motion to dismiss."[77] *Ajibola v. Ohio Med. Career Coll., Ltd.*, 122 N.E.3d 660, 669 (2d Dist. 2018).  However, Ohio courts have also recognized that a "plaintiff cannot claim to have justifiably relied on representations that contradict the terms of the written agreement," and that in such scenarios, a "genuine issue of material fact does not exist …" *Shannak v. Yark Auto.*

---

[77] *See also Shannak v. Yark Automotive Group, Inc.*, 2021 WL 2886331, at *4 (6th Dist. July 9, 2021) (similar); *Reed v. Vickery*, 2009 WL 3276648, at *7 (S.D. Ohio Oct. 9, 2009) (similar); *Bush Truck Leasing, Inc. v. All Ways Auto Transport, LLC*, 2021 WL 3173073, at *10 (S.D. Ohio July 26, 2021) (similar); *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 516 (6th Cir. 1999) (similar); *Orlich v. ALDnet Media Group LLC*, 2006 WL 8446834, at *2 (N.D. Ohio Mar. 7, 2006) (similar).

*Group, Inc.*, 2021 WL 2886331, at *4 (6th Dist. July 9, 2021); *see also Addison Holdings, LLC v. Fox, Byrd & Co., P.C.*, 203 N.E.3d 1259, 1284 (4th Dist. 2022).

Further, Ohio courts have concluded that an integration clause "does not bar the use of parole evidence to prove a fraudulent inducement claim."  *P.J. Lindy & Co., Inc. v. Savage*, 2019 WL 994149, at *5 (6th Dist. Mar. 1, 2019) (citing *Galmish v. Cicchini*, 734 N.E.2d 782, 789–90 (Ohio 2000)).  At issue in *P.J. Lindy* was whether an integration clause prevented the plaintiff from introducing parol evidence to prove a claim for fraudulent inducement.  *Id.* at *5.  The court relied on the Supreme Court of Ohio's decision in *Galmish* for the proposition that the "presence of a general integration clause 'does not vitiate the principle that parol evidence is admissible to prove fraud' because, simply put, '[f]raud cannot be merged.'"  *Id.*  Accordingly, the court concluded that an integration clause "must 'directly contradict' the allegedly fraudulent representation at issue" to prevent a claim for fraudulent inducement.[78]  *Id.*

In this case, the integration clause at issue provides that "you have not received or relied on any representations about us or our franchising program or policies … that are *contrary* to the statements made in our Franchise Disclosure Document or to the terms of this Agreement."[79]  (FA, Section 2.4(c), Doc. No. 1-5 at PageID #730 (emphasis added).)  Plaintiffs correctly note that their claim is not based on allegations that are fundamentally *inconsistent* with the FA, but rather on alleged statements *in addition to* the statements in the FA.  (Doc. No. 13 at PageID #950.)  For example,

---

[78] Federal courts applying Ohio law have reached the same conclusion.  *See, e.g.*, *Stuckey v. Online Resources Corp.*, 819 F. Supp.2d 673, 683 (S.D. Ohio 2011) (concluding that "Ohio law … permit[s] introduction of extrinsic evidence to prove a fraud claim" notwithstanding the existence of integration clause).

[79] Defendants similarly reference Section 21.15 of the FA.  That provision is similarly a general integration clause that "must 'directly contradict' the allegedly fraudulent representation at issue" to prevent Plaintiffs' Fraud Claims.  *P.J. Lindy*, 2019 WL 994149, at *5.

Plaintiffs' Fraud Claims do not merely rest on the fact that TA did not have construction specifications.  Rather, as already discussed at length, Plaintiffs allege that the Representations and Omissions as to the FDDs led DG Gas to believe that a delayed Opening Date would not be an issue and that TA would not penalize DG Gas for any such lack of specifications caused by TA's own delays.  *See* Section IV.C.5.  These allegations do not "directly contradict" the FA or FDDs.[80]  *P.J. Lindy*, 2019 WL 994149, at *5.

Defendants cite to Ohio case law in support of their argument that the integration clause prevents any plausible allegations of justifiable reliance or fraud.  *See, e.g.*, *Casserlie v. Shell Oil Co.*, 2007 WL 1559510 (8th Dist. May 31, 2007); *Addison*, 203 N.E.3d at 1284.  These cases, however, are distinguishable from the present case.  First, Defendants submit that "the Court can determine *at this stage* that Plaintiffs could not have justifiably relied on any of the alleged misrepresentations." (Doc. No. 17 at PageID #990 (emphasis added).)  Yet both cited cases were decided at the summary judgment stage, not the early motion to dismiss stage.  *See Casserlie*, 2007 WL 1559510, at *1; *Addison*, 203 N.E.3d at 1262.  Second, unlike here, Defendants' cited authority are cases where the "majority of the allegations set forth by the dealers were directly contradicted by the executed agreements."  *Casserlie*, 2007 WL 1559510, at *11; *see also Addison*, 203 N.E.3d at 1284–85.

---

[80] For example, Defendants assert that DG Gas claims that "TA represented it had developed specifications and operational plans for the TA Express Center concept," even though TA had indicated that the "design is not yet final." (Doc. No. 11 at PageID #904.)  Yet Plaintiffs' Fraud Claims in this respect do not directly contradict the FA—rather, Plaintiffs allege that they justifiably relied on these representations to believe that any *delays by TA* in delivering the required specifications would not create issues for DG Gas.  Similarly, the mere fact that the FA indicated that the typical time to open a ground-up TA Express Center was "*approximately* 18 months" does not directly contradict Plaintiffs' claim that TA *omitted* information required under the FTC Franchise Rule by not disclosing *all* the "factors that may affect the time period," and that DG Gas was harmed by its justifiable reliance on the FDDs because of their omissions. (*Id.*); 16 C.F.R. 436.5(k)(2).  Accordingly, the Court rejects Defendants' arguments that Plaintiffs' allegations of justifiable reliance are insufficient at this stage.

Finally, Defendants' authority recognizes that the "question of justifiable reliance [is] ordinarily a question of fact," and the Court finds no reason to deviate from this general rule in the absence of direct contradictions between Plaintiffs' allegations and the FA and FDDs.  *Addison*, 203 N.E.3d at 1284.

 The Court thus finds that the Fraud Claims do not claim that Plaintiffs "justifiably relied on representations that contradict the terms" of the FA and FDDs.  Rather, the Court determines that "the issue of justifiable reliance is one of fact" and is premature at this stage.  *Ajibola*, 122 N.E.3d at 669.  Accordingly, the Court concludes that Plaintiffs have adequately pled justifiable reliance at this stage and declines to dismiss the Fraud Counts on that basis.[81]

  **7.** **Count Four:  Special Relationship for Negligent Misrepresentation Claims**

---

[81] In their Opposition, Plaintiffs raise the issue of particularity and submit that they "need not plead dates, times and places with precision, provided that the Complaint gives fair and reasonable notice to the defendants of the claim and the grounds upon which it is based."  (Doc. No. 13 at PageID #949.)  In their Reply, Defendants respond that Plaintiffs ignore Sixth Circuit precedent requiring a plaintiff to set forth the time, place, and content of the alleged misrepresentation.  (Doc. No. 17 at PageID #989.)  Defendants further contend that Plaintiffs neglected in their Opposition to "even attempt[] to explain how the allegations in the Complaint comply with Rule 9(b)."  (*Id.*)  Notwithstanding that Defendants are correct in asserting that this circuit requires plaintiffs to allege the time, place, and content of the alleged misrepresentation under Rule 9(b), the Court finds Defendants' argument unpersuasive for two reasons.  First, in its initial Motion, Defendants do not raise Rule 9(b) as a basis for dismissing Plaintiffs' Complaint aside from the assertion that Plaintiffs "improperly lump[] the Individual Defendants together" as to Defendant TA Operating.  (Doc. No. 11 at PageID #901.)  It is thus unreasonable to argue that Plaintiffs neglected to demonstrate in their Opposition how they complied with Rule 9(b) when Defendants never challenged the Fraud Claims under Rule 9(b) in the first place.  Second, the Court nevertheless finds that Plaintiffs have pled the Fraud Claims with sufficient particularity to satisfy Rule 9(b).  Plaintiffs' Fraud Claims are based on alleged Representations and Omissions in the FDDs, and Plaintiffs provide the exact dates of each FDD in their Complaint.  (Compl. at ¶ 37.)  The Complaint's identification of the FDDs as the basis for the alleged misrepresentations, including the exact date of each FDD, is sufficiently particular to satisfy the requirements of Rule 9(b).  Similarly, Plaintiffs allege that TA's representative, Pete Ungaro, made certain misrepresentations relating to the Opening Date in an email communication dated December 16, 2022.  (Compl. at ¶ 70.)  Plaintiffs also allege that "TA representatives visited the site of [the Maysville, KY] project in February 2023 and gave their approval for it to become a TA Express Center conversion."  (Compl. at ¶ 64.)  These alleged misrepresentations also sufficiently plead the dates, time, and content in accordance with Rule 9(b).

Next, in their Motion, Defendants assert that Count Four fails because there was no special relationship between the parties.  (Doc. No. 11 at PageID #905.)  Defendants contend that a negligent misrepresentation claim "arises only in the context of a special, fiduciary-type relationship … where the defendant is in the business of supplying information."  (*Id.*)  According to Defendants, negligent misrepresentation has no application to "typical business transactions," and the "relationship between DG Gas and TA was an arms-length, ordinary business relationship."  (*Id.* at PageID #906.)  Finally, Defendants note that the FA specifically provides that "this Agreement does not create a fiduciary relationship" and that DG Gas was merely an "independent contractor[]."  (*Id.*)

In their Opposition, Plaintiffs dispute Defendants' assertion that there was only an "ordinary business relationship" between DG Gas and TA.  (Doc. No. 13 at PageID #950.)  Rather, Plaintiffs submit that a "plaintiff seeking guidance from the defendant with respect to a business transaction is sufficient to satisfy the 'special relationship' standard."  (*Id.* at PageID #951.)  In this case, Plaintiffs contend that "Defendants solicited Plaintiffs" and "TA then provided the FDDs to guide [DG Gas] on whether to become a franchisee."  (*Id.* at PageID #950–51.)  Plaintiffs further explain that they "relied on Defendants' expertise, experience, and FDDs … [having] had no truck center operational or franchising experience," and that "TA supplied false information for the guidance of DG Gas who was considering whether a franchise was right for it."  (*Id.* at PageID #951.)  Accordingly, Plaintiffs submit that these allegations are sufficient for the pleadings phase.  (*Id.*)

In their Reply, Defendants maintain that a duty only exists in the negligent misrepresentation context "when the defendant speaks to 'the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information.'"  (Doc. No. 17 at PageID #988.)  In this case, however, Defendants contend that Plaintiffs "were mislead in the same way as

'the extensive, faceless, and indeterminable investing public-at-large." (*Id.*)  Finally, Defendants submit that "[e]ven the cases cited by Plaintiffs dismissed claims for lack of a special relationship," and that accordingly, this Court should do the same. (*Id.* at PageID #989.)

This district recently addressed the relevance of a "special relationship" in reference to a negligent misrepresentation claim under Ohio law. *See Mosaic Fin. Ltd. v. Mut. S'holder Services, LLC*, --- F. Supp.3d ---, 2025 WL 524593 (N.D. Ohio Feb. 18, 2025).  In *Mosaic*, the court first noted that a "special relationship" is not a separate element of negligent misrepresentation. *Id.* at *21. However, the "Ohio Supreme Court interprets the requirement that a defendant supplies information for guidance in business transactions to mean that the plaintiff must be a member of a limited class of people who foreseeably rely on the defendant's representations." *Id.* (citing *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 214–15 (Ohio 1982)).

Ultimately, "the determinative question is whether the plaintiff belongs to a 'faceless or unresolved class of persons' or 'a known group possessed of vested rights, marked by a definable limit and made up of certain components.'" *Id.* (citing *Haddon View*, 436 N.E.2d at 214).  Following the Ohio Supreme Court's guidance, the *Mosaic* court concluded that the "focus is on whether such a plaintiff's reliance was foreseeable." *Id.* (citing *Haddon View*, 436 N.E.2d at 215).  The court further clarified that the "legal analysis under the special-relationship test" in Ohio was not determined by whether the defendants themselves "reasonably foresaw that [p]laintiffs would rely on the [representations]," nor by "the sophistication of the plaintiff." *Id.* at *22.  Applying these principles, the court concluded that a special relationship was pled based on the defendants allegedly supplying false statements regarding an investment share class to the plaintiffs, who were "members

83

of a limited identifiable group who relied on those statements" as the only shareholder in that class. *Id.*

Other courts within this district have reached similar conclusions.[82]  *See, e.g.*, *Benedettini Cabinets, L.P. v. Sherwin-Williams Co.*, 695 F. Supp.3d 948, 964 (N.D. Ohio 2023) (finding that plaintiff adequately pled negligent misrepresentation by alleging that defendant "allegedly made specific representations to [plaintiff] in response to complaints it received from its customers—not generic statements to the market or another amorphous group"); *cf. Miller v. Kent Nutrition Group, Inc.*, 2016 WL 11246420, at *9–10 (N.D. Ohio Sept. 16, 2016) (finding no special relationship because plaintiff failed to "allege facts that indicate[d] she was a person, or part of a limited class of persons, whose reliance on [defendant's] certification in the course of business was foreseeable").

Having set forth the above principles, the Court hereby concludes that Plaintiffs have plausibly alleged a claim for negligent misrepresentation.  DG Gas relies on the Representations contained in the FDDs in support of its negligent misrepresentation claim.  (Compl. at ¶¶ 84–88, 153–56.)  The FDDs were provided specifically to DG Gas to "summarize[] certain provisions of your Franchise Agreement" and to "help you make up your mind" as to whether to purchase a franchise.

---

[82] The Court is aware of the circuit split within this circuit regarding the requirements surrounding a "special relationship" as related to a claim for negligent misrepresentation.  *See Salata Holding Co., LLC v. Chepri, LLC*, 2021 WL 1964614, at *8–11 (S.D. Ohio Mar 17, 2021) (highlighting split in authority on the issue of a "special relationship" in negligent misrepresentation claims).  In determining whether a claim for negligent misrepresentation has been pled, the Court is persuaded by *Mosaic*'s discussion regarding the Ohio Supreme Court's indication that the "focus is on whether such a plaintiff's reliance was foreseeable." 2025 WL 524593, at *21 (citing *Haddon View*, 436 N.E.2d at 215).  Accordingly, the Court concludes that even if a "special relationship" is required, it exists in this case because DG Gas's reliance on the FDDs was foreseeable as part of the defined limited group of prospective franchisees.  Finally, this point is further supported by contrasting the present case with *Salata*, in which the court explained that the defendant was "not alleged to be in the business of providing guidance to others in such a way that it would owe [plaintiff] any special duty"—whereas in this case, DG Gas has plausibly alleged that TA owed it a special duty independent of the FA under the FTC Franchise Rule.  2021 WL 1964614, at *11.

84

(2019 FDD, Doc. No. 1-1 at PageID #41; 2021 FDD, Doc. No. 1-2 at PageID #233.) These facts make clear that DG Gas is not a "faceless or unresolved class of persons" relying on TA's alleged Representations, but rather an entity "marked by a definable limit" as a prospective franchisee. *Mosaic*, 2025 WL 524593, at *21. Simply put, DG Gas is undeniably a "person or member of a limited class of persons whom [TA] intend[ed] to benefit or guide with the information supplied." *Pacifica Loan Five, LLC v. Fifth Third Bank*, 2011 WL 13228111, at *10 (S.D. Ohio Apr. 14, 2011).

Construing the Complaint in the light most favorable to Plaintiffs and considering the FTC Franchise Rule, Plaintiffs have sufficiently alleged that DG Gas's "reliance was foreseeable." *Mosaic*, 2025 WL 524593, at *21. The Court therefore finds that any "special relationship" required by Ohio law is satisfied at this early pleading stage, and accordingly, declines to dismiss Count Four.

### 8. Count Five: Fraud Arguments

Finally, in its Motion, Defendants assert various arguments related to Plaintiffs' fraud claims. These arguments address the alleged Omissions referenced in the Complaint and primarily reiterate many of the arguments previously discussed, including that: (i) Plaintiffs failed to demonstrate a duty to disclose; (ii) the parties shared an ordinary business relationship; (iii) DG Gas did not justifiably rely on the Omissions which are "mirror images of the Representations" previously discussed; (iv) DG Gas cannot rely on the Omissions as a "party to a complex business transaction"; (v) the "parties agreed that failure to meet the Opening Date permitted TA to terminate"; and (vi) the claim is barred by the integration and disclaimer clauses previously discussed. (Doc. No. 11 at PageID #906–07.) The Court finds that it has sufficiently addressed these arguments above and need not do so again here. Accordingly, for the reasons previously discussed, the Court declines to dismiss Count Five.

### D. Count Six: Ohio Statutory Fraud

The Court next turns to Count Six of the Complaint alleging that TA committed "Statutory Fraud" under Section 2913.01(B) of the Ohio Revised Code.

In their Motion, Defendants submit that there is "no private right of action based on Chapter 2913 of Ohio's criminal code."  (Doc. No. 11 at PageID #908.)  Defendants further assert that DG Gas "did not even attempt to specify what crime TA is supposed to have committed," as none of the types of fraud defined in Chapter 2913 "are called 'Statutory Fraud.'"  (*Id.* at PageID #907–08.)

In their Opposition, Plaintiffs solely address Count Six in a short footnote.  (Doc. No. 13 at PageID #951.)  In that footnote, Plaintiffs merely assert that they "intended—and did—successfully plead Ohio and Georgia fraud claims for all the reasons set forth in this Response," and that their "Ohio fraud claims can be informed by the Ohio fraud statute."  (*Id.*)

In their Reply, Defendants contend that "Plaintiffs appear to concede that Count Six fails" because they "never respond substantively to lack off a private action, but merely reference it in a footnote."  (Doc. No. 17 at PageID #990.)  Accordingly, Defendants submit that Plaintiffs "seem to acknowledge that Count Six is meritless."

The Court finds that Plaintiffs have abandoned this claim by failing to substantively respond.  *See Humphrey*, 279 Fed. Appx at 331.  Moreover, it is well established that "[i]n the absence of a specific provision to the contrary, criminal statutes generally do not create a private cause of action, but give rise only to a right of prosecution by the state."  *McCloud v. Duffy*, 2018 WL 4404159, at *5 (7th Dist. Sept. 13, 2018) (finding no right of action under Section 2913.48(D) of the Ohio Revised Code); *Wurdlow v. Turvy*, 977 N.E.2d 708, 712 (10th Dist. 2012).  Plaintiffs have failed to meaningly assert any argument to the contrary.  Accordingly, the Court dismisses Count Six.

E.    **Count Seven:  Georgia Statutory Fraud**

The Court next turns to Count Seven of the Complaint alleging that Defendants committed "Statutory Fraud" under § 23-2-51 of the Georgia Code.

In their Motion, Defendants submit that Count Seven fails to cite to any provision that creates a private cause of action, and instead cites to a definition. (Doc. No. 11 at PageID #908.) Defendants further assert that the Complaint references a "statutory provision that defines the terms 'actual fraud' and 'constructive fraud' as used in the statutes governing courts of equity in Georgia," and that even liberally construed, "Georgia law does not apply." (*Id.*) Next, Defendants contend that Count Seven alleges that "DG Gas expended substantial resources to enter into the FA, and to pursue the Additional Sites," and are thus "related to [DG Gas's] 'franchise relation' or 'collateral agreements,'" making the claim subject to the FA's Ohio choice-of-law provision. (*Id.*)

In their Opposition, Plaintiffs assert that the Ohio choice-of-law provision is inapplicable to Count Seven because the claim "relate[s] to many Additional Sites" and the "parties agree that the FA does not govern these Additional Sites." (Doc. No. 13 at PageID #953.) Plaintiffs also submit that it is "premature to interpret the FA to include the Additional Sites." (*Id.*) Finally, Plaintiffs contend that Georgia's fraud statute provides a private right of action because "Georgia statutory fraud claims sound in equity." (*Id.* at PageID #953–54.)

In their Reply, Defendants reiterate that "Count Seven fails to state a claim because DG Gas agreed in the FA to an Ohio choice-of-law provision." (Doc. No. 17 at PageID #990–91.) Defendants assert that "Plaintiffs never engage in any analysis of the provision, and Plaintiffs' own allegations make clear that Count Seven 'relates to' the franchise relation between DG Gas and TA." (*Id.* at PageID #991.) Finally, Defendants acknowledge that Plaintiffs cites federal cases that have sustained

claims under § 23-2-51 of the Georgia Code, but nevertheless submit that the "statute by its own terms applies only to courts of equity in Georgia." (*Id.* at PageID #990.)

As this Court has already explained above, the "interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."[83] *Savedoff*, 524 F.3d at 763 (collecting cases); *see also Nations Lending Corp.*, Case. No. 22 Civ. 2102, Doc. No. 9, at *13–16 (interpreting contractual language at motion to dismiss stage). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Savedoff*, 524 F.3d at 763; *see also Jewell Coke Co., L.P. v. ArcelorMittal USA, Inc.*, 756 F. Supp.2d 858, 863 (N.D. Ohio 2010) (concluding on motion to dismiss that "claim of fraudulent inducement falls within the scope of that choice of law provision" contained in guaranty agreement).

Here, the Court finds the FA's choice-of-law provision to be clear and unambiguous.  The choice-of-law provision provides that Ohio law will apply to all claims "which in any way arise out of or relates to your franchise relation with us, including but not limited to … any guaranty or other collateral agreements with us or our affiliates." (FA, Section 21.7, Doc. No. 1-5 at PageID #776.) Count Seven explicitly references DG Gas "expending substantial resources to enter into the FA [and] develop and plan the Cordele, GA site" as an allegation of fraud under the Georgia Code. (Compl. at ¶ 173.) This alone is sufficient to bring the claim within the purview of the choice-of-law provision.

---

[83] The Court finds that Plaintiffs' cited authority asserting that "contract interpretation is inappropriate on a motion to dismiss" is distinguishable because it did not analyze whether the contract was clear and unambiguous. (Doc. No. 13 at PageID #953 (citing *DeNune v. Cons. Capital of North America, Inc.*, 2004 WL 1474653, at *2 (N.D. Ohio May 21, 2004)). To the extent that Plaintiffs insist upon relying on *DeNune*, the Court finds it to be inconsistent with Sixth Circuit precedent and accordingly rejects its premise. *See Savedoff*, 524 F.3d at 763.

Moreover, even if the Court was inclined to separate Plaintiffs' allegations within Count Seven regarding the "Additional Sites" from those directly involving the FA, it would make no difference.  The choice-of-law provision applies to any claim that "arises out of or *relates to* your franchise relation with us, including … *other collateral agreements with us* or our affiliates."  (FA, Section 21.7, Doc. No. 1-5 at PageID #776.)  Thus, any separate "collateral agreements" between DG Gas and TA with respect to the Additional Sites would still fall within the purview of the choice-of-law provision.  In light of the above, the Court concludes that Ohio law applies to the allegations contained in Count Seven.  Accordingly, Plaintiffs cannot assert a claim under Georgia law.

For the aforementioned reasons, the Court hereby dismisses Count Seven of the Complaint.[84]

### F.      Count Eight:  Promissory Estoppel

The Court next turns to Count Eight of the Complaint alleging promissory estoppel.

#### 1.      Clear and Unambiguous Promise

In their Motion, Defendants first submit that the Complaint fails to allege a clear and unambiguous promise and Plaintiffs "cannot rely on nebulous representations."  (Doc. No. 11 at PageID #908.)  Specifically, Defendants contend that Count Eight only identifies two alleged promises: (i) "a discount on the franchise fee"; and (ii) "that DG Gas's Additional Sites were being pursued by suitable franchises on suitable properties."  (*Id.*)  Defendants maintain that these alleged promises are "neither 'clear' nor 'unambiguous,'" as DG Gas fails to "describe the wording of the allegedly 'clear and unambiguous' promises" or identify "when and by whom the promises were made," thereby failing to "bring[] these conclusory allegations into the realm of plausibility."  (*Id.* at

---

[84] Having found that Ohio law applies to Count Seven, the Court finds it unnecessary to address the parties' remaining argument regarding whether a private cause of action exists under § 23-2-51 of the Georgia Code.

PageID #908–09.)  Defendants further assert that even if the alleged promises were non-conclusory, they would still not be actionable.  (*Id.* at PageID #909.)  Regarding the alleged discounted franchise fee promise, Defendants contend that the "Complaint never alleges that TA agreed to award additional franchises" as it admits that DG Gas was "wait[ing] for TA to submit updated disclosure and contract documents."  (*Id.*)  As for the second promise, Defendants submit that it appears to be a "statement of opinion" and is too "vague" to support a claim for promissory estoppel.  (*Id.*)

In its Opposition, DG Gas asserts that Defendants "ignore Plaintiffs well-pled allegations that they were approached by Defendants and encouraged by Defendants to develop the Additional Sites as franchisees."  (Doc. No. 13 at PageID #952.)  DG Gas submits that these allegations are "more than sufficient," and that "[a]t minimum, this issue is a question of fact that cannot be determined on a motion to dismiss."  (*Id.*)

In their Reply, Defendants contend that "Plaintiffs backtrack from the alleged promises identified under Count Eight … charge the Court with a duty to hunt through their voluminous Complaint to guess which allegations they contend support their promissory estoppel claim."  (Doc. No. 17 at PageID #991.)  Regarding the promises identified under Count Eight, Defendants assert that DG Gas failed to address that the alleged promises were "improper 'nebulous representations.'" (*Id.*)  Thus, Defendants submit that "nowhere … have Plaintiffs alleged an unambiguous, unconditional promise that plausibly alleges promissory estoppel under Ohio law."  (*Id.*)

As a preliminary matter, "when determining the plausibility of claims at the motion to dismiss stage, the complaint must be viewed as a whole."  *In re East Palestine Train Derailment*, 2024 WL 1094616, at *5 (N.D. Ohio Mar. 13, 2024); *see also Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 895 n.3 (6th Cir. 2019)  In other words, "a federal court may consider an entire complaint to determine

90

whether a plaintiff pleaded plausible claims." *Cahoo*, 912 F.3d at 895 n.3. The Sixth Circuit has explicitly rejected the assertion that a court is limited solely to the allegations contained under each count when evaluating the claims on a motion to dismiss. *See id.* ("Therefore, the Court will consider conduct alleged through the entire Amended Complaint—*regardless of what count it appears in*—when evaluating Plaintiffs' claims.") (emphasis added). Accordingly, the Court rejects Defendants' submission that DG Gas's references to alleged promises contained in other sections of the Complaint should be disregarded.

Under Ohio law, a promissory estoppel claim requires: "[1] a promise, clear and unambiguous in its terms; [2] reliance [on the promise] by the party to whom the promise is made; [3] that the reliance was reasonable and foreseeable; and [4] that the party claiming estoppel was injured by the reliance." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (quoting *Rigby v. Fallsway Equip. Co.*, 779 N.E.2d 1056, 1061 (Ohio 9th Dist. Ct. App. 2002)). Ohio courts define promise as a "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." *Cranpark, Inc. v. Rogers Group, Inc.*, 498 Fed. App'x. 563, 570–71 (6th Cir. 2012) (citing *HAD Enters. V. Galloway*, 948 N.E.2d 473, 481 (4th Dist. 2011)).

"A clear and unambiguous promise is the type that the promisor would expect to induce reliance." *Stern v. Shainker*, 2009 WL 1636173, at *2 (8th Dist. June 11, 2009); *Casillas v. Stinchcomb*, 2005 WL 1845318, at *3 (6th Dist. July 8, 2005); *Williams v. U.S. Bank Shaker Square*, 2008 WL 802523, at *2 (8th Dist. Mar. 27, 2008). "This element is not satisfied by vague or ambiguous references." *Stern*, 2009 WL 1636173, at *2; *Williams*, 2008 WL 802523, at *2. Rather, "Ohio courts have made clear that promissory estoppel requires 'specific promises' and that

91

'nebulous representations' will not do." *Middleton v. United Church of Christ Board*, 483 F. Supp.3d 489, 504 (N.D. Ohio 2020) (collecting cases).  Whether a party "made a 'clear and unambiguous promise' is a question of fact." *Cranpark, Inc.*, 498 Fed. App'x at 571; *Johnson v. Calhoun Funeral Homes, Inc.*, 2017 WL 661692, at *3 (N.D. Ohio Feb. 17, 2017); *Simon v. Aulino*, 165 N.E.3d 706, 724 (4th Dist. 2020) (collecting cases).

Upon reviewing the Complaint in totality, the Court concludes that DG Gas has met its initial burden in plausibly alleging a promise that DG Gas would be granted franchises for the Additional Sites.  In the Complaint, DG Gas pleads that it purchased numerous contracts for properties "[w]ith encouragement from TA, and based on plans that the parties jointly developed … with the intent to build and operate TA Express Centers at these Additional Development Sites."  (Compl. at ¶ 63.) TA's alleged promise to pursue Additional Sites is supported by the allegation that "[DG Gas][85] secured site approvals from TA and signed additional TA paperwork for several of these Additional Development Sites"—which could constitute promises to pursue such additional franchises.  (Compl. at ¶ 63.)

Most importantly, however, DG Gas cites a *specific* instance of an alleged promise for an additional franchise.  Specifically, paragraph 64 of the Complaint alleges that "TA representatives visited the site of [the Maysville, KY] project in February 2023 and gave their approval for it to become a TA Express Center conversion."  (Compl. at ¶ 64.)  If true, TA's "approval for [the site] to

---

[85] In paragraph 63 of the Complaint, it appears that Plaintiffs made a typographical error in alleging that "TA secured site approvals from TA and signed additional TA paperwork …."  (Compl. at ¶ 63.)  Context indicates that the first word of the sentence was meant to be DG Gas—indeed, TA obviously did not "secure[] site approvals" from itself.  (*Id.*)  Accordingly, the Court interprets this paragraph as alleging that *DG Gas* "secured site approvals from TA and signed additional TA paperwork …."  (*Id.*)

become a TA Express Center conversion" given on February 2023 may constitute a promise to pursue that site.  (*Id.*)  Whether this constitutes a "'clear and unambiguous promise' is a question of fact," and DG Gas will bear the burden of establishing this "clear and unambiguous" promise with evidence at the summary judgment stage.  *Cranpark, Inc.*, 498 Fed. App'x at 571.  But for purposes of this preliminary stage, DG Gas has alleged a promise sufficient to withstand dismissal.[86]

Similarly, the Court finds that DG Gas has sufficiently alleged the promise that "DG Gas would get a discount on the franchise fee for each franchise it developed."  (Compl. at ¶ 178.) Specifically, Section 9.1(b) of the FA attached to the Complaint explicitly references this promise that the "Franchise Fee due and owing under the second and each subsequent Franchise Agreement you execute with us for a TA® Center or TA® Express Center shall be discounted …."  (Doc. No 1-5 at PageID #748.)  While this provision is contained within the FA, "at this stage in litigation … [DG Gas] may plead breach of contract and also promissory estoppel in the alternative if [its] breach of contract claim fails."  *MTD Products, Inc. v. American Honda Motor Co., Inc.*, 627 F. Supp.3d 867, 883 n.5 (N.D. Ohio 2022).

Accordingly, the Court concludes that DG Gas has plausibly pled a clear and unambiguous promise.

### 2. Reasonable Reliance

---

[86] Contrary to Defendants' assertions, the allegation that "TA representatives visited the site of [the Maysville, KY] project in February 2023 and gave their approval for it to become a TA Express Center conversion" sufficiently identifies "when and by whom the promises were made."  *Stewart v. Everyware Global, Inc.*, 68 F. Supp.3d 759, 767 (S.D. Ohio 2014).  While these details will need to be further developed through discovery, this specific example alleged is sufficient to survive dismissal at this preliminary stage.  *See Cranpark, Inc.*, 498 Fed. App'x at 571 (providing that whether a party "made a 'clear and unambiguous promise' is a question of fact").

Next, in their Motion, Defendants submit that DG Gas has "not plausibly allege[d] reasonable reliance."  (Doc. No. 11 at PageID #909.)  Defendants cite an Ohio case for the assertion that it is "unreasonable as a matter of law for a party to rely on a statement of future intent in 'complex business transactions,' especially when the negotiations involve two sophisticated business entities."  (*Id.*)  Accordingly, Defendants contend that this case involves statements of future intent in a complex business transaction between sophisticated business entities, and therefore, "DG Gas cannot have reasonably relied on the alleged promises in these circumstances."  (*Id.* at PageID #910.)

In its Opposition, DG Gas submits that it has "relied on these promises and sunk substantial time and resources into the development of the Additional Sites on the promise that they would be granted franchises," and that it "would not have made these investments but for these assurances."  (Doc. No. 13 at PageID #952.)  Thus, DG Gas contends that it has sufficiently alleged reliance.  (*Id.* at PageID #952–53.)  DG Gas does not directly respond to Defendants' cited authority regarding complex business transactions between sophisticated business entities.  (*Id.*)

In their Reply, Defendants assert that DG Gas fails to address their "on-point Ohio case law" and instead cites to an argument not made—"arguing *actual* reliance (rather than reasonableness)."  (Doc. No. 17 at PageID #991.)  Accordingly, Defendants submit that DG Gas's allegations are implausible.  (*Id.*)

By not responding to Defendants' specific argument, DG Gas has waived any opposition thereto.  *See Humphrey*, 279 Fed. Appx at 331.  Nonetheless, the Court will address the substance of Defendants' arguments.[87]

---

[87] *See supra* note 55.

"Typically, the question of whether reliance on a promise was reasonable is a question of fact to be resolved by the fact finder." *Centennial Plaza III Invest., L.L.C. v. Centennial Plaza I Invest., L.L.C.*, 2016 WL 524362, at *5 (1st Dist. Jan. 27, 2016) (citing cases).  In *Centennial Plaza*, the court noted that the Ohio Supreme Court had previously stated that "it is unreasonable as a matter of law for a party to rely on a statement of future intent in 'complex business transactions,' especially when the negotiations involve two sophisticated business entities." *Id.*  However, the court recognized that the statement was made only when refusing to allow promissory estoppel to defeat a statute-of-frauds defense in a breach-of-contract claim. *Id.*  The court further noted that in the same case, the Ohio Supreme Court sanctioned the use of a promissory-estoppel cause of action to obtain reliance damages for a party that relied on an unenforceable oral promise. *Id.*

In evaluating this arguable inconsistency, the court explained that the "interest to be protected by the statute of frauds is not as significant when only reliance damages are sought and not the specific performance of the promise." *Id.* at *6.  As such, the court concluded the plaintiff in the case before it—who notably, along with defendant, was a corporate entity involved in the sale of commercial real estate properties downtown—could assert promissory estoppel as a separate cause of action "to obtain reliance damages" because the plaintiff was "not seeking enforcement of the oral agreement." *Id.* at *1–2, 6.  Accordingly, notwithstanding the Ohio Supreme Court's previous statement regarding sophisticated parties to complex business transactions, the court "decline[d] to hold that [the plaintiff's] reliance was unreasonable as a matter of law." *Id.* at *6.

Turning to the case at hand, the Court finds that Defendants' reliance on *Centennial Plaza* is misplaced.  Just as in *Centennial Plaza*, DG Gas here does not seek enforcement of the alleged promise.  Rather, DG Gas seeks reliance damages for harm caused by its reliance on the alleged

95

promises.  (*See* Compl. at ¶ 181 ("DG Gas's reliance on TA's Promises has caused DG Gas to incur substantial losses in an amount that will be proven at trial.").)  The present case is thus distinguishable because "only reliance damages are sought and not the specific performance of the promise." *Centennial Plaza*, 2016 WL 524362, at *6.  Therefore, just as in *Centennial Plaza*, the Court declines to find that sophisticated parties to a complex business transaction can *never* rely on a statement of future intent in asserting a promissory estoppel claim.[88]  And Defendants do not contest DG Gas's assertions that it *actually* relied on the promise—in fact, Defendants expressly acknowledge that this was "an argument not made."  (Doc. No. 17 at PageID #991.)  At the bare minimum, the issue of reasonable reliance is a question of fact to be resolved by the fact finder."  *Centennial Plaza*, 2016 WL 524362, at *5.

Accordingly, for the foregoing reasons, the Court finds that DG Gas has plausibly alleged a claim for promissory estoppel and declines to dismiss Count Eight.

### G.    Count Nine:  Declaratory Judgment

The Court next turns to Count Nine of the Complaint seeking a Declaratory Judgment that the "use restrictions imposed on the Cordele Site violates Georgia public policy."[89]  (Doc. No. 13 at PageID #954.)

In its Motion, TA submits that the Complaint fails to plausibly state a claim for relief because while the Limited Warranty Deed is between TA Operating and DG Cordele, DG Gas asserts Count

---

[88] This is supported by the Ohio Supreme Court allowing the promissory-estoppel cause of action to survive in the same case with relation to reliance damages.  *See Centennial Plaza*, 2016 WL 524362, at *5 (explaining inconsistent results from Ohio Supreme Court regarding application of promissory estoppel).

[89] TA does not contest that Georgia law applies.  (*See* Doc. No. 11 at PageID #910.)

Nine only against TA "who is not a party to the deed that contains" the Use Restriction.  (Doc. No. 11 at PageID #910.)  TA next contends that even if the claim was asserted against TA, dismissal is warranted because the Use Restriction is not void against public policy.  (*Id.*)  TA cites to numerous state and federal cases for the assertion that "these types of use restrictions are generally upheld in similar contexts."  (*Id.* at PageID #910–11.)  Specifically, TA asserts that the Georgia Supreme Court has provided specific circumstances in which a contract can be deemed "contrary to public policy," and maintains that "[n]one of those circumstances apply here."  (*Id.* at PageID #911.)  TA next submits that the Use Restriction does not meet the "high bar for finding unconscionability."  (*Id.* at PageID #911–12.)  Finally, TA contends that Count Nine should be dismissed because DG Gas's release in the PSA is an "absolute bar" to its claim.  (*Id.* at PageID #912.)

In its Opposition, DG Gas asserts that the determination of whether the Use Restriction violates Georgia's public policy is "premature and better suited for trial."  (Doc. No. 13 at PageID #954.)  DG Gas contends that to prevail on a declaratory judgment claim, a plaintiff must show that "(1) a real controversy exists between the parties, (2) the controversy is justiciable in character, and (3) speedy relief is necessary to preserve the rights of the parties," and that none of those are challenged by TA.  (*Id.*)  DG Gas cites to cases finding restrictive covenants to violate Georgia public policy and submits that none of TA's cases "demonstrate that a court can resolve the permissibility of land use restrictions on public policy grounds on the pleadings alone."  (*Id.* at PageID #954–55.)  As for the "unconscionability" argument, DG Gas similarly maintains that the issue is a "factual determination inappropriate for resolution at the motion to dismiss phase."  (*Id.* at PageID #955.)

In its Reply, TA first submits that dismissal is warranted because DG Gas failed to respond to its point that Count Nine is "wrongly asserted against TA—who is not a party to the deed

containing the Use Restriction, thereby conceding it." (Doc. No. 17 at PageID #992.) TA next asserts that DG Gas never addressed its argument that the Georgia Supreme Court has instructed that contracts may be declared void against public policy only "where the case is free from doubt and an injury to the public clearly applies." (*Id.*) TA thus contends that DG Gas has offered "nothing more than a conclusory allegation that [the Use Restriction] is 'void as against public policy.'" (*Id.*) TA further submits that "Georgia courts have upheld restrictions of similar length" and that "both federal and state Georgia cases have considered unconscionability arguments on preliminary motions." (*Id.* at PageID #992–93.) Finally, TA asserts that DG Gas's authority is distinguishable because it was decided in the employment context and "Georgia courts treat real property restrictions differently." (*Id.*)

By not responding to TA's argument regarding Count Nine being raised against TA Operating, DG Gas has waived any opposition thereto. *See Humphrey*, 279 Fed. Appx at 331. Nonetheless, the Court will address the substance of TA's argument.[90]

Georgia precedent indicates that a "misnomer of a corporation … in a judicial proceeding is not material or vital in its consequences, if the identity of the corporation intended is clear or can be ascertained by proof." *Spinnaker Int. v. Greenfence, LLC*, 2019 WL 2016881, at *2 (N.D. Ga. Mar. 1, 2019 (citing *Atlanta Indoor Advert. Concepts., Inc. v. World Class Fitness, Inc.*, 213 Ga. App. 295, 296 (Ga. Ct. App. 1994) (quoting *Hawkins v. Turner*, 166 Ga. App. 50, 51–52 (Ga. Ct. App. 1983))). "However, it is fundamental that a person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms." *Spinnaker Int.*, 2019 WL 2016881, at *2

---

[90] *See supra* note 55.

(citing *Plaza Properties, Ltd. v. Prime Business Invest., Inc.*, 240 Ga. App. 639, 642 (Ga. Ct. App. 1999)) (alterations omitted).

In this case, the "identity of the corporation intended is clear" in that TA Operating, DG Cordele, and DG Real Estate Partners are the proper parties with respect to this count rather than TA and DG Gas. *Spinnaker Int.*, 2019 WL 2016881, at *2. Accordingly, the Court concludes that Plaintiffs' misnomer of TA and DG Gas instead of TA Operating, DG Cordelle, and DG Real Estate Partners is "not material or vital in its consequences," and hereby substitutes TA Operating, DG Cordele, and DG Real Estate Partners as the proper parties in Count Nine. *Id.*

The Declaratory Judgment Act permits a court to enter declaratory relief only "[i]n a case of actual controversy."[91] *Fieger v. Michigan Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009). "To get a declaratory judgment, [the plaintiff] must present a justiciable case or controversy under Article III." *Larry E. Parrish. P.C. v. Bennett*, 989 F.3d 452, 456 (6th Cir. 2021). "That is, the plaintiff must demonstrate that the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[92] *Larry E. Parrish P.C.*, 989 F.3d at 456 (citing

---

[91] The Court applies federal law in determining whether it can render a declaratory judgment. *See, e.g.*, *Payne v. State Farm Fire and Casualty Co.*, 2011 WL 13220695, at *3 (N.D. Ga. Aug. 2, 2011) ("Federal law determines whether a federal court can render a declaratory judgment, and therefore, Georgia law with regard to whether this case is a justiciable controversy does not control federal law here … Whether a certain case presents a controversy under Article III of the Constitution is a question of federal law to be resolved independent of state law … Accordingly, the Court will apply federal law in determining the justiciability of this action.").

[92] *See also McKee Foods Corp. v. BFP, Inc.*, 2024 WL 1213808, at *3 (6th Cir. Mar. 21, 2024) ("A justiciable case or controversy exists when the parties have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment even though the injury-in-fact has not yet been completed.") (internal quotation marks omitted); *Galluzzo v. Champaign Cnty. Ct. of C.P.*, 168 Fed. App'x 21, 24 (6th Cir. 2006) (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

*MedImmune, Inc. v. Genentech, Inc.*, 546 U.S. 118, 127 (2007)) (internal quotation marks omitted). "Therefore, a plaintiff must demonstrate 'an actual injury traceable to the defendant [that is] likely to be redressed by a favorable judicial decision.'" *Larry E. Parrish P.C.*, 989 F.3d at 456 (citing *Spencer v. Kamna*, 523 U.S. 1, 7 (1998)).

As noted by DG Gas, TA does not appear to challenge whether DG Gas has presented a real justiciable controversy that can be heard by this Court. (*See* Doc. No. 13 at PageID #954.) Instead, TA challenges the substantive merits of DG Gas's position, contending that the Use Restriction is not void against public policy or unconscionable under Georgia law. (*See* Doc. No. 11 at PageID #910–12; Doc. No. 17 at PageID #992–93.) In response, DG Gas submits that the issue is a "factual determination inappropriate for resolution at the motion to dismiss phase." (Doc. No. 13 at PageID #955.)

"Under Georgia law, 'the basic test for determining unconscionability is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1265 (11th Cir. 2017) (citing *NEC Techs., Inc. v. Nelson*, 267 Ga. 390 (1996)). "Other definitions of unconscionable agreements are those that 'no sane man not acting under a delusion would make, and that no honest man would take advantage of,' … that are 'abhorrent to good morals and conscience,' … and in which 'one of the parties takes a fraudulent advantage of another.'" *Id.* (citations omitted).

"Georgia's unconscionability doctrine contemplates both procedural unconscionability, which 'addresses the process of making the contract,' and substantive unconscionability, which 'looks to the contractual terms themselves.'" *Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118, 1124 (11th

100

Cir. 2010) (citing Georgia law).  "When considering procedural unconscionability, the Georgia courts examine 'the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.'"  *Id.*; *see also Jones*, 866 F.3d at 1265.  "As for the substantive element, 'courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'"  *Cappuccitti*, 623 F.3d at 1124; *see also Jones*, 866 F.3d at 1265.

Based on the foregoing, "[i]t is obvious … that resolving the issue of unconscionability under Georgia law is a fact-intensive exercise."  *Cappuccitti*, 623 F.3d at 1124; *see also Matthews v. Ultimate Sports Bar, LLC*, 621 Fed. App'x 569, 573 (11th Cir. 2015) ("[R]esolving this issue under Georgia law is a fact-intensive exercise.").  Indeed, courts evaluating Georgia law have concluded that "[a] finding that enforcing a contract provision would be unconscionable is a finding of an ultimate fact" that is "inferred from a variety of circumstances depending on the nature of the case." *Cappuccitti*, 623 F.3d at 1124; *Matthews*, 621 Fed. App'x at 573.  At best, "[o]ne could argue that the ultimate finding on the unconscionability is also a legal conclusion, i.e., unconscionability is a mixed question of fact and law," but "because unconscionability is determined on a case-by-case basis, the determination is nonetheless heavily fact laden."  *Cappuccitti*, 623 F.3d at 1124 n.15.

The Court hereby concludes that a finding on the issue of unconscionability would be premature at this stage.  Although TA advances compelling substantive arguments at this stage, Georgia law suggests that a final determination should not be made without the requisite fact-finding

101

necessary to evaluate the complete circumstances surrounding the disputed contractual provision. Indeed, the cases cited in TA's Motion support this notion.[93]

The Court also finds the two cases cited in TA's Reply to be distinguishable.  *See Smith v. Adventure Air Sports Kennesaw, LLC*, 357 Ga. App. 1 (Ga. Ct. App. 2020); *Johnson v. Wells Fargo Bank, N.A.*, 2015 WL 12591792 (N.D. Ga. June 17, 2015).  In *Smith*, the trial court held a hearing on the motion to dismiss and compel arbitration and inquired into the parties' actions, and the reviewing court "defer[red] to the trial court's factual findings …."  357 Ga. App. at 1, 8.  Moreover, the court found that the contract was not unconscionable "in the absence of a showing that [the party] 'was fraudulently induced into signing the … agreement,'" whereas that fraudulent inducement issue is contested in this case.  *Id.* at *6.  Finally, the facts in *Smith* are distinguishable as they involved a 17-year-old minor who executed a contract by admittedly forging his father's signature.  *Id.* at *5–6.  Turning to *Johnson*, the plaintiff specifically "discussed in detail the cost of arbitration" and the "limited bargaining power he had in relation to the clause."  *Johnson*, 2015 WL 12591792, at *2; *see also Jeffries v. Wells Fargo & Co.*, 2017 WL 3149513, at *4 n.3 (N.D. Ala. July 25, 2017) (distinguishing *Johnson*).  Further, the Court finds *Johnson* to be inconsistent with Eleventh Circuit precedent.  Specifically, the Eleventh Circuit published *Matthews* just one month after *Johnson*, explaining that "resolving this issue [of unconscionability] under Georgia law is a fact-intensive exercise."  621 Fed. App'x at 573.  The court concluded that "despite the fact-intensive nature of this

---

[93] *See North Bay Avalon, LLLP v. Speedway, LLC*, 340 Ga. App. 899, 512–13 (Ga. Ct. App. 2017) (discussing trial court's express factual findings and noting that "[n]othing in the record contradicts these factual findings"); *Brunson v. Centennial Am. Properties, LLC*, 2010 WL 11613662, at *1 (S.D. Ga. May 27, 2010) (analyzing issue at summary judgment stage); *Sofran Peachtree City, L.L.C. v. Peachtree City Holdings, L.L.C.*, 250 Ga. App. 46 (Ga. Ct. App. 2001) (same); *Salkhi v. BP West Coast Products, LLC*, 826 Fed. App'x 671, 672 (9th Cir. 2020) (same); *Eastling v. BP Products North Am., Inc.*, 578 F.3d 831, 833 (8th Cir. 2009) (same); *Double Diamond Properties, LLC v. BP Products North Am., Inc.*, 277 Fed. App'x 312, 313 (4th Cir. 2008) (same).

question, the district court has made no findings to this effect" and remanded to the district court for an initial determination.  *Id.*  The Court thus finds *Matthews* to be more persuasive and declines to follow *Johnson*.

Accordingly, for the foregoing reasons, the Court declines to dismiss Count Nine at this stage.

## H.     Count Ten:  Violation of the Ohio Business Opportunity Plan Act

The Court next turns to Count Ten of the Complaint alleging a violation of the Ohio Business Opportunity Plan Act ("BOPA").  *See* Ohio Rev. Code § 1334.01 *et seq.*

In their Motion, Defendants assert that the BOPA defines a "Business Opportunity Plan" to require "an initial payment greater than five hundred dollars, but less than one hundred thousand dollars."  (Doc. No. 11 at PageID #912.)  Thus, Defendants submit that the BOPA is inapplicable because "DG Gas paid at least $100,000 for the initial franchise fee—which is not 'less than one hundred thousand dollars.'"  (*Id.*)  Defendants further contend that the BOPA "exempts any 'transaction that complies in all material respects with the' FTC Franchise Rule," and that the 2021 FDD shows that the "items required under the FTC Franchise Rule were disclosed."  (*Id.*)

In their Opposition, Plaintiffs submits that "Defendants misstate the terms of the parties' agreement."  (Doc. No. 13 at PageID #955.)  Plaintiffs contend that Section 9 of the Addendum to the FA requires DG Gas to pay $40,000 as the "Initial Payment" and to later pay another $60,000 as a "Balance Payment" at the time of purchase of the site in question.  (*Id.* at PageID #955–56.)  Plaintiffs thus assert that the BOPA "applies because the 'Initial Payment' of $40,000 was between $500 and $100,000."  (*Id.* at PageID #956.)  Next, Plaintiffs submit that their Complaint "alleges that Defendants *did not* comply with the FTC Franchise Rule," including the alleged failures of Defendants to disclose "*all factors relating to any opening deadline*" or "include a warning about

103

Defendants' own lack of preparedness to provide guidance to a ground-up developer of the new franchise concept." (*Id.* (emphasis in original).)  Accordingly, Plaintiffs assert that their BOPA claim should be "further evaluated in subsequent proceedings in this case." (*Id.*)

In their Reply, Defendants submit that the 2021 FDD expressly provides that Plaintiffs "must pay us an **initial** franchise fee of … $100,000 for a TA Express Center franchise in a lump sum when you sign the Franchise Agreement." (Doc. No. 17 at PageID #993 (emphasis in original).) Defendants contend that while the "parties agreed to modify the timing of those payments, the total of $100,000 was paid as the initial franchise fee." (*Id.* at PageID #993–94.)  Thus, Defendants assert that the "FDD, the original terms of the FA, and the Addendum to the FA all identify the same initial franchise fee due: $100,000." (*Id.* at PageID #994.)  Next, Defendants turn to the BOPA's definition of "Initial Payment" as "the total amount a purchaser is obligated to pay prior to or during the first six months after commencing operation of the business opportunity plan." (*Id.*)  Thus, according to Defendants, the $60,000 paid when the "purchase of the Cordele property closed on December 3, 2021" and the $40,000 paid when the "FA was entered [on] December 6, 2021" qualify as initial payments."  Finally, on this same point, Defendants submit that the definition of "Initial Payment" under the BOPA acknowledges that it may be paid in "installments."

Section 1334.01 of the BOPA provides, in relevant part, as follows:

(A) "Seller" means a person who sells or leases a business opportunity plan.

(B) "Purchaser" means a person to whom a business opportunity plan is sold or leased.

\*\*\*

(D) "Business opportunity plan" means an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all of the following conditions:

104

(2) The purchaser is required to make an *initial payment greater than five hundred dollars, but less than one hundred thousand dollars*, to the seller or an affiliated person to *begin or maintain* the business opportunity plan.

\*\*\*

(G) "Initial payment" means the *total amount a purchaser is obligated to pay prior to or during the first six months after commencing operation of the business opportunity plan*. If an agreement sets forth a specific total sale price for purchase of a business opportunity plan, which is to be paid in one or more installments, "initial payment" means the entire total sale price.

(emphasis added).

Under the BOPA, an agreement only constitutes a "business opportunity plan" if the purchase is required to make an "initial payment" that is "greater than five hundred dollars, but less than one hundred thousand dollars." § 1334.01(D)(2). The BOPA has statutorily defined this "initial payment" to include the "*total amount* a purchaser is obligated to pay prior to or during the first six months after commencing operation of the business opportunity plan." § 1334.01(G) (emphasis added). Accordingly, the operative question is whether the "initial payment" in this case includes *both* the $40,000 paid when the FA was entered on December 6, 2021 *and* the $60,000 paid when the purchase of the Cordele Site closed on December 3, 2021.

Ohio courts have analyzed similar scenarios under the BOPA. *See, e.g.*, *Watch What Develops Franchise Concepts, Inc. v. Custom 1-Hour Photo, Inc.*, 1990 WL 163950 (9th Dist. Oct. 17, 1990). In that case, the parties executed a franchise agreement on March 16, 1982, and executed a document titled "Addendum" the following month that added the "Savannah, Georgia area to the franchise areas." *Watch What Develops Franchise Concepts, Inc.*, 1990 WL 163950, at *2. The consideration for the initial agreement was $35,000, while the consideration for the addendum was $20,000. *Id.* At issue was whether the documents should be read as "one agreement" for purposes

105

of falling within the BOPA's "initial payment" limit of $50,000.[94]  *Id.*  The court concluded that the initial agreement "clearly provid[ing] for the consideration payable upon the acquisition of a second franchise area," coupled with the "small amount of time between the execution of the two documents, strongly suggested that the parties foresaw the addition of a second franchise area and intended to have it covered by the March 16 agreement."  *Id.*

In this case, the Court finds that both the $40,000 and $60,000 payments count towards the "initial payment" threshold under the BOPA.  First, both payments indisputably occurred "prior to or during the first six months after commencing operation of the business opportunity plan."  (*See* Compl. at ¶¶ 7, 42, 67; Doc. No. 1-5 at PageID #815.)  Thus, regardless of the parties' choice of verbiage in the FA, the statutorily defined term "initial payment" encompasses both payments.  § 1334.01(G).  Moreover, both payments were clearly intended to be applied towards the same business opportunity plan.  This is consistent with Ohio courts holding that payments required to "begin" the business are included as "initial payments."  *See, e.g.*, *Andrew v. Power Marketing Direct, Inc.*, 978 N.E.2d 974, 998 (10th Dist. 2012) (concluding that initial inventory purchase was part of "initial payment" under the BOPA because "[j]ust as he could not 'begin' his business without inventory, neither could he 'maintain' his business without inventory"); *GJ Food Service One, Inc. v. Shepherd*, 1998 WL 195698 (1st Dist. Apr. 24, 1998) ("[Plaintiff] in this case was undoubtedly required to pay $66,000 to consummate the entire agreement, or nothing whatever would have been accomplished.").  Finally, the mere fact that the payments were made separately does not take them outside the

---

[94] The BOPA was amended in 2012 to increase the upper limit of the "initial payment" from $50,000 to $100,000.  *See* BUSINESS AND COMMERCE—PLANS AND SPECIFICATIONS—REMEDIES, 2012 Ohio Laws File 130 (Sub. S.B. 196) (effectuated September 28, 2012).

definition of an "initial payment" under the BOPA, as the definition explicitly provides that an "initial payment" includes payments made in installments.  § 1334.01(G).

In sum, even the most favorable interpretation for Plaintiffs cannot overcome the reality that both the $40,000 and $60,000 payments are part of the "*total amount*" they were "obligated to pay *prior to or during the first six months* after commencing operation of the business opportunity plan." § 13341.01(G).  The Court therefore finds that the "initial payment" amount totaled $100,000, bringing the agreement outside the scope of the BOPA.  Accordingly, the Court hereby dismisses Count Ten of the Complaint.

## I.      Count Eleven:  Breach of Oral Contract

The Court next turns to Count Eleven of the Complaint alleging breach of oral contract.

In its Motion, TA asserts that a claim based on an oral agreement is only plausible if the parties "manifested an intention to be bound by its terms" and that "these intentions are sufficiently definite to be specifically enforced."  (Doc. No. 11 at PageID #913.)  Thus, TA contends that the "Complaint does not plead facts showing 'sufficiently definite' terms of the purported future agreements," and that DG Gas fails "fail[s] to even allege which of the Additional Sites were the subject of oral agreements."  (*Id.* at PageID #913–14.)  Next, TA submits that the Complaint fails to show that TA "manifested an intention to be bound," and that "statements throughout the FDDs make it clear that TA would not be bound absent a signed, written Franchise Agreement."  (*Id.* at PageID #914.)  TA also asserts that Plaintiffs' own allegations show that "neither DG Gas nor TA believed they had any form of a binding agreement with respect to an Additional Site" because the Complaint alleges that the parties engaged in "continued negotiations over franchise agreement for the [Additional Sites]." (*Id.* at PageID #914–15.)  Further, TA alleges that the statute of frauds bars any oral contract

107

concerning a contract for sale of land or agreement "not to be performed within one year." (*Id.* at PageID #915.)  Finally, TA reiterates its previous arguments under *Centennial Plaza* that a sophisticated party cannot "rely on a statement of future conduct in a complex business transaction." (*Id.*)

In its Opposition, DG Gas submits that the "terms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.'" (Doc. No. 13 at PageID #957.)  DG Gas responds to TA's argument regarding not plausibly alleging "sufficiently definite and certain terms" with the assertion that the terms of an oral contract "must be established by oral testimony and their determination is a question for the trier of fact." (*Id.*)  DG Gas further contends that "only the essential terms must be pled," which includes the "parties to the contract, the subject matter of the contract, and consideration." (*Id.*)  Thus, DG Gas submits that the Complaint clearly alleges these points—namely that the "oral contract was between TA and DG Gas," the agreement "concerned the identification and development of TA Express Centers at the Additional Sites," and that DG Gas would "acquire the land under the Additional Sites and construct or develop the Additional Sites as a TA franchisee pursuant to applicable franchise agreements." (*Id.* at PageID #958.)  Next, DG Gas asserts that the Complaint's mere recognition that additional franchise agreements would be required "does not negate the parties' oral contract to develop the Additional Sites into franchises." (*Id.*)  Finally, DG Gas contends that its claim is not barred by the statute of frauds because it is "entirely possible to investigate an Additional Site and enter into a franchise agreement in less than a year," and because the defense of statute of frauds is a "fact-sensitive affirmative defense" that is not appropriate for 12(b)(6) dismissal. (*Id.* at PageID #958–59.)

In its Reply, TA maintains that the Complaint fails to plead the contents of any alleged oral contract with the requisite level of definiteness, including the "subject matter of the contract." (Doc. No. 17 at PageID #994.)  Specifically, TA points to DG Gas's allegation that it entered into oral contracts for "some or all of the Additional Sites," and submits that "[e]ven Plaintiffs cannot decide if it would be 'some or all.'" (*Id.*)  Thus, TA asserts that DG Gas did not "clearly indicate what the material terms of the oral agreement were" and thus "did not adequately plead the existence of a valid contract." (*Id.* at PageID #995.)  TA next contends that DG Gas failed to address their "failure to plead sufficient facts to show an intention of the parties to be bound by the supposed oral contracts." (*Id.*)  Further, TA submits that DG Gas failed to address that the "alleged oral contract was subject to the statute of frauds as a contract for 'sale of lands … or interest in or concerning them.'" (*Id.*)  Finally, TA asserts that 12(b)(6) dismissal is appropriate where "Plaintiffs themselves plead facts showing that the alleged oral contracts involve a subject matter to which the statu[te] of frauds applies." (*Id.* at PageID #995–96.)

"An oral agreement may be enforceable provided there is sufficient particularity to form a binding contract." *Danzinger & De Llano, LLP v. Morgan Verkamp, LLC*, 2023 WL 3606699, at *7 (1st Dist. May 24, 2023) (citing *Kodu v. Medarametla*, 2016 WL 7131035, at *3 (1st Dist. Dec. 7, 2016)).  "[E]vidence of the exact words of offer and acceptance in proof of an oral contract is not essential … if the words, deeds, acts, and silence of the parties disclose the intent to contract and the terms of the agreement." *Blessing v. Bowersock*, 2000 WL 1808359, at *2 (10th Dist. Dec. 12, 2000) (citing *Rutledge v. Hoffman*, 75 N.E.2d 608 (Ohio 1947)).

"For a contract to be enforceable, there must be a 'meeting of the minds' as to the essential terms of the agreement." *Widok v. Estate of Wolf*, 2020 WL 6504277, at *9 (8th Dist. Nov. 5, 2020);

109

*see also Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) ("A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."). "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." *Cooper v. City of West Carrollton*, 112 N.E.3d 477, 484 (2d Dist. 2018) (citing cases). In other words, "the essential terms of the agreement must be 'reasonably certain and clear' and mutually understood by the parties." *Widok*, 2020 WL 6504277, at *3.

> The Ohio Supreme Court has stressed that:
>
> "A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract."

*Cooper*, 112 N.E.3d at 484 (citing *Rulli v. Fan Co.*, 683 N.E.2d 337, 339 (Ohio 1997)).

The Court finds that DG Gas has failed to plausibly allege an oral contract with sufficient particularity to withstand dismissal. The Complaint alleges that "DG Gas and TA entered into oral contracts for *some or all of the Additional Sites* …." (Compl. at ¶ 195 (emphasis added).) Even construing this allegation in the light most favorable to DG Gas, the terms of the purported oral contract are entirely unclear. For starters, it is unclear how many sites are included in the Additional Sites. Although the Complaint references six sites by name,[95] it provides that the Additional Sites "include[] but [are] not limited to" those sites. (Compl. at ¶ 63.) This creates ambiguity when referenced against the allegation that the parties "entered into oral contracts for some or all of the

---

[95] (*See* Compl. at ¶¶ 63–65 (noting that the Additional Sites include: (i) Macon, GA; (ii) Bowman, SC; (iii) Silver Springs, NV; (iv) Van Buren, AK (purchase contract); (v) Fulton, KY; and (vi) Maysville, KY).)

Additional Sites," in that it is entirely unclear how many oral contracts were entered into.  (Compl. at ¶ 195.)

The same issue would arise even if the Additional Sites were limited to the six named sites—for in that instance, the phrase "some or all of the Additional Sites" could constitute anywhere from one to six oral contracts.[96]  (*Id.*)  In other words, as currently pled, it is unclear whether DG Gas alleges that the parties entered into one, two, three, four, five, or six oral contracts.  (*Id.*)  Nor is it clear which sites are implicated by any of the alleged oral contracts.  (*Id.*)  While the Court recognizes that "the exact words of offer and acceptance in proof of an oral contract is not essential," the bare minimum level of particularity in this case must include how many oral contracts were agreed to and what site locations are the subject of those oral contracts.  *Blessing*, 2000 WL 1808359, at *2.  As acknowledged by DG Gas, the "[e]ssential terms of an oral contract include the identity of the parties to the contract, the subject matter of the contract, and consideration."  (Doc. No. 13 at PageID #958.)  These omitted details certainly constitute the "subject matter of the contract" at even a basic level of specificity.    (*Id.*)    Without this information, the Complaint's "[v]agueness of expression, indefiniteness and uncertainty" fails to demonstrate that "the essential terms of the agreement [were] 'reasonably certain and clear' and mutually understood by the parties."  *Cooper*, 112 N.E.3d at 484; *Widok*, 2020 WL 6504277, at *3.  DG Gas has thus failed to allege an oral contract with "sufficient particularity to form a binding contract."  *Danzinger & De Llano, LLP*, 2023 WL 3606699, at *7.

DG Gas submits that the issue of whether an oral contract was formed "is a fact question resolvable on the pleadings alone."  (Doc. No. 13 at PageID #958.)  Yet courts have not hesitated to

---

[96] *See supra* note 95.

dismiss claims for breach of oral contract at the pleadings stage when not alleged with sufficient particularity. *See, e.g.*, *Setzer v. First Choice Lending Services, LLC*, 2018 WL 7500477, at *4 (6th Cir. Sept. 10, 2018) ("In her amended complaint, … [Plaintiff's] allegations were too general to establish the existence of an oral agreement. She did not, for instance, clearly indicate what the material terms of the oral agreement were …"). The Court thus rejects DG Gas's assertion that dismissal is not appropriate at this stage.

Moreover, even if DG Gas had sufficiently alleged a breach of oral contract, the claim would still fail because it is barred by the statute of frauds as a contract for "sale of lands … or interest in or concerning them." Ohio Rev. Code. § 1335.05. As a preliminary note, DG Gas does not address this argument in its Opposition, instead limiting its statute of frauds discussion to the "one year" rule. (Doc. No. 13 at PageID #957–59.) Nonetheless, Ohio courts have concluded that the "obtaining of a mutual agreeable site for [a] franchise outlet involved the formation of a contract the subject of which was a property interest in land" sufficient to invoke the statute of frauds. *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 652 N.E.2d 218, 224 (8th Dist. 1994). And courts have dismissed breach of contract claims based on the statute of frauds at the motion to dismiss stage when the alleged terms clearly invoke the rule. *See, e.g.*, *Voting Solutions, Inc. v. Deibold, Inc.*, 2009 WL 3242031, at *3 (N.D. Ohio Oct. 2, 2009). Finally, DG Gas has not attempted to argue any exceptions to the statute of frauds in its Opposition.

Accordingly, the Court dismisses Count Eleven of DG Gas's Complaint.[97]

### J. Count Twelve: Rescission or Reformation of the PSA

---

[97] The Court finds it unnecessary to address the parties' remaining arguments.

The Court next turns to Count Twelve of the Complaint requesting recission or reformation of the PSA.

In its Motion, TA asserts that it is not a party to the PSA despite DG Cordelle and DG Real Estate Partners asserting Count Twelve solely against it, and therefore, "no relief against TA can have any effect on the PSA." (Doc. No. 11 at PageID # 915–16.)  TA also contends that Plaintiffs' claim for rescission must fail because their underlying fraudulent inducement claim fails.  (*Id.* at PageID #916.)  Next, TA references Georgia law for the proposition that Plaintiffs were required to return or offer to return the Cordele Site to TA Operating as a prerequisite to rescission and submits that "Plaintiffs' actions were inconsistent with any intent to rescind."  (*Id.*)  Finally, relating to reformation, TA asserts that the Complaint never alleges mistake, and that the "Complaint does not state a viable claim for fraud," thereby preventing reformation.  (*Id.* at PageID #916–17.)

In their Opposition, DG Cordelle and DG Real Estate Partners submit that the "thrust of Defendants' argument is that rescission or reformation is not an available remedy because Plaintiffs' fraud claims fail." (Doc. No. 13 at PageID #959.)  Thus, DG Cordelle and DG Real Estate Partners maintain that they have adequately pled fraud claims, and thus, the "claims for rescission and/or reformation of the PSA may proceed."  (*Id.*)  Finally, DG Cordelle and DG Real Estate Partners submit that the PMPA, as remedial applicable law, permits contracts to be rescinded or reformed. (*Id.*)

In its Reply, TA asserts that DG Cordelle and DG Real Estate Partners failed to respond to: (1) their alleged failure to comply with Georgia law requiring them to have offered to return the Cordele Site; and (2) the argument that TA is not a party to the PSA.  (Doc. No. 17 at PageID #996.)  As to the claim for reformation, TA further contends that DG Cordelle and DG Real Estate Partners

fail to address their failure to allege a mistake relievable in equity.  (*Id.*)  Accordingly, TA maintains that "[f]or these reasons alone, the claim fails."  (*Id.*)

As previously explained, under Georgia law, a "misnomer of a corporation … in a judicial proceeding is not material or vital in its consequences, if the identity of the corporation intended is clear or can be ascertained by proof."  *Spinnaker Int.*, 2019 WL 2016881, at *2.  With respect to Count Twelve, it is clear that TA Operating is the "corporation intended."  *Id.*  Thus, this "misnomer" is not fatal to DG Cordelle and DG Real Estate Partners' claim, and the Court hereby substitutes TA Operating as the appropriate party.  *Id.*

As a preliminary matter, the Court references its above conclusion that Plaintiffs have adequately pled the Fraud Claims.  *See* Section IV.C.  The Court thus rejects TA's argument that Count Twelve must fail because the Fraud Claims fail.  In similar fashion, the Court reiterates that the PMPA is inapplicable to this case.  *See* Section IV.A.  Accordingly, the Court rejects DG Cordelle and DG Real Estate Partners' contention that the PMPA permits rescission or reformation of the PSA.

Under Georgia law, "[a] contract may be rescinded at the instance of the party defrauded." O.C.G.A. § 13-4-60.  However, "in order to rescind, the defrauded party must promptly, upon discovery of the fraud, restore or offer to restore to the other party whatever he has received by virtue of the contract if it is of any value."  *Id.*  Accordingly, "Georgia courts have long recognized that a tender to restore, or offer to restore, the consideration received is a condition precedent to filing a lawsuit for fraud in the inducement."  *Prosper v. Navy Federal Credit Union*, 2022 WL 18780929, at *4 (N.D. Ga. Nov. 16, 2022), *report and recommendation adopted*, 2022 WL 18780943 (N.D. Ga. Dec. 12, 2022); *see also Conway v. Romarion*, 252 Ga. App. 528, 530 (Ga. Ct. App. 2001) ("[T]he

114

aggrieved party must adhere to the intent to rescind and may waive any claim for rescission by failing to do so.").

Similarly, "[r]eformation … is a remedy cognizable in equity for the purpose of correcting an instrument so as to make it express the true intention of the parties, where from some cause, such as fraud, accident, or mistake, it does not express such intention." *City of Atlanta v. Allianz Global Risks US Ins. Co.*, 2014 WL 12061535, at *9 (N.D. Ga. Aug. 8, 2014) (citing Georgia law). Thus, "equity will reform a written instrument for the unilateral mistake of one party accompanied by fraud or inequitable conduct on behalf of the other party." *Layfield v. Sanford*, 247 Ga. 92, 93 (Ga. 1981); *Frame v. Hunter, Maclean, Exley & Dunn, P.C.*, 236 Ga. App. 226, 227 (Ga. Ct. App. 1999). "A mistake relievable in equity is some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence." O.C.G.A. § 23-2-21; *Frame*, 236 Ga. App. at 227. Reformation, however, "does not permit the Court to draft a different contract for the parties." *C &C Family Trust 04/04/05 ex rel. Cox-Ott v. AXA Equitable Life Ins. Co.*, 44 F. Supp.3d 1247, 1261 (N.D. Ga. 2014).

The Court finds that DG Cordelle and DG Real Estate Partners have sufficiently alleged that they "adhere[d] to the intent to rescind" sufficient to survive 12(b)(6) dismissal of their rescission claim. *Conway*, 252 Ga. App. at 530. In this case, TA contends that "Plaintiffs' actions were inconsistent with any intent to rescind." (Doc. No. 11 at PageID #916.) However, the Complaint alleges that after the "improper termination of the FA," TA "refused to invoke" its right of first refusal or option to purchase the Cordele Site. (Compl. at ¶ 105.) Construing the Complaint in the light most favorable to Plaintiffs, and in light of the lenient pleading requirements at the motion to dismiss stage, this alleged refusal to invoke the right to purchase the Cordele Site can be read as alleging that

115

TA expressly "refused to invoke" its right to purchase after being offered the property by Plaintiffs. (*Id.*)  Moreover, Plaintiffs allege that this occurred "after its improper termination of the FA," and as this Court has already determined, Plaintiffs allege that they did not fully discovery the fraud until the FA was finally terminated.  *See* Section IV.C.5.  The Court thus declines to find that there is no interpretation of Plaintiffs' allegations that demonstrates compliance with § 13-4-60.  DG Cordelle and DG Real Estate Partners will need to provide supporting evidence to this effect at the summary judgment stage.  But here, the Complaint's allegations are sufficient to withstand 12(b)(6) dismissal.

The Court similarly finds that dismissal of DG Cordelle and DG Real Estate Partners' request for reformation would be premature.  Contrary to TA's contention, the Complaint plausibly alleges the Fraud Claims.  *See* Section IV.C.  Further, the Complaint references the alleged "material false statements in [the] FDDs" in relation to Count Twelve.  (Compl. at ¶¶ 203–04.)  Additionally, Plaintiffs allege "inequitable conduct" by challenging the Use Restriction as unconscionable in their claim for declaratory judgment.  (Compl. at ¶¶ 182–85.)  Because the above-described claims survive dismissal, DG Cordelle and DG Real Estate Partners have sufficiently alleged an "error arising from ignorance, surprise, imposition, or misplaced confidence" as a result of "fraud or inequitable conduct on behalf of the other party."  § 23-2-21; *City of Atlanta*, 2014 WL 12061535, at *8–9 (denying motion to dismiss for reformation where plaintiff sufficiently alleged fraud and negligent misrepresentation claims).  Accordingly, dismissal would be premature at this stage.

For the foregoing reasons, the Court declines to dismiss Count Twelve and will revisit these arguments at the summary judgment stage.

### K.   Jury Demand

116

The Court next turns to the parties' arguments regarding Plaintiffs' jury demand.  In their Motion, Defendants assert that Plaintiffs waived any right to jury trial in both the FA and PSA.[98] (Doc. No. 11 at PageID #917.)  Defendants indicate that both waiver provision are "in all caps or bold with headings that make clear they waive a jury trial," and that Plaintiffs do not allege or challenge that their consent to the jury waiver provisions were not knowing or voluntary.  (*Id.*)

In their Opposition, Plaintiffs argue that Defendants ignore the Complaint's allegations concerning the Fraud Claims and Additional Sites, which are "not within the scope of the FA." (Doc. No. 13 at PageID #960.)  Plaintiffs further contend that the PMPA sets aside any contractual waiver

---

[98] Section 21.10 of the FA provides as follows:

> "21.10 <u>Waiver of Jury Trial</u>.  IN ANY ACTION OR SUIT BROUGHT BY OR AGAINST YOU OR US (INCLUDING OUR PRESENT OR FORMER AGENTS AND EMPLOYEES, OUR AFFILIATES, AND OUR AFFILIATES' PRESENT OR FORMER AGENTS AND EMPLOYEES), THAT IN ANY WAY ARISES OUT OF OR RELATES TO YOUR FRANCHISE RELATION WITH US, INCLUDING BUT NOT LIMITED TO, ANY AND EVERY ASPECT OF THE PROCESS OF ENTERING INTO SUCH RELATION, THIS AGREEMENT, ANY GUARANTY OR OTHER COLLATERAL AGREEMENTS WITH US OR OUR AFFILIATES, OUR PERFORMANCE IN CONNECTION WITH THE FRANCHISE RELATION, ANY TERMINATION, RESCISSION, CANCELLATION OR NONRENEWAL OF THE FRANCHISE RELATION, AND CONDUCT POST-TERMINATION OR POST-EXPIRATION OF THIS AGREEMENT, YOU AND WE AGREE THAT IN THE EVENT THAT SUCH ACTION IS RESOLVED THROUGH A COURT PROCEEDING, SUCH ACTION WILL BE TRIED TO A COURT WITHOUT A JURY."

(Doc. No. 1-5 at PageID #777.)  Similarly, Section 20(l) of the PSA provides as follows:

> "(l) <u>Jury Waiver</u>.  PURCHASER AND SELLER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER AT CLOSING OR SELLER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY HERETO ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCTED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF SELLER AND PURCHASER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND SHALL SURVIVE THE CLOSIING OF TERMINATION OF THIS AGREEMENT."

(Doc. No. 1-4 at PageID #676–77.)

of jury trial rights. (*Id.*) Finally, Plaintiffs submit that Defendants' request to strike a jury demand is procedurally improper because Defendants only moved under Fed. R. Civ. P. 12(b)(6). (*Id.* at PageID #959–60.)

In their Reply, Defendants reiterate that both the FA and PSA contain jury waivers, and thus, Plaintiffs cannot demand a jury trial for "any claim that is related to or arises under either of those agreements." (Doc. No. 17 at PageID #996.) Finally, Defendants again submit that there is no PMPA relationship here. (*Id.*)

As a preliminary matter, the Court interprets Defendants' Motion on this point as a motion to strike the demand for jury trial pursuant to Fed. R. Civ. P. 12(f). Accordingly, the Court will evaluate whether Plaintiffs contractually waived their right to a jury trial.

"[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law …" *SBAV LP v. Porter Bancorp, Inc.*, 2014 WL 1922874, at *1 (W.D. Ky. May 14, 2014) (citing *Simler v. Conner*, 372 U.S. 221, 222 (1963)); *see also Chesterfield Exchange, LLC v. Sportsman's Warehouse, Inc.*, 528 F. Supp.2d 710, 712 (E.D. Mich. 2007) (citing *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir. 1985)). "Although the right to a jury trial is guaranteed by the Constitution, like other constitutional rights, it can be waived by the parties." *SBAV LP*, 2014 WL 1922874, at *1 (citing *Sewell v. Jefferson Cnty. Fiscal Court*, 863 F.2d 461, 464 (6th Cir. 1988)) (internal quotation marks omitted). "It is clear that the parties to a contract may by prior written agreement waive the right to jury trial." *Id.* (citing *K.M.C. Co.*, 757 F.2d at 755). "For the waiver to be valid, the waiving party must make it knowingly and voluntarily." *Id.* (citing *K.M.C. Co.*, 757 F.2d at 756). "When a contract contains an express jury waiver provision, the party objecting to the

118

provision has the burden of demonstrating that its consent to the waiver was not knowing and voluntary." *Id.*; *see also K.M.C. Co.*, 757 F.2d at 758.

"In the Sixth Circuit, a contractual jury waiver applies to fraud and other tort claims, unless the fraud is alleged to have procured the jury waiver provision itself." *Reed Elsevier Inc. v. Legal Research Center, Inc.*, 2016 WL 3597424, at *10 (S.D. Ohio July 5, 2016). While the Sixth Circuit itself has not addressed the specific issue of whether a general allegation of fraud in the inducement as to the entire contract suspends application of a jury trial waiver in the contract, district courts in the Sixth Circuit have overwhelmingly upheld jury waiver provisions in such cases.[99]

The Court finds that Plaintiffs have waived their right to any jury trial in this case. First, contrary to Plaintiffs' assertions, the PMPA is inapplicable to this case and therefore cannot set aside any contractual waiver of jury trial rights. *See* Section IV.A. Second, while Plaintiffs assert various fraud claims, they do not argue that the "fraud is alleged to have procured the jury waiver provision itself." *Reed Elsevier*, 2016 WL 3597424, at *10. Rather, Plaintiffs incorrectly assert that their general allegations of fraud as to the entire FA negate the jury waiver provision contained therein. (Doc. No. 13 at PageID #960.) Absent a specific allegation of fraud as to the jury waiver provision itself, the jury waiver provision will apply.[100] *See Reed Elsevier*, 2016 WL 3597424, at *10. Third, Plaintiffs submit that its Fraud Claims and claims concerning the Additional Sites fall outside the scope of the jury waiver provisions contained in the FA and PSA. (Doc. No. 13 at PageID #960.)

---

[99] *See, e.g.*, *MTR Capital, LLC v. LaVida Massage Franchise Dev., Inc.*, 2019 WL 1455240, at *2 (E.D. Mich. Apr. 2, 2019); *Reed Elsevier*, 2016 WL 3597424, at *10–11; *SBAV LP*, 2014 WL 1922874, at *2–3; *MSCI 2007-IQ16 Retail 9654, LLC v. Dragul*, 2014 WL 3342570, at *2 (S.D. Ohio July 8, 2014); *Chesterfield Exchange*, 528 F. Supp.2d at 714–15; *Pacifica Loan Five, LLC v. Fifth Third Bank*, 2010 WL 11561272, at *1–2 (S.D. Ohio Aug. 11, 2010).

[100] *See supra* note 99.

119

However, the jury waiver provisions apply to claims that "in any way arise[] out of or relate[] to" the FA or are "in connection with" the PSA.  (Doc. No. 1-5 at PageID #777; Doc. No. 1-4 at PageID #676.)  Plaintiffs' fraud and Additional Sites claims clearly "relate" to or are "in connection with" the FA and PSA.  Finally, Plaintiffs make no attempt to argue that their "consent to the waiver was not knowing and voluntary."[101]  *SBAV LP*, 2014 WL 1922871, at *1.

Therefore, consistent with the numerous courts in this circuit that have addressed the issue, the Court finds that Plaintiffs have waived their right to a jury trial on all claims.  Accordingly, the Court grants Defendants' motion to strike the jury demand.

### L.    Requests for Punitive Damages

Finally, the Court turns to the parties' arguments regarding Plaintiffs' requests for punitive damages.  In their Motion, Defendants submit that the prayer for punitive damages should be stricken because "DG Gas expressly agreed to 'Waiver of Punitive Damages.'" (Doc. No. 11 at PageID #918.)  In their Opposition, Plaintiffs contend that "Defendants' argument makes sense only if Defendants are correct that the PMPA does not apply."  (Doc. No. 13 at PageID #960–61.)  However, Plaintiffs assert that the franchise agreement is "subject to the PMPA" both "by the terms of the [FA]" and because the "PMPA is 'applicable law' that is incorporated into the FA," and thus, the "PMPA overrides the FA's punitive damages waiver provision."  (*Id.*)  In their Reply, Defendants note that Plaintiffs "appear to concede that punitive damages are waived, unless the PMPA applies," and reiterate that the requests for punitive damages should be stricken.  (Doc. No. 17 at PageID #996.)

---

[101] *Cf. L.A. Ins. Agency Franchising, LLC v. Montes*, 2015 WL 9314738, at *2 (E.D. Mich. Dec. 23, 2015) (finding jury waiver unenforceable based on excessive allegations of "alleged unequal bargaining power" between the parties that prevented any knowing and voluntary waiver).

As explained at length above, the PMPA is inapplicable to this case.  *See* Section IV.A. Accordingly, in light of Plaintiffs' concession that punitive damages are improper absent a finding that the PMPA applies, the Court hereby strikes the requests for punitive damages.

**V.  Conclusion**

For the reasons set forth above, Defendants' Motion to Dismiss (Doc. No. 11) is **GRANTED IN PART** and **DENIED IN PART**.  The Court **GRANTS** Defendants' Motion to Dismiss as to Count One, Count Six, Count Seven, Count Ten, and Count Eleven.  The Court **DENIES** Defendants' Motion to Dismiss as to Count Two, Count Three, Count Four, Count Five, Count Eight, Count Nine, and Count Twelve.  The Court **STRIKES** Plaintiffs' requests for jury demand and punitive damages.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  March 14, 2025                    U. S. DISTRICT JUDGE

121